UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x

UNITED STATES OF AMERICA,

    -against-                                        S7 98 Cr. 1023 (LAK)

KHALID AL FAWWAZ, *et al.*,

    Defendants.

-----------------------------------------------------x


# MOTION FOR ISSUANCE OF LETTERS ROGATORY TO THE UNITED KINGDOM AND FOR RULE 15 DEPOSITIONS OF WITNESS PAUL BANNER AND ANOTHER MI5 AGENT AND MEMORANDUM OF LAW IN SUPPORT THEREOF


ATTORNEYS FOR KHALID AL FAWWAZ

| | |
|---|---|
| Bobbi C. Sternheim, Esq. | David V. Kirby, Esq. |
| Law Offices of Bobbi C. Sternheim | Barbara E. O'Connor, Esq. |
| 33 West 19th Street – 4th Floor | O'Connor & Kirby, PC |
| New York, NY 10011 | 174 Battery Street |
| 212-243-1100 | Burlington, VT 05401 |
| | 802-863-5655 |

## MOTION FOR LETTERS ROGATORY TO THE UNITED KINGDOM
## AND TO ALLOW A RULE 15 DEPOSITION OF WITNESS PAUL BANNER
## AND ANOTHER SECURITY SERVICE (MI5) AGENT

Khalid Al Fawwaz, through his counsel, hereby moves for the issuance of Letters Rogatory to the courts of the United Kingdom for assistance in obtaining testimony from Security Service (MI5) Agent Paul Banner and from the agent who replaced him in dealing with Mr. Al Fawwaz.  This Court has issued Letters Rogatory to the United Kingdom for: (1) All documents that concern or memorialize any and all conversations between MI5 officers (including Mr. Paul Banner) and Mr. Al Fawwaz during the period 1994 to 1998; and (2) All recordings obtained from any electronic surveillance of Khalid Al Fawwaz's home and/or telephones and/or of the Advice and Reformation Committee's telephones during the period 1994 to 1998.  The defense had requested that Letters Rogatory be issued also for the testimony of Agent Banner.  The Court denied that request without prejudice to our renewing it by September 16, 2013.  We hereby respectfully renew that request and enlarge it to apply to the MI5 agent who replaced Mr. Banner in dealing with Mr. Al Fawwaz.

Mr. Al Fawwaz further moves under Rule 15, Fed.R.Crim.P., that the Court order depositions of these witness to be taken in the United Kingdom either through the compulsion of the British courts pursuant to the Letters Rogatory or, if possible, through informal procedures established between the parties.  The testimony sought is exculpatory, it cannot be obtained from any other source, and it is necessary to provide Mr. Al Fawwaz with a fair trial.

### Factual Support for this Request

**The Allegations and Countervailing Evidence.**  Indictment S7 98 Cr. 1023 (LAK) is a massive indictment containing a total of 308 counts, including several conspiracies and 270 separate counts of murder.  Khalid Al Fawwaz is charged only in four conspiracy counts (One,

Three, Five and Six) with conspiring, as an alleged member of al Qaeda along with Usama Bin Laden and others, to kill Americans worldwide and destroy United States embassies and defense utilities.

From 1994 until his arrest in 1998, Mr. Al Fawwaz headed the London office of the Advice and Reformation Committee (ARC), a Saudi dissident group actively pursuing peaceful reform of the Saudi government.  The Consultative Council of the ARC was made up of numerous Saudi dissidents who remained anonymous because of the danger of retaliation from the Saudi government they faced as dissidents living in Saudi Arabia.  The only publicly acknowledged members were Bin Laden and Mr. Al Fawwaz.  Being publically acknowledged as a dissident placed Mr. Al Fawwaz in grave danger from the Saudi security services because dissent is violently repressed in Saudi Arabia.  Indeed, part of the information sought from the MI5 materials concerns a Saudi plot to kill Mr. Al Fawwaz and other Saudi dissidents that Mr. Al Fawwaz learned of from MI5 Agent Paul Banner who was apparently concerned for Mr. Al Fawwaz's safety.

In the extradition proceedings and in the indictment, the government alleges that Mr. Al Fawwaz's position as London representative of the Advice and Reformation Committee was a "front" for Al Qaeda activities.  The government also cited the security measures that Mr. Al Fawwaz took to protect the identities of other members of the Advice and Reformation Committee as indicia of his role as an Al Qaeda member.

The government also alleged in the extradition proceedings that Mr. Al Fawwaz pledged bayat (unconditional loyalty) to Bin Laden.

**Interactions with MI5 and Paul Banner.**  Shortly after Mr. Al Fawwaz arrived in the United Kingdom, Paul Banner approached him and proposed that they meet and talk.  They met

3

in Room 030 of the Old War Office Building in Whitehall (a British government building).[1] Banner explained that he was with MI5 and proposed that he and Mr. Al Fawwaz meet regularly. These meetings occurred, spanning the entire four years prior to his arrest in 1998, sometimes at Room 030, but often at hotels in and around London. When the meetings took place outside of government buildings, other agents would be present at the hotel to meet Mr. Al Fawwaz and escort him to the room for the meeting with Agent Banner or his replacement.

In approximately 1998, Agent Banner introduced Mr. Al Fawwaz to another agent, purportedly MI5, whose name Mr. Al Fawwaz has forgotten. This agent took over for Agent Banner in meeting with Mr. Al Fawwaz.

The meetings, always prearranged by Mr. Banner or one of his colleagues, would last at times up to three hours. Mr. Al Fawwaz discussed his political and religious views, his role with the Advice and Reformation Committee, security issues, the plight of Muslims in different regions around the world and similar issues. Throughout, Mr. Al Fawwaz expressed his commitment and desire to secure peace with the Saudi Government for all Muslims without recourse to any violence or other unlawful activity. Detailed notes were made by the officers in the course of meetings.

Mr. Banner also informed Mr. Al Fawwaz at various times that MI5 was concerned for his security. On one particular occasion, Mr. Al Fawwaz was told that he, along with other Saudi dissidents, were the targets of an assassination plot. Mr. Al Fawwaz was specifically told that the plot had been hatched by the United States authorities, that the exercise was funded by

---

[1] In an address book seized at his home, Mr. Al Fawwaz posted an entry for Paul Banner (misspelled as "Bonner"). The entry provides a telephone number and notes "030" "Old War Office Bilding [sic]".

the Saudi regime and that Moroccan agents had been engaged to carry out the proposed executions.

Mr. Banner offered advice on steps Mr. Al Fawwaz could take for his personal safety. He also offered to provide bodyguards and to survey his home to consider what measures could be taken to improve security. Mr. Al Fawwaz was advised as to various measures he could take to guard against an attack.

Following the publication and circulation of the declaration made by Bin Laden in 1996, Mr. Al Fawwaz was interviewed by Mr. Banner. Mr. Al Fawwaz was unequivocal with respect to his position. He stated in no uncertain terms that he did not support or advocate any violence. He reiterated his role in the ARC as a reformer solely concerned with peaceful reform within Saudi Arabia. He also made it clear that the ARC as a whole was exclusively committed to peaceful reform (within Saudi Arabia). Although Bin Laden had been one of the founding members of the ARC, following the publication of the August 1996 declaration, both Mr. Al Fawwaz and other members of the ARC made it clear that Bin Laden had diverged from the goals of the ARC and thus diverged from the path of the reformers (including Mr. Al Fawwaz).

Examples of specific interactions with Mr. Banner include an instance when Mr. Al Fawwaz asked him whether it would be permissible to communicate with Bin Laden (after Bin Laden moved from Sudan to Afghanistan). The context of any such communications would have been to further the ARC's declared peaceful aims. Notably, this question was put to Mr. Banner prior to the 1996 declaration by Bin Laden. Mr. Al Fawwaz subsequently confirmed to Mr. Banner that he did not have any idea that such a declaration, one that diverged dramatically from the ARC's goals, was about to be released.

Mr. Al Fawwaz made it clear to Mr. Banner that he wished to remain in contact with the Consultative Council of the ARC in order to discuss issues relating to the reform movement. Mr. Banner advised Mr. Al Fawwaz that there was no objection to such communications or contact so long as there was no discussion involving any criminal conduct. Mr. Banner reiterated that communications by themselves were not unlawful. Mr. Al Fawwaz made a point of stating to Mr. Banner that if Banner's or the MI5's views changed then he wished to be notified immediately as he was acutely conscious of not placing himself in a position where he "did anything against the law".

Mr. Al Fawwaz noted that the frequency of meetings with MI5 increased after the 1996 declaration was published. Mr. Banner met with Mr. Al Fawwaz following the publication of the 1996 declaration in Al Quds, an Arabic language newspaper. Mr. Al Fawwaz recalls that a further meeting was held after an additional article was published in the Independent newspaper (also concerning the 1996 declaration). Mr. Al Fawwaz enquired, once again, whether it was permissible for him to communicate with Bin Laden. Mr. Banner informed Mr. Al Fawwaz that there continued to be no objection to this. However, he told Mr. Al Fawwaz what could be a problem was "what you discuss with him". Mr. Banner elaborated by explaining that anything which was "against the law . . . could be a . . . problem". Mr. Banner suggested that, if Mr. Al Fawwaz had any doubt, he ought to seek legal advice.

Mr. Al Fawwaz told Mr. Banner that he wanted to seek an explanation concerning the release of the 1996 declaration without his knowledge or consent. Mr. Al Fawwaz and other ARC members were angry. They felt Bin Laden had jeopardized the mission of the ARC. Mr. Al Fawwaz was shocked. He wanted to know why Bin Laden had diverged from the ARC's unequivocal commitment to advising Saudi rulers on the benefits of change, peacefully so.

6

**The Extradition Proceedings**

During the extradition proceedings in the UK, counsel for Mr. Al Fawwaz requested that the court subpoena MI5 and Paul Banner to provide evidence about the relationship between Mr. Al Fawwaz and MI5. The court agreed. Thereafter, counsel for MI5 appeared at the proceedings accompanied by an MI5 officer carrying a substantial file. Counsel informed the parties that Mr. Banner was out of the country. The file was ultimately not reviewed or testimony obtained because Mr. Banner, the officer with first-hand knowledge, was not present.

**The Testimony to Be Obtained from Paul Banner and the Agent who replaced him in interactions with Mr. Al Fawwaz.**

Mr. Al Fawwaz seeks to obtain through letters rogatory the testimony of Mr. Paul Banner and the agent who replaced him in his interactions with Mr. Al Fawwaz to identify and authenticate the MI5 information already subject to the prior letters rogatory and to discuss the interactions with Mr. Al Fawwaz.

**MEMORANDUM OF LAW**

**The Testimony of Paul Banner is Exculpatory and Necessary for a Fair Trial.**

Unquestionably, Mr. Al Fawwaz had numerous contacts with members of MI5. These contacts were entirely voluntary on Mr. Al Fawwaz's part. The content of the conversations between Mr. Banner and Mr. Al Fawwaz are crucial to Mr. Al Fawwaz's defense. We are informed and believe fully that the conversations are exculpatory. They establish the legitimacy of the ARC, its peaceful purposes and Mr. Al Fawwaz's role in the organization. They demonstrate the lengths to which Mr. Al Fawwaz would go to make sure his conduct in the United Kingdom was proper and legal. These contacts are the antithesis of an undercover terrorist operative and demonstrate Mr. Al Fawwaz's openness and good faith. Indeed, Mr. Al

7

Fawwaz asked if his contacts with Bin Laden were permissible and received the answer that they were so long as criminal matters were not discussed. It simply defies belief that someone who knew that Bin Laden was planning to orchestrate an attack on US embassies would so openly disclose his close association with Bin Laden. These conversations will also disclose the particular interest of the British in the Saudi dissident movements located in London.

Moreover, these conversations undermine the government's claim that Mr. Al Fawwaz pledged bayat (unconditional loyalty) to Bin Laden. Mr. Al Fawwaz, on numerous occasions during these conversations with Mr. Banner, expressed his disagreement with Bin Laden's turn toward violence and his declaration and fatwah. Mr. Al Fawwaz expressed his distress that Bin Laden unilaterally issued his Declaration in 1996. Mr. Al Fawwaz felt that this undermined all the work he was doing through the ARC and discredited the message of peaceful change that the ARC was promoting. These statements are not those of a man who has pledged unconditional loyalty to Bin Laden.

Further, the fact that the British intelligence services warned Mr. Al Fawwaz of a plot to assassinate him and other Saudi dissidents is particularly relevant to the defense. This would corroborate the dangers that members of legitimate dissident groups like the ARC faced, and continue to face, from the Saudi government. Many of the activities that the government characterizes as surreptitious and as indicia of criminality are simply normal precautions that a Saudi dissident group like the ARC would take in light of the dangers posed by the Saudi security services. For instance, the government suggests that Mr. Al Fawwaz ran an MCI phone line to aid secret contact with al Qaeda members. We argue, on the contrary, that the Consultative Council members of the Advice and Reformation Committee who lived in Saudi Arabia were in extreme danger from the Saudi security services simply for being dissidents, and

that the MCI phone line was obtained to provide a safe way that could not be tracked by the security services for those members of the ARC in Saudi to contact the London office. The Saudi funded assassination plot to kill three prominent dissidents in London corroborates that danger. These men were not targeted because they were al Qaeda; they were targeted because they were dissidents clamoring against the corruption and the repressive and undemocratic policies of the Saudi government.

   We seek the testimony of Mr. Banner and the agent who replaced him in dealing with Mr. Al Fawwaz only in so far as it is necessary to authenticate the materials from MI5 and to elucidate the conversations they had with Mr. Al Fawwaz. We do not seek to "rummage" through MI5's files or through Mr. Banner's or his colleague's memories not related to these areas. Such testimony will be crucial to authenticate tape recordings of the meetings (if such exist) or to describe those conversations from memory or, if the agents do not remember some conversations, introduce the notes of the conversations through the past recollection recorded exception to the hearsay rule. Fed.R.Evid. 803(5).

   It is important to note that the request for testimony concerning the interaction between Mr. Al Fawwaz and MI5 does not invade the intelligence gathering functions of the UK government. While general intelligence information on Mr. Al Fawwaz would be valuable, our request has been narrowed to simply the testimony concerning the interactions between Mr. Al Fawwaz and Agent Banner and his replacement. Mr. Al Fawwaz was present for those meetings and certainly has a right to disclose the contents of the meetings. Revelation of the existence and content of those conversations does not in any way undermine the intelligence gathering function; indeed, the existence and content have already been revealed by counsel for Mr. Al Fawwaz in the extradition proceedings; and in part, confirmed by the UK government in

9

responding to the subpoena in the extradition proceedings.[2]

**The Request for Letters Rogatory and a Deposition under Rule 15 Should Be Granted**

This Court has discretion to issue Letters Rogatory to the courts of the UK for the materials and testimony requested:

> Federal courts have both statutory and inherent authority to issue letters rogatory, regardless of whether the case is civil or criminal. *See* 28 U.S.C. § 1781; *United States v. Staples*, 256 F.2d 290, 292 (9th Cir.1958), *United States v. Steele*, 685 F.2d 793, 802 (3d Cir.1982). And, it is also settled that the decision to issue letters rogatory lies within a court's sound discretion. *See United States v. Mason*, 919 F.2d 139 (4th Cir.1990) (unpublished *per curiam* decision) (citing *Leasco Data Processing Equip. Corp. v. Maxwell*, 63 F.R.D. 94 (S.D.N.Y.1973)). *Accord U.S. v. Liner*, 435 F.3d 920, 924 (8th Cir.2006) (denial of letters rogatory reviewed for abuse of discretion). In general, "[w]here the relevancy or materiality of the testimony sought is doubtful, the court should not grant the application" for letters rogatory. 26B C.J.S. Depositions § 34 (internal citations omitted). Instead, letters rogatory should be issued only where "necessary and convenient."

*United State v. Rosen*, 240 F.R.D. 204, 215 (EDVa 2007) (final citation omitted); *see also* 28 USC § 1781. As we have shown above, the testimony is relevant and material to Mr. Al Fawwaz's defense. Indeed, it is substantially exculpatory. Thus, it is critical to his defense.

Similarly, Rule 15 depositions should only be taken in "exceptional circumstances and in the interests of justice." Fed.R.Crim.P. 15(a)(1). "It is well-settled that the 'exceptional circumstances' required to justify the deposition of a prospective witness are present if that witness' testimony is material to the case and if the witness is unavailable to appear at trial. *United States v. Singleton*, 460 F.2d 1148, 1154 (2d Cir.1972)." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984). "Unavailability is to be determined according to the practical

---

[2] Indeed, the UK government appeared to be prepared to allow the defense to view materials from MI5's files and to examine an officer of MI5 about those materials at the extradition proceedings. Thus, it seems fair to say that the UK government has indicated by responding to the subpoena that it is not taking the position that its national security would be compromised if the materials were released or an agent testified about the interactions.

standard of whether under the circumstances the [party] has made a good-faith effort to produce the person to testify at trial. *See Ohio v. Roberts*, 448 U.S. 56, 74 (1979)." *Id.*

Here we have met both these criteria. London counsel for Mr. Al Fawwaz has attempted to reach Mr. Banner but cannot even find a telephone number for the Security Service. Counsel did, however, find a website on which a request to MI5 can be left. We have left such a request for Mr. Banner on the website asking that he agree to come to the United States to testify at trial. We further requested that a dialogue be started that might lead to clarifying whether Banner will be willing to come or whether the agency will be willing to allow his attendance. Since we do not have the name of the replacement agent, we cannot make a similar request for him.

We do not expect that these requests will be fruitful. It seems fair to posit that MI5 will not want its agents testifying in the courts of another country. Responding to a deposition in the United Kingdom before a UK court is far different. Under those circumstances, MI5 could be assured that it would have the ability to protect its national security interests. In the courts of another country, it would not receive the same level of assurance. While we will report to the Court any response from MI5 through the website request, it seems fair to conclude that Agent Banner and his replacement are unavailable to us for purposes of testimony at trial.

As we have shown, the testimony of Paul Banner and of the agent who replaced him in dealing with Mr. Al Fawwaz is crucial for Mr. Al Fawwaz's defense. Such testimony is relevant and material to establishing who Mr. Al Fawwaz is and what he was doing in London and elsewhere during the events of this case. Indeed, the testimony contradicts any suggestion that he gave bayat to Bin Laden. It also explains numerous of the measures that Mr. Al Fawwaz took to protect communications with the ARC Consultative Counsel, which the government has alleged are indicia of membership in Al Qaeda. The testimony, establishing and authenticating

as it does, the relationship between MI5 and Mr. Al Fawwaz is both material and exculpatory.

As such, we request that the Court issue the requested Letters Rogatory and authorize the requested depositions under Rule 15. A proposed Letters Rogatory is attached.

## **CONCLUSION**

For the above-stated reasons, it is respectfully requested that the Court grant the relief requested.

Dated: New York, New York

September 15, 2013

> Respectfully submitted,
> ATTORNEYS FOR KHALID AL FAWWAZ
>
> *Bobbi C. Sternheim*
> Bobbi C. Sternheim, Esq.
>
> *David V. Kirby*
> David V. Kirby, Esq.
>
> *Barbara E. O'Connor*
> Barbara E. O'Connor, Esq.