UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,


                    -against-                                    S7 98-cr-1023 (LAK)


KHALID AL FAWWAZ,

                          Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OPINION REGARDING
DENIAL OF MOTION TO ADJOURN TRIAL**


    Appearances:

                    Sean S. Buckley
                    Adam Fee
                    Nicholas J. Lewin
                    Stephen J. Ritchin
                    Assistant United States Attorneys
                    Preet Bharara
                    UNITED STATES ATTORNEY

                    Bobbi C. Sternheim
                    John Robinson
                    LAW OFFICES OF BOBBI C. STERNHEIM

                    David V. Kirby
                    Barbara E. O'Connor
                    O'CONNOR & KIRBY, PC

                    *Attorneys for Defendant Khalid al Fawwaz*

*Table of Contents*

*Facts*.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

  The Extradition of Al Fawwaz.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    Initial U.K. Litigation – Al Fawwaz Decided Not to Pursue Alleged MI5
      Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    U.K. Events After the House of Lords Decision – 2001 through 2009. . . . . . . . . 8

    The European Court of Human Rights – 2010 - 2012.. . . . . . . . . . . . . . . . . . . . 8

    The Second U.K. Judicial Review Action – 2012. . . . . . . . . . . . . . . . . . . . . . . . 9

  Relevant Prior Proceedings in this Court.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    The Indictment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    The Schedule and the Present Motion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    The Alleged MI5 Material and Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    The Computer Discs Seized From Al Fawwaz's Apartment.. . . . . . . . . . . . . . . . 19

*Discussion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

  I.   The Legal Standard Governing Adjournments and Continuances. . . . . . . . . . . . . 22

    A.   Adjournments and Continuances Are Committed to Trial Court Discretion.22

    B.   Trial Courts Evaluate Such Requests in Light of All the Circumstances.. . . 23

      1.   Supreme Court Precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      2.   Second Circuit Precedent.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

  II.   The U.K. Lawsuit Is Not Sufficiently Likely to Result in Evidence Helpful to
      Al Fawwaz, Let Alone to Do So in Any Reasonable Period of Time. . . . 27

  III.  Any Difficulties Accessing Files on Computer Discs Seized From Al Fawwaz's
      Apartment Did Not Warrant a Further Postponement. . . . . . . . . . . . . . . 36

  IV.  Al Fawwaz's Other Assertions Were Unpersuasive. . . . . . . . . . . . . . . . . . . . . . . 37

    A.   Client Review of Documents.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

    B.   The Death of Al Liby.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

    C.   The Surveillance Reports.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

  V.   The Public Interest in Adhering to the Previously Adjourned Trial Date. . . . . . . 43

*Conclusion*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

LEWIS A. KAPLAN, *District Judge.*

In August 1998, the United States embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania, were bombed. Two hundred twenty-four people were killed and thousands injured.

Khalid al Fawwaz, then a resident of London, England, was charged here in 1998 with conspiring with Usama bin Laden and others to murder American citizens and to bomb the U.S. embassies in Nairobi and Dar es Salaam as well as other U.S. facilities. The United States promptly sought his extradition, and al Fawwaz was arrested in England.

Al Fawwaz, as was his right, fiercely resisted extradition to this country. After a fourteen-year battle, much of it consumed with extensive litigation and other efforts initiated by al Fawwaz, he finally was extradited and presented in this Court on October 6, 2012.[1] The case initially was set for trial on October 7, 2013. After several postponements, most at al Fawwaz's request, the trial was scheduled to commence on January 12, 2015. Nevertheless, al Fawwaz sought yet another adjournment.[2] The Court delayed the start until January 20, 2015[3] but denied any further postponement. This opinion gives its reasons.

---

[1]

As two justices of the Queen's Bench Division of the U.K. High Court put it in rejecting al Fawwaz's final attempt in the U.K. courts to block his extradition, "each of these claimants [al Fawwaz and a co-defendant who subsequently pleaded guilty in this Court] long ago exhausted the procedures in the United Kingdom. They then applied to the European Court of Human Rights on a number of matters. That failed. There can be no doubt that each has, over the many years, either taken or had the opportunity to take every conceivable point to prevent his extradition to the United States." *Hamza v. Sec'y of State for the Home Dep't*, [2012] EWHC (QB) 2736 [20] (Eng.).

[2]

Ltr. from B. Sternheim to Court (Jan. 5, 2015) (under seal) [DI 1824]; Raja Decl. (Jan. 5, 2015) (under seal) [DI 1825] (hereinafter "Raja Decl. (2015)"); Joslin Decl. (Jan. 5, 2015) (under seal) [DI 1826] (hereinafter "Joslin Decl.").

[3]

Ltr. from S. Ritchin to Court (Jan. 5, 2015) [DI 1847]; Jan. 6, 2015 Tr. [DI 1896], 8:1-11.

In summary, al Fawwaz requested a delay in his trial on two principal grounds: (1) to await developments in his already-dismissed action against the British Home Secretary with respect to certain letters rogatory of which the United Kingdom had denied enforcement on the grounds of national security, and (2) to examine a small number of initially unreadable electronic files in the hope that they might be helpful to his defense.

In relevant part, the letters rogatory sought documents from the United Kingdom Security Service, formerly known as MI5, and testimony from two alleged MI5 agents, one identified by defense counsel as Paul Banner and the other unnamed. They were issued – without opposition by the government – in response to al Fawwaz's contention that he was approached by Banner shortly after al Fawwaz arrived in the United Kingdom, that he met frequently with Banner, and that he made clear to Banner that his objective was merely to secure peace with the Saudi government without recourse to violence or other unlawful activity.[4]  But two justices of the High Court of England and Wales on December 19, 2014 unanimously dismissed al Fawwaz's case on the merits.  Written judgments (in our parlance, opinions) – one public and the other sealed on British national security grounds and hence unavailable to this Court or the parties here – will follow at some point.  Al Fawwaz asked that the trial be delayed pending his receipt of the public judgment and his evaluation of whether to seek permission to appeal to the U.K. Court of Appeal.[5]

---

[4]  Al Fawwaz Mot. for Issuance of Ltrs. Rogatory (July 2, 2013) [DI 1248], at 3.

[5]  While he did not so request, the motion, had it been granted, likely would have been a precursor of future requests for additional postponements of the trial pending the filing of requests for permission to appeal, the outcome of any appeal if permission were granted, and exhaustion of any further appellate rights by al Fawwaz and, had he ever prevailed at any stage, by the British government.

The question before the Court was whether and to what extent the trial of this sixteen-year-old criminal case should be postponed still further based on al Fawwaz's hope that judicial review of the British government's denial of enforcement of the letters rogatory, on national security grounds – a lawsuit that he already had lost at the court of first and, absent permission to appeal, last instance – ultimately might result in his obtaining useful evidence. The Court concluded that the possibility of anything helpful to al Fawwaz being secured through the United Kingdom litigation was exceptionally speculative.

The second of al Fawwaz's principal arguments was that he had difficulty in opening, at least in readable form, some computer files containing images of the contents of a number of computer discs that were seized from his home by British police in 1998 – images that had been in his possession since July 2013 and to which the defense team gave almost no attention until July 2014. The details with respect to the alleged technical problems concerning these floppy discs and other electronically stored information were many. In the last analysis, however, the facts were clear and the outcome did not depend upon complex technology. Al Fawwaz offered no persuasive reason to believe that there was anything in any unreadable portions of these files, if indeed any were unreadable in the end, that would be helpful to his defense or, for that matter, even relevant to the case.

In sum, then, the Court was asked to grant a further delay, essentially on the ground that it might have resulted in al Fawwaz finding exculpatory or helpful evidence. But there was no reason to believe that any such evidence existed or, if it existed, that it would be obtained, no matter how long a postponement were granted. The Court had no reason to conclude that al Fawwaz was likely to prevail in the British lawsuit or, even if he were to prevail, that any helpful evidence would be found. Nor did it have any reason to conclude that further time would result in the discovery of

anything useful to his defense in the allegedly unreadable computer files in which al Fawwaz claimed such a keen, but indisputably belated, interest. And there were competing claims that supported trying this case at long last:

- Al Fawwaz is charged with crimes that culminated in 1998. The victims, their families, and the cause of justice were entitled to closure. The sixteen-year delay had been too long already.

- Every day that passed threatened harm to the case, as memories fade and the inevitable toll of our mortality threatened witnesses.

- Finally, "[a] defendant is entitled to a fair trial but not a perfect one,"[6] "for there are no perfect trials."[7] Al Fawwaz had been afforded several postponements and ultimately was provided the opportunity for a fair trial. A fair trial – not perfection – was the measure of his entitlement.

The Court nonetheless granted, upon the government's consent, a postponement of the trial from January 12 until January 20, 2015. Following oral argument on January 14, 2015, the Court denied the motion in all other respects.[8] As noted, this opinion sets forth the reasons for that decision.

---

[6] *Lutwak v. United States*, 344 U.S. 604, 609 (1953).

[7] *Brown v. United States*, 411 U.S. 223, 232 (1973).

[8] Order (Jan. 14, 2015) [DI 1851].

*Facts*

We take up first al Fawwaz's request to delay the trial still further to await developments in his already-dismissed action against the British Home Secretary with respect to the portions of the letters rogatory seeking evidence from MI5 concerning his alleged dealings with that agency more than seventeen years ago. This in turn implicates his efforts to prevent his extradition to the United States.

*The Extradition of Al Fawwaz*

*Initial U.K. Litigation – Al Fawwaz Decided Not to Pursue Alleged MI5 Evidence*

Al Fawwaz first was charged in 1998. The United States promptly requested his extradition on charges of conspiring to murder Americans and conspiring to bomb U.S. embassies and installations.[9] Al Fawwaz resisted before the British courts, but the House of Lords in 2001 affirmed the lower court decision denying relief.[10]

Most of the details of the initial U.K. litigation need not detain us, but one is quite relevant in the present context. Al Fawwaz initially relied in the extradition proceeding upon the same contentions he made in this motion concerning his alleged interactions with Banner and MI5. But he ultimately elected not to obtain such evidence, despite the availability of a witness who purportedly brought the MI5 file.

---

[9]

*R. (Al-Fawwaz) v. Governor of Brixton Prison*, [2001] 1 W.L.R. 1234 [1]-[6] (QB) (Eng.) (hereinafter "*Al-Fawwaz I*").

[10]

*R.(Al-Fawwaz) v. Governor of Brixton Prison,* [2001] U.K.H.L. 69, [2002] A.C. 556 (appeal taken from Eng.) (hereinafter "*Al-Fawwaz II*").

Once al Fawwaz was arrested pursuant to the extradition request, there was a hearing before a British magistrate at which evidence was taken to determine whether there was a *prima facie* case against al Fawwaz and, in consequence, whether the extradition request should be granted.[11] Witnesses were examined. And it was at that hearing that al Fawwaz had the opportunity referred to but elected not to pursue the matter.

The solicitor who represented al Fawwaz in the extradition proceedings – and who represents him in the current British litigation – submitted here a declaration in which he stated:[12]

> 2. I confirm that I have acted as one of Mr Al Fawaz'[s] lawyers in the United Kingdom throughout the duration of the extradition proceedings initiated by the Unite[d] States government.
>
> 3. I make this declaration with specific reference to the application for a witness summons made to the Magistrate in the course of the committal proceedings in September 1999 requiring the attendance at Court by Paul Banner, an MI5 officer.
>
> 4. Mr. Banner's attendance was sought to address the following issues (which were also set out in the application for the witness summons);
>
> **(i) That he was a member of M15;**
>
> **(ii) That he had numerous meetings with Mr. Al Fawaz, some at the Old War Office Building, others in numerous hotels since Mr. Al Fawaz arrived in the UK in 1994;**
>
> **(iii) That at one point at these meetings, Mr. Banner warned Mr. Al Fawaz that there was an assassination plot against Mr. Al Fawaz and two other Saudi dissidents that posed a serious threat to his safety; that this threat was known to Mr. Banner to come from the Saudi government and other governments; and that Ml5 had warned the Saudi Embassy against any attack on Mr. Al Fawaz on British soil;**

---

[11] *Al-Fawwaz I*, [2001] 1 W.L.R. at 1237 [7].

[12] Raja Decl. (May 19, 2013) [DI 1248-1] ¶¶ 2-9 (bold emphasis in original, italics added).

**(iv) That Mr. Banner advised Mr. Al Fawaz as to the precautions he should take to protect his own safety. Mr. Banner further offered the services of MI5 officers to visit Mr. Al Fawaz's premises and assist in this regard;**

**(v) That Mr. Al Fawaz complained about the fact that his home telephone number was monitored, but that he had made it clear that he did not object to the ARC number being monitored;**

**(vi) That his phone was in fact monitored and nothing to connect him with any terrorist activity was detected;**

**(vii) That in his conversations Mr[.] Al Fawaz gave an in depth account of ARC's activities, and made it clear that the organisation was "committed to peaceful change."**

5. Mr. David Perry QC was instructed on behalf of the Home Office/MI5.

6. Mr. Perry appeared before the Magistrate and stated that Mr. Banner was not in the jurisdiction at the time. *Instead, he confirmed, another officer had attended Court and had brought the MI5 file.*

*7. I confirm that another individual did indeed attend court carrying a file.*

*8. Mr. Al Fawaz' barrister, Mr. Edward Fitzgerald QC, decided not to cross-examine the person with the file because,* inter alia*, the person with first-hand knowledge of the relationship with Mr. Al Fawaz, Mr. Banner, was not in court.*

*9. The officer (who attended in place of Mr. Banner) was not called to give evidence.*

Thus, on the account of al Fawwaz's solicitor, an MI5 officer attended the hearing pursuant to a witness summons and brought what the solicitor understood to be the MI5 file. But al Fawwaz's barrister elected not to call the witness because Banner was not immediately available, and the barrister did not seek access to the file.[13]

---

[13]

To be sure, the account by al Fawwaz's solicitor cannot be taken as establishing that there actually are any documents responsive to the letters rogatory at issue here. The official position of the British government, as stated recently to the High Court, is that it neither confirms nor denies the existence in MI5's possession of any responsive documents, and it disputes in most respects Mr. Raja's account of what transpired in the magistrate's court. *See* Third Witness Statement of Sarah Jane Dubs, filed in *R. (Al Fawwaz) v. Sec'y of State*

*U.K. Events After the House of Lords Decision – 2001 through 2009*

Once al Fawwaz failed to overturn the extradition order by direct appeal in the United Kingdom courts, he attempted to persuade the British Home Secretary not to extradite him.[14]  When that effort was unsuccessful as an executive matter, al Fawwaz returned to the British courts.  He filed an action seeking judicial review of the Home Secretary's decision.[15]  On August 7, 2009, however, the High Court rejected his claim and refused permission to appeal to the Supreme Court of the United Kingdom.[16]  The Supreme Court denied leave to appeal in December 2009.[17]

*The European Court of Human Rights – 2010 - 2012*

Al Fawwaz next sought relief from the European Court of Human Rights.  He claimed that he would be committed for life without parole to the Bureau of Prisons' ADX Florence

---

*for the Home Dep't,* CO 3663/2014 ¶¶ 5-6 (Q.B. Oct. 10, 2014); Ltr. from Sarah Dubs, U.K. Home Office, to Court (Oct. 6, 2014) [DI 1753], at 1-2.  But that is not the point for present purposes.  The immediately relevant point is that al Fawwaz's English counsel, on al Fawwaz's solicitor's version of the events, sixteen years ago had the opportunity to call an MI5 witness and to examine him with a view to showing that al Fawwaz had given MI5 the account of his activities that he recently claimed were exculpatory.  But his counsel elected not to call that witness or examine the file the witness was said to have brought with him – which al Fawwaz's counsel took to be an MI5 file on al Fawwaz – because his lawyers viewed the available witness as less than ideal given his alleged lack of personal knowledge or the alleged interaction between al Fawwaz and Banner.

[14]

The protracted and extraordinary efforts are described in detail in the later decision of the European Court of Human Rights.  *Ahmad v. United Kingdom*, 56 Eur. Ct. H.R. 1 ¶¶ 49-55 (2012).

[15]

*Id.* ¶ 56.

[16]

*Id.* ¶¶ 56-60. The Supreme Court of the United Kingdom in 2009 replaced the Appellate Committee of the House of Lords as the U.K.'s highest court.

[17]

*Id.* ¶ 61.

facility and there subjected to Special Administrative Measures in the event he were extradited and convicted. He argued that his extradition therefore would violate Article 3 of the European Convention.[18] On April 10, 2012, however, a division of the court rejected al Fawwaz's contentions on the merits and held "that there would be no violation of art.3 of the Convention [1] as a result of conditions at ADX Florence and the imposition of special administrative measures post-trial" or "[2] as a result of the length of [his] possible sentence[] if [al Fawwaz] were extradited to the United States."[19] That decision became final on September 24, 2012 when the Grand Chamber of the Court refused al Fawwaz's petition for review.[20]

### The Second U.K. Judicial Review Action – 2012

The decision of the Grand Chamber of the European Court of Human Rights to refuse al Fawwaz's petition for review "was sent out in the early evening of 24 September 2012."[21] Nevertheless, shortly after 8 a.m. on September 25, 2012, al Fawwaz's U.K solicitor delivered to the Treasury Solicitor "representations" – additional or renewed arguments – to withdraw the extradition order that "[e]vidently. . . had been in preparation for some time."[22] The Home Secretary

---

[18]    Article 3 provides: "No one shall be subjected to torture or to inhuman or degrading treatment or punishment." *See id.* ¶ 159.

[19]    *Id.* at 76.

[20]    *See Hamza*, [2012] EWHC 2736 [15].

[21]    *Id.* at [72].

[22]    *Id.* at [73].

rejected "[t]hose late representations" on September 28, 2012.[23]  Al Fawwaz then sought leave to

seek a judicial review of that decision.[24]

On October 5, 2012, the High Court dismissed al Fawwaz's application for

permission to apply for judicial review in an extensive decision on the ground that "[t]he application

[wa]s . . . hopeless."[25]  It stated that the "extradition to the United States of America may proceed

immediately."[26]  And that is exactly what transpired.  Al Fawwaz finally was presented to this Court

on October 6, 2012, more than fourteen years after the Embassy bombings and nearly as long after

he was arrested in London.

---

[23]

*Id.* at [75].

[24]

*Id.*

Under the U.K. practice, permission  of court is required to proceed with an action for judicial review.  U.K. MINISTRY OF JUSTICE, CPR § 54.4 (73rd update, June 5, 2014), *available at* https://www.justice.gov.uk/courts/procedure-rules/civil/rules  (hereinafter "CPR"); NEIL ANDREWS, ENGLISH CIVIL PROCEDURE §§ 42.20-.48 (2003).

[25]

*Hamza*, [2012] EWHC 2736 [97].

The justices evidenced some concern that the process of the U.K. court may have been abused by al Fawwaz's solicitor by his possibly having withheld the representations made on September 25, 2012 to the Home Secretary while the Grand Chamber decision was pending.  The effect of such withholding, if it occurred, would have been to place both the Home Secretary and the High Court under unnecessary time pressure.  The High Court, however, accepted the solicitor's explanation, albeit perhaps with a hint of skepticism, *id.* at [73]-[74], and decided the matter on the merits.

[26]

*Id.* at [208].

*Relevant Prior Proceedings in this Court*

*The Indictment*

On June 17, 1999, while the extradition battle proceeded in Britain, the grand jury returned an indictment against al Fawwaz. A superseding indictment returned in May 2000 charges him with conspiracy to kill United States nationals (Count One), conspiracy to kill officers and employees of the United States and internationally protected persons (Count Three), conspiracy to destroy buildings and property of the United States including by bombing the U.S. embassies in Nairobi, Kenya, and Dar es Salaam, Tanzania (Count Five), and conspiracy to attack national U.S. defense premises and utilities (Count Six).[27] It is that indictment upon which al Fawwaz now is on trial.

While the theory of the government's anticipated case against al Fawwaz has been refined and elaborated upon, it suffices for present purposes to quote the brief summary given by the British High Court shortly after the start of the extradition proceedings many years ago:[28]

> 4 The Government of the United States of America's case alleges as follows. Bin Laden was the moving force in an Islamic terrorist organisation called Al-Qaida, devoted to violent opposition to, in particular, the United States of America. The organisation issued various fatwas or rulings, which members were obliged to obey, including rulings requiring the pursuit of jihad (holy war) against the United States of America. Since 1993 Al-Qaida had operated a cell in Kenya. In 1994 it created an organisation in London called the Advice and Reform Committee ("ARC"), which purported to be devoted to peaceful activities against breaches of human rights in Arab countries, but which was in fact the London organisation of the conspiracy. Amongst the alleged fruits of this conspiracy was the bombing on 7 August 1998 of the embassies of the United States of America in Nairobi and Dar-es-Salaam. Many persons were killed, including American diplomats who were IPPs [internationally protected persons].

---

[27] Indictment (S7) [DI 186] (hereinafter "Indictment").

[28] *Al-Fawwaz I*, [2001] 1 W.L.R. 1234, [4]-[5].

> 5  So far as Mr[.] Al-Fawwaz is concerned, it is alleged against him that he was a participant in the cell in Kenya. He lived in London from 1994, at a house at 94 Dewsbury Road. It is further alleged that he had clear links during that period with the premises in London at which ARC was operated, at 1a Beethoven Street, and with a man called Adel Barry who is another alleged conspirator, and that Mr Al-Fawwaz was the head of or strongly involved in ARC. Claims of responsibility for the bombings in Nairobi and Dar-es-Salaam, allegedly originating from before the time of the bombings and thus demonstrating knowledge of what was planned, were said to be traceable or attributable to him.

To this might be added that the prosecution contends that bin Laden installed al Fawwaz as the head of the London office, that al Fawwaz provided bin Laden and other al Qaeda members with a satellite telephone to facilitate communication, and that al Fawwaz stored and disseminated bin Laden's 1996 declaration of *jihad* on and through the computer at his residence.[29]

Al Fawwaz, for his part, denies participating in any conspiracy with bin Laden or al Qaeda.  As will appear, he contends that he is a peaceable man opposed to violent *jihad* and argues that the ARC was not an arm of al Qaeda but an organization devoted to peaceful political reform in Saudi Arabia.[30]  Moreover, he claims that he met regularly with Paul Banner, and then Banner's replacement, both allegedly MI5 agents, between 1994 and 1998.  The Court notes, however, that al Fawwaz has not submitted any affidavit or declaration as to the occurrence or substance of these alleged meetings.  The only accounts are those of his English solicitor and one of his counsel in this case, both of which at best are second hand.[31]  In general, al Fawwaz's counsel contend that al Fawwaz in those conversations disavowed bin Laden's 1996 declaration of *jihad* and

---

[29] Indictment ¶ 12(rr), (zz), (fff)-(iii); Trial Tr. (Gov't Opening), 21:10-22:7.

[30] Trial Tr. (Al Fawwaz Opening), 40:8-42:5.

[31] *See* DI 1248-1; Kirby Am. Decl. (Sept. 15, 2013) [DI 1324] (hereinafter "Kirby Decl.").

spoke of his dedication to peaceful reform in Saudi Arabia.[32]  In addition, Banner allegedly advised

al Fawwaz concerning the legality of his communications with bin Laden and other ARC members.[33]

### *The Schedule and the Present Motion*

Al Fawwaz and a co-defendant[34] initially appeared in this Court on October 6, 2012.

Shortly thereafter, the case was set for trial on October 7, 2013.  As will appear, the trial was

postponed three times, ultimately until January 12, 2015, prior to the present motion.

The first delay occurred on June 11, 2013 when the Court granted al Fawwaz's

motion for a continuance "for a minimum of six months," which was based principally on a claimed

need for additional time within which to review documents.[35] Accordingly, the Court reset the trial

for April 7, 2014.[36]

---

[32]

Kirby Decl. ¶¶ 9-16.

[33]

*Id.* ¶¶ 14-15.

[34]

Al Fawwaz was extradited with Adel Abdel Bary who subsequently pleaded guilty to a superseding information. *See United States v. Bary*, No. 98-cr-1023 (LAK), 2014 WL 5006633 (S.D.N.Y. Sept. 30, 2014) (accepting Bary's guilty plea).

[35]

Mem. of Law in Support of al Fawwaz's Mot. Seeking Continuance (Apr. 1, 2013) [DI 1175], at 2.  It must be noted that the government had not yet produced electronic images of al Fawwaz's floppy discs and other electronic media so that the readability problems discussed below had not yet arisen at that point.  The electronic evidence discussed in regard to that continuance motion referred to accessing documents in an electronic database.  *Id*. at 3-4.

[36]

Scheduling Order (June 11, 2013) [DI 1239].

In late 2013, U.S. personnel apprehended Anas al Liby and the Court then granted the government's motion to try him jointly with al Fawwaz.[37]  In light of the joinder, the trial was rescheduled to begin on November 3, 2014,[38] thus affording al Fawwaz an additional seven months of preparation time.  It must be noted that al Fawwaz resisted a joint trial and moved to sever his case from al Liby's on several occasions.[39]

Less than a month before the November 3, 2014 trial date, al Fawwaz moved for another postponement, this one for ninety days, *i.e.*, until the first week in February 2015.[40]  That motion was filed after a large jury panel had been summoned and just prior to prospective jurors reporting to the courthouse to complete questionnaires.[41]  Nonetheless, the Court granted the motion to the extent that it postponed the trial until January 12, 2015.[42]

---

[37]

    Order (Dec. 12, 2013) [DI 1400].

[38]

    *Id*.

[39]

    *See, e.g.*, Reply in Support of Khalid al Fawwaz's Mot. in Limine to Preclude Evidence . . . Or, in the Alternative, for Severance or Dual Juries (Dec. 30, 2014) [DI 1816]; Supp. Mot. to Sever Def. Khalid al Fawwaz (Aug. 1, 2014) [DI 1674].

[40]

    Ltr. from B. Sternheim to Court (Oct. 7, 2014) [DI 1754]; Mem. of Law in Support of Khalid al Fawwaz's Request for a Continuance to Obtain Evidence Pursuant to the Ltrs. Rogatory Issued to the U.K. (Oct. 20, 2014) [DI 1758].

[41]

    *See* Order (July 29, 2014) [DI 1667] ("Prospective jurors will be summoned for the purpose of completing questionnaires on October 22 and 23, 2014.").

[42]

    Oct. 22, 2014 Tr. [DI 1898], 24:12-27:19; Order (Oct. 22, 2014) [DI 1766].

Jury selection then began on December 17 and 18 when 707 prospective jurors reported and completed questionnaires. As required by the Court, counsel met and agreed to discharge 102 prospective jurors on grounds of hardship and/or prejudice.[43]

On January 2, 2015, al Liby passed away due to "complications arising out of his long-standing medical problems."[44] Then, late on the night of January 5, 2015, one week before the commencement of the trial, al Fawwaz filed the present motion, this time for an additional postponement of sixty days.[45] In the event the motion were granted, this second jury panel too would have been summoned only to be discharged. The government promptly consented to, and the Court granted, a postponement until January 20, 2015.[46] Following oral argument on January 14, 2015, the Court denied the motion on the merits in all other respects.[47]

*The Alleged MI5 Material and Witnesses*

As noted above, the alleged MI5 material and witnesses al Fawwaz seeks have been on his radar screen since his arrest sixteen years ago. Nevertheless, even after he was extradited and presented in this Court, he was slow to pursue them by means offering any real hope of success.

---

[43] Ltr. from N. Lewin to Court (Jan. 5, 2015) [DI 1883], at 2.

[44] Ltr. from S. Buckley to Court (Jan. 3, 2015) [DI 1821].

[45] DI 1824-1826 (under seal).

[46] Jan 6, 2015 Tr., 8:1-11; DI 1847.

[47] DI 1851.

Al Fawwaz first began efforts to seek some of this evidence months after his extradition and after the case initially was set for trial on October 7, 2013. He did so, however, in a curious way.

On April 2, 2013 – just after the deadline that the Court had set at the outset for all pretrial motions[48] – al Fawwaz moved for an order compelling the prosecution in this case to produce the alleged MI5 documents.[49]

The government opposed that aspect of the motion, stating that al Fawwaz should have sought letters rogatory directed to the British government[50] – not at all a surprising position in view of the fact that the U.S. government did not have the materials. Accordingly, the Court denied that aspect of his discovery motion but extended al Fawwaz's time to seek letters rogatory, ultimately until September 3, 2013.[51]

On July 2, 2013 al Fawwaz moved for the issuance of letters rogatory to obtain from MI5 (1) documents concerning communications between al Fawwaz and any officers (including Paul Banner), (2) information and recordings from any surveillance of al Fawwaz or the ARC, and

---

[48]

    Mem. Endorsement (Feb. 27, 2013) [DI 1149] (extending deadline for defense motions to April 1, 2013).

[49]

    Al Fawwaz Mot. to Compel the Gov't to Provide Add'l Disc. (Apr. 2, 2013) [DI 1176].

    The motion, insofar as relevant here, sought to have the United States produce "[a]ll intelligence files of the government of the United Kingdom, any of its agencies, concerning Mr. Al Fawwaz" as well as other documents which might have related to al Fawwaz's contentions regarding MI5. Sternheim Decl. (Apr. 1, 201[3]) [DI 1177] ¶ 15.

[50]

    Gov't Omnibus Opp. to Defs. Pretrial Mots. (Apr. 25, 2013) [DI 1202], at 58-63.

[51]

    Order (June 20, 2013) [DI 1244] (denying discovery motion); *see also* Memo. Endorsement (July 29, 2013) [DI 1274] (extending deadline to seek letters rogatory to September 3, 2013); DI 1239 ¶ 3.

(3) testimony from Banner concerning any conversations or interactions with al Fawwaz.[52]  The motion rested on several unsupported factual assertions, including, among others, that al Fawwaz and Banner "me[]t regularly," that their meetings "would last sometimes up to three hours," that "Banner appeared to acknowledge the [existence of telephone] surveillance in his conversations with Mr. Al Fawwaz," and that al Fawwaz "expressed his commitment and desire to secure peace . . . without recourse to any violence or other unlawful activity" even after bin Laden's 1996 declaration of *jihad*.[53]

Nonetheless, the government did not oppose the motion.[54]  The Court assumed, "particularly in the absence of any contrary argument by the government," that it had the authority to issue letters rogatory in these circumstances and that the documents and recordings were "potentially relevant and significant to the defense of this action."[55]  Accordingly, it granted al Fawwaz's motion to the extent it sought letters rogatory to obtain documents and information from MI5, but denied al Fawwaz's request for Banner's testimony on the ground that the motion did not address the requirements to obtain depositions in criminal cases under Fed. R. Crim. P. 15.  A letter rogatory, consistent with the Court's order, was issued on October 2, 2013 ("LR 1").[56]

---

[52]

*See* DI 1248; Proposed Ltrs. Rogatory (July 2, 2013) [DI 1248-2], at 3.

[53]

DI 1248 at 3-5, 8.

[54]

Ltr. from S. Buckley to Court (Aug. 1, 2013) [DI 1287] ("The Government writes to respectfully advise the Court that it takes no position with respect to defendant Fawwaz's pending motion seeking letters rogatory.").

[55]

Order (Aug. 19, 2013) [DI 1283].

[56]

Ltrs. Rogatory to Courts of the U.K. (Oct. 2, 2013) [DI 1337].

In September 2013, al Fawwaz then moved, pursuant to Rule 15, to depose Banner and another unnamed, alleged MI5 agent, presumably the same person whom he declined to call at the 1999 extradition hearing in the U.K., and for letters rogatory on the grounds that their testimony would be "exculpatory," "c[ould] not be obtained from any other source," and that defense counsel had been unable even to locate contact information for the alleged agents.[57]  The motion relied on the same factual assertions as the prior application, "based on [defense counsel's] information and belief" from "discovery documents" and "conversations with other individuals."[58]  The motion again was unopposed by the government.  Accordingly, the Court concluded that the defense had satisfied the Rule 15 standard and could depose them.  The Court issued a letter rogatory in this regard on February 18, 2014 ("LR 2").[59]

Al Fawwaz additionally moved, along with a co-defendant, for letters rogatory to obtain from MI5 and the Metropolitan Police Service (the "MPS") information and recordings from any surveillance concerning them and/or an alleged co-conspirator, their telephones, and the ARC's telephones.  The Court again issued the letter rogatory ("LR 3") in the absence of any contrary argument by the government, though it did not permit al Fawwaz to seek information from an unidentified and unnamed private security firm.[60]

---

[57]

    Mot. and Mem. of Law for Issuance of Ltrs. Rogatory to the U.K. and for Rule 15 Deps. of Witness Paul Banner and Another MI5 Officer (Sept. 26, 2013) [DI 1323], at 2, 13-14.

[58]

    Kirby Decl. ¶ 3.

[59]

    Ltrs. Rogatory to Courts of the U.K. (Feb. 18, 2014) [DI 1491].

[60]

    Order with Respect to Joint Mot. for Issuance of Ltrs. Rogatory (Apr. 15, 2014) [DI 1793]; Ltrs. Rogatory to Courts of the U.K. (Apr. 22, 2014) [DI 1616].

The United Kingdom furnished the material sought by LR 3 from the MPS.[61] On September 29, 2014, however, the Home Secretary refused the remainder of the requests contained in LR 1 - LR 3.[62] Al Fawwaz sought judicial review of the Home Secretary's decision. Two justices of the High Court of England and Wales heard al Fawwaz's challenge in a substantive hearing on December 17-19.[63] At the conclusion of the three-day hearing, the High Court dismissed al Fawwaz's claim on the merits.[64]

### The Computer Discs Seized From Al Fawwaz's Apartment

In 1998, the MPS conducted searches of al Fawwaz's London apartment and the office that the government alleges was shared by al Fawwaz and others. It seized "[i]n excess of 100 boxes . . . of . . . actual physical material," including among other things, a computer from al Fawwaz's apartment and "various videotapes, computer diskettes, [and] audiotapes."[65] Al Fawwaz's claimed need for additional time to review such materials relates to a single exhibit – PLW/35 – containing a number of floppy and other compact discs seized from his apartment.[66]

---

[61]

See Ltr. from Sarah Dubs, U.K. Home Office, to Court (Sept. 29, 2014) [DI 1731].

[62]

Id.; see also DI 1753.

[63]

Raja Decl. (2015) ¶ 1.

[64]

Id. ¶ 4.

[65]

April 9, 2013 Tr., 7:23-9:10.

[66]

See, e.g., Ltr. from B. Sternheim to Court (Oct. 21, 2014), at 3 n.2 [DI 1762]; Oct. 22, 2014 Tr., 4:24-5:20.

Forensic images of those discs were produced to al Fawwaz in July 2013.[67]  Many of the documents included on the discs additionally were provided to the defense in hard copy printouts, but those apparently did not depict the electronic metadata associated with each file.[68]

More than a year after the electronic files were produced and less than a month before the then-scheduled November 3, 2014 trial date, the al Fawwaz team notified the Court that it was unable to open files of a certain type, specifically .IMG files, included on the forensic images and sought an adjournment.[69]  Defense counsel claimed not to have realized the importance of these files in advance of the government's July 23, 2014 expert disclosure anticipating testimony from computer forensic experts regarding the electronic media seized from al Fawwaz's home.[70]  The defense claimed it had spent the next several months working with its own expert to try to access the files, but it did not seek additional technical support or bring the matter to the Court's attention.[71]  Nonetheless, the al Fawwaz team agreed that the magnitude of these files was not large and, assuming it could access the files, "the computer problem [was] solved."[72]

---

[67] Oct. 22, 2014 Tr., 11:6-21; Joslin Decl. ¶ 1.

[68] Oct. 16, 2014 Tr. [DI 1900], 8:12-19.

[69] *Id*. at 2:22-3:4, 4:11-22.

[70] *Id*. at 19:5-20:19.

[71] *Id*. at 5:2-7:10.

[72] *Id*. at 7:13-8:11, 9:11-25.

While the technical nature of the issue need not detain us, the government originally believed that it had had no difficulty opening these files.[73] The parties later concluded that neither side was able to access the .IMG files due to the software that had been used by the U.K authorities to prepare the forensic images.[74] Accordingly – despite the mutual apparent inability to read these files – the government worked with the FBI and the original electronic media provided by the United Kingdom to create new forensic images of the discs which were produced in December 2014.[75]

Al Fawwaz immediately was able to access more than 99 percent of the files contained on the forensic images, including each and every file that the government intended to use in its case-in-chief.[76] Al Fawwaz's team nonetheless complained that it was unable to access 119 files (out of several thousand), which it believed "may contain important information."[77] The government again assisted the defense team in accessing the electronic files.[78] Ultimately, the defense's technical difficulties – which it made only a modest effort to overcome and relied on the

---

[73]

*Id.* at 3:19-23.

[74]

Ltr. from S. Buckley to Court (Oct. 20, 2014) [DI 1920], at 6 n.6; DI 1762, at 1-3.

[75]

Ltr. from S. Buckley to Court (Jan. 10, 2015) (under seal), at 2 & Exs. 2-3; Welsh Decl. (Jan. 9, 2015) (under seal) ¶¶ 1-4.

[76]

Ltr. from S. Buckley to Court (Jan. 10, 2015), at 1; Welsh Decl. ¶¶ 3, 4, 6, 12.

[77]

DI 1824 at 2; Joslin Decl. ¶¶ 18-20.

[78]

Welsh Decl. ¶¶ 5-14.

prosecution to solve for them – were resolved and the team acknowledged its ability to access, review, and conduct forensic analysis of the electronic files.[79]

*Discussion*

I.  *The Legal Standard Governing Adjournments and Continuances*

A.      *Adjournments and Continuances Are Committed to Trial Court Discretion*

"[W]hether or not to adjourn a trial date 'is traditionally within the discretion of the trial judge.'"[80]  A defendant must show "both arbitrariness and prejudice in order to obtain reversal of the denial of a continuance."[81]  Prejudice in this context means that the defendant must demonstrate that the denial "substantially impaired the defense."[82]  This test "is a stringent one."[83] The "burden of showing such an impairment is on the party complaining of the lack of a sufficient continuance" – here, al Fawwaz.[84]

---

79

Ltr. from B. Sternheim to Court (Jan. 13, 2015) (under seal), at 2.

80

*United States v. Scopo*, 861 F.2d 339, 344 (2d Cir. 1988) (quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964)); *accord United States v. Edwards*, 101 F.3d 17, 19 (2d Cir. 1996) (a motion "to adjourn the start of trial . . . is left to the discretion of the trial judge").

81

*United States v. Miller*, 626 F.3d 682, 690 (2d Cir. 2010); *see also United States v. Tin Yat Chin*, 476 F.3d 144, 146 (2d Cir. 2007) (sustaining denial of a continuance where defendant was "unable to specify with any particularity how he was prejudiced").

82

*United States v. Beverly*, 5 F.3d 633, 641 (2d Cir. 1993).

83

*United States v. Ellenbogen*, 365 F.2d 982, 985 (2d Cir. 1966).

84

*United States v. O'Connor*, 650 F.3d 839, 854 (2d Cir. 2011) (citing *Tin Yat Chin*, 476 F.3d at 146).

B.      *Trial Courts Evaluate Such Requests in Light of All the Circumstances*

1.      *Supreme Court Precedent*

Whether a continuance is appropriate is a case-specific determination entrusted to the discretion of the trial court.  The Supreme Court has recognized also the practical difficulties inherent in last-minute requests to delay imminent trials.  Three cases are touchstones.

The first, *Avery v. Alabama*,[85] establishes the defendant's burden to demonstrate that the denial of a continuance would be prejudicial.  *Avery* involved an appeal following a defendant's murder conviction.  The defendant had been arrested on a Monday and the judge scheduled his trial to start that Wednesday.[86]  When the case was called on Thursday, defense counsel sought a continuance on the ground that they had lacked sufficient time to prepare.  The trial nonetheless proceeded and the jury sentenced the defendant to death.[87]  The Court affirmed the conviction, emphasizing "the absence of any indication . . . that [the defense attorneys] could have done more had additional time been granted."[88]

---

[85]

308 U.S. 444 (1940).

[86]

*Id*. at 447.

[87]

*Id.* at 448.

[88]

*Id.* at 452.

A later case, *United States v. Valenzuela-Bernal*, 458 U.S. 858 (1982), reinforces the need for a defendant to show prejudice in order to challenge the denial of a continuance successfully.  There, a defendant appealed his criminal conviction on the ground that a witness whose testimony he sought had been deported by the government.  He argued that this had deprived him of his Sixth Amendment right to compulsory process and to due process.  *Id.* at 860.  The Supreme Court held that there had been no violation of defendant's constitutional rights because he had not offered "some plausible explanation of the assistance he would have received from the testimony of the deported witnesses." *Id.* at 871.

In *Ungar v. Sarafite*,[89] a trial witness was held in criminal contempt notwithstanding the witness's requests for a continuance in order to prepare a defense. He argued on appeal that the denial of a continuance "deprived him of his constitutional right to engage counsel and to defend against the charge."[90] The Supreme Court rejected the contention. It stated that "[t]he matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel," although it cautioned that "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."[91] Indeed, "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process."[92] "The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied."[93] The Court held that, in the circumstances, the five days that the defendant had had to prepare for his contempt hearing was not "constitutionally inadequate."[94]

---

[89]

376 U.S. 575 (1964).

[90]

*Id*. at 589.

[91]

*Id*.

[92]

*Id.*

[93]

*Id*.

[94]

*Id*. at 590.

*Morris v. Slappy*[95] involved the district court's denial of a continuance following substitution of counsel six days before trial. The Supreme Court held that the petitioner had received "a fair trial."[96] It reasoned:

> "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel."[97]

### 2. Second Circuit Precedent

There is no mechanical test with respect to requests for a continuance or an adjournment.[98] The Second Circuit is "particularly solicitous of a district court's ruling on a motion to adjourn the scheduled start of a trial proceeding."[99] Cases overturning a district court's denial of a continuance for abuse of discretion are few and far between. *United States v. White*,[100] however, is illustrative.

---

[95]

461 U.S. 1 (1983).

[96]

*Id*. at 15.

[97]

*Id*. at 11-12 (quoting *Ungar*, 376 U.S. at 589).

[98]

*Ellenbogen*, 365 F.2d at 986 ("There is no mechanical test."); *see also Childs v. Herbert*, 146 F. Supp. 2d 317, 324 (S.D.N.Y. 2001) (rejecting defendant's citations to a multi-factor test adopted by the D. C. Circuit because "there are no mechanical rules to determine when a denial of a continuance violates due process").

[99]

*Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 147-48 (2d Cir. 1998).

[100]

324 F.2d 814 (2d Cir. 1963).

In *White*, the defendant sought the testimony of a government informant whom the defendant argued would support his entrapment theory. The government offered the informant as a defense witness, but then discovered that he was seriously ill. A doctor testified that the informant would be unable to appear for "a couple of weeks."[101] The defendant's request for a continuance was denied and he was convicted. The Second Circuit reversed the conviction, reasoning that an adjournment would not have been "unduly burdensome" because the "the witnesses were few and the factual issues clearly defined."[102] Moreover, the defendant "had not been dilatory in locating [the informant] or in making it clear to the court and the prosecution that he intended to rely heavily upon his testimony."[103] Additionally, "there was no other way for appellant to substantiate his defense" and "[e]ntrapment, if he could prove it, was his only hope."[104]

*White* thus illustrates circumstances in which continuances are appropriate or perhaps even required. They include instances in which (i) the requested delay is of a short (or at least fixed) duration, (ii) the sought-after evidence is specified with particularity, (iii) the proposed evidence is critical to the defense, and (iv) the defendant has not been dilatory. As will appear, none of these characteristics is present here.

The Court now turns to al Fawwaz's contentions in support of his request for a postponement.

---

[101] *Id*. at 815.

[102] *Id*. at 816.

[103] *Id*.

[104] *Id*.

*II.*     *The U.K. Lawsuit Is Not Sufficiently Likely to Result in Evidence Helpful to Al Fawwaz, Let Alone to Do So in Any Reasonable Period of Time*

Not very much need be said with respect to the contention that the trial should have been postponed for sixty days in light of al Fawwaz's now dismissed British judicial review action. But it first perhaps would be helpful to set out the precise procedural position in that litigation when this Court ruled and then to consider its prospects, if any, for this case as they were relevant to that ruling.

Al Fawwaz's U.K. action is for judicial review of the Home Secretary's decision declining to seek enforcement of the letters rogatory on the ground of British national security.[105] The case was heard by two justices in the High Court. While the procedural niceties need not detain us, special confidentiality procedures known as a closed materials proceeding or CMP were employed with respect to "sensitive" (read, "classified") information. Accordingly, the sensitive information was available to the court, to "special advocates" appointed by the Attorney General of England and Wales to protect al Fawwaz's interests, and to counsel for the Home Secretary but not to al Fawwaz's counsel.[106] Two written judgments will be rendered, one public and available to al Fawwaz's counsel and the other containing sensitive material and therefore not available to

---

[105]

U.K. law provides for judicial review of certain official actions, including certain decisions, actions or failures to act in relation to the exercise of a public function. ANDREWS, ENGLISH CIVIL PROCEDURE §§ 42.01-.06. Such cases appear, in a general way, to be roughly comparable in some but not all respects to actions under our own Administrative Procedure Act, 5 U.S.C. §§ 551-59, 701-06.

[106]

*See generally* Justice and Security Act, 2013, c.18 (U.K.); CPR § 82; *see also* Raja Decl. (2015) ¶¶ 2-3.

al Fawwaz's counsel as distinct from the special advocates.[107]  The decision of the High Court will

not be appealable as of right; an appeal would lie only with permission either of the High Court or

the Court of Appeals.[108]  Should permission to appeal to the Court of Appeals be granted, the

unsuccessful party before that court could seek permission to appeal from the Court of Appeal's

decision to the Supreme Court of the United Kingdom.[109]  With that procedural context in mind, the

Court considered the prospects in relation to possible appellate proceedings in the United Kingdom.

 As an initial matter, the timing even for the immediate and foreseeable future was

quite uncertain when this Court ruled and, indeed, remains so.  The High Court evidently indicated

in December that it would render written judgments after the start on January 11, 2015 of its Hilary

Term.[110]  But al Fawwaz's solicitor has stated that even the public judgment first "must be vetted

by the Security Service and the Secretary of State prior to being made public" and that he therefore

did not anticipate receiving it until early February, even assuming the written judgments were

---

[107]

 Raja Decl. (2015) ¶¶ 5-7; *see also* CPR § 82.16 (separate written judgment containing information the disclosure of which would be damaging to national security to be served on the Home Secretary and the special advocate).

[108]

 CPR §§ 52.3(1) ("[a]n appellant . . . requires permission to appeal (a) where the appeal is from a decision of . . . the High Court" with exceptions not applicable here), 52.3(2) (application for permission may be made to the "lower court at the hearing at which the decision to be appealed was made" or to the appeal court); 52.15(1) (where permission refused by the High Court, application for permission to appeal may be made to the Court of Appeal); Raja Decl. (2015) ¶ 8 ("An appeal lies from the decision of the High Court to the Court of Appeal, subject to permission being granted.").

[109]

 Constitutional Reform Act, 2005, c. 4, § 40(6) (U.K.) ("An appeal under subsection (2) [*i.e.*, an appeal from an order or judgment of the Court of Appeal in England and Wales in a civil proceeding] lies only with the permission of the Court of Appeal or the Supreme Court; but this is subject to provision under any other enactment restricting such an appeal.").

[110]

 Raja Decl. (2015) ¶ 5.

rendered in mid- to late January.[111]  This Court was well aware of the possibility that the solicitor's expected timetable would not be met.  And events have vindicated this Court's assessment, at least thus far.  It now is February 19, 2015, and neither party has indicated that the High Court has rendered its written judgments.[112]

But even if the solicitor's expectation in this respect had been met, the Court could not confidently have predicted whether or when permission to appeal would be granted.  And if permission to appeal were granted, the timing of the determination of the appeal by the Court of Appeal and of the likelihood of a further attempt by one side or the other to appeal to the Supreme Court and its duration would have been, as it remains, essentially unknowable.  Only one thing, it seems, safely could be said about the timing when this Court ruled on the postponement request – a postponement until March 12, the relief sought by al Fawwaz's motion, if granted on the basis of the British litigation, would have been only the first.  The Court had no reasonable basis for concluding that appellate litigation in England would end by any date predictable with any level of confidence.  At best al Fawwaz could be in for months and – if the extradition proceedings are any indication – perhaps a longer period of litigation in the United Kingdom.

Second,  it was difficult when this Court ruled – and it remains difficult – to assess the possibility that al Fawwaz will obtain permission to appeal, assuming (as this Court assumes)

---

[111]   *Id.* ¶ 6.

[112]   This implies no criticism of my judicial brethren in London.  Quite the contrary.  This Court is most appreciative of their expeditious handling of al Fawwaz's judicial review action in consequence of their desire to facilitate the proceedings here to the extent they properly may do so.  It recognizes also that time is required to render written judgments in many cases, including the one before them.

that he seeks it. We have as yet neither any oral statement of reasons[113] nor any written decision from the High Court. Nor are we likely to be in a much better position even when the public written judgment becomes available, as there will be also a sealed judgment that will not be shared either with this Court or with al Fawwaz's counsel (as distinct from the special advocates).

Third, the evidence al Fawwaz seeks, assuming it exists, would do no more than corroborate a claim that al Fawwaz was in a position to prove by other means. He certainly had personal, first-hand knowledge of any interactions he had with MI5 or someone claiming to be MI5. Moreover, al Fawwaz conducted depositions of Abdel Bari Atwan and Dr. Muhammad al Massari for the purpose of eliciting evidence relevant to al Fawwaz's claim that he was committed to peaceful means. Specifically, both witnesses were said to have met with al Fawwaz in the immediate wake of bin Laden's 1996 declaration of *jihad* and to have heard from al Fawwaz or observed him distressed and in a state of shock.[114] Moreover, it must be noted that the Court admitted portions of these depositions at trial, including that al Fawwaz "wasn't happy with the communique and he was distressed."[115] Thus, al Fawwaz was able to advance – and in fact advanced – the argument that he was committed to non-violent reform of Saudi Arabia in the absence of the evidence sought from the United Kingdom.

Fourth, as noted previously, al Fawwaz had little claim on the further exercise of discretion in his favor on this account given his prior actions with respect to seeking this evidence.

---

[113]

    *Id*. ¶ 4.

[114]

    *United States v. al Fawwaz*, No. 98-cr-1023 (LAK), 2014 WL 627083, at *3-4, 6 (S.D.N.Y. Feb. 18, 2014); Order (Sept. 4, 2014) [DI 1706], at 1.

[115]

    *See, e.g.*, Trial Tr. (Atwan), 1784:23-1785:11.

He had the opportunity to call an MI5 witness and to seek production of what he claims was an MI5 file on him at the extradition hearing in London in 1999 but elected not to do so. And he was very slow to seek the letters rogatory. He first sought the documents (but not the witnesses) from the prosecution in this case, which quite foreseeably did not have them. He then moved to compel the prosecution to produce that which he knew it did not have.[116] The Court then extended al Fawwaz's time to move for letters rogatory, which he finally began doing months later.[117] Thus, al Fawwaz did not even seek letters rogatory – the only even potentially viable means of obtaining what he seeks, assuming it exists – until at least nine months after he was presented to this Court. His delay weighed against a further postponement.

Fifth, even if evidence responsive to the letters rogatory exists,[118] the likelihood that it would be of any significant help to him on the issue of guilt or innocence was not established. These reasons for denying al Fawwaz's request for an adjournment of the trial's start date, in this Court's view, were insuperable. Courts have cited all four of the rationales articulated here –

---

[116]

DI 1176; DI 1177 ¶ 15; *see also* DI 1244 (denying discovery motion).

[117]

DI 1274; DI 1239 ¶ 3.

[118]

Mr. Raja's declaration states that he was "made aware . . . that the Special Advocates were given access to materials falling into one of the eight categories of materials of which we applied for specific disclosure (see the Fourth Witness Statement of Akhtar Raja, attached), for the purposes of the closed proceedings." Raja Decl. (2015) ¶ 3. But that does not necessarily mean that there are any materials responsive to the letters rogatory. As the Fourth Witness Statement makes clear, the eight categories of material to which the declaration referred included materials relating to the Home Secretary's decision not to seek enforcement of the letters rogatory as distinguished from materials responsive to the letters rogatory themselves.

(i) uncertainty over when (if ever) the alleged evidence might be obtained,[119] (ii) doubt as to whether a delay would achieve its desired object,[120] (iii) delay on the part of the defendant,[121] and (iv) the absence of any showing that purported evidence would be helpful to the defendant at trial[122] – as proper bases for denying such requests.

      The fact that the Court itself authorized the issuance of the letters rogatory does not change this conclusion. Indeed, this has occurred in several cases: a judge approved the issuance of letters rogatory, the letters percolated through the administrative and judicial machinery of a foreign jurisdiction, and the defendant in the United States then pointed to the unresolved proceedings abroad as a reason to delay his or her trial here at home. The cases make clear that

---

[119]

    *See Gastaldi v. Sunvest Resort Cmtys., LC*, 709 F. Supp. 2d 1284, 1294 (S.D. Fla. 2010) ("This is not a case . . . in which it can be said with some measurable degree of confidence that granting the continuance will remedy the need for it." (internal citations omitted)); *United States v. Mitchell*, 385 F. Supp. 1190, 1192 (D.D.C. 1974) ("It would be unwarranted and wholly inappropriate to interrupt, adjourn or continue this trial, with the jury sequestered, until an uncertain date in the somewhat distant future."), *aff'd sub nom. United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).

[120]

    *See United States v. Aprea*, 358 F. Supp. 1126, 1129 (S.D.N.Y. 1973) (rejecting defendant's request for a continuance until after murder trial of key government witness, noting that the witness might be acquitted rather than convicted and that, in such an instance, the delay would have been for naught).

[121]

    *See United States v. King*, 762 F.2d 232, 235 (2d Cir. 1985) ("[A]ny detriment suffered by [defendant] resulted from his own dilatory conduct and not from the court's ruling."); *United States v. Bein*, 728 F.2d 107, 114 (2d Cir. 1984) (counsel did not act to secure witness's presence despite adequate notice of the need to do so); *United States v. Houlihan*, 332 F.2d 8, 15 (2d Cir. 1964) (defendant did not issue subpoena for witness's testimony until six weeks after the prosecution rested its case).

[122]

    *See O'Connor*, 650 F.3d at 854 (defendant provided "no inkling of what helpful information might have been found" during a continuance sought to investigate "surprise testimony"); *Miller*, 626 F.3d at 690 (no showing that resolution of other proceedings would have "strengthened [defendant's] case at trial"); *United States v. Dalli*, 424 F.2d 45, 48-49 (2d Cir. 1970) (no indication that witness's testimony "would have been at all helpful" to defendant).

trials need not be stayed indefinitely to await the unpredictable developments of foreign proceedings.   Two cases illustrate the point.

In *United States v. Bastanipour*,[123] the defendant challenged his conviction for smuggling heroin from Iran into the United States.[124]   He had landed at Chicago's O'Hare International Airport bearing twenty sealed caviar tins with heroin concealed beneath false bottoms.[125]   He sought allegedly exculpatory testimony via letters rogatory from the owner of the shop in Tehran that sold him the caviar.[126]   The trial judge delayed the case for several months but, when no response from Iran was forthcoming, ordered the trial to proceed.   The Seventh Circuit upheld the trial court's decision.   It reasoned that, "[g]iven the strained relations between Iran and the United States, the likelihood of a reasonably prompt response was never very good," and concluded that court was not "obliged to postpone commencement of trial indefinitely."[127]   And while *Bastanipour* obviously is distinguishable in that the relations of the United States with the United Kingdom – in contrast to those with Iran – are very close, the distinction makes no difference material to this case.   This Court had, and has, no greater reason to think that al Fawwaz will prevail in his United Kingdom litigation and that such a result would prove helpful to him than the Seventh

---

[123]
     697 F.2d 170 (7th Cir. 1982).

[124]
     *Id.* at 172.

[125]
     *Id.*

[126]
     *Id.* at 178.

[127]
     *Id.*

Circuit in *Bastanipour* had to believe that anything useful to that defendant ever would emerge from Iran.

In the second case, *United States v. Croft*,[128] the Ninth Circuit upheld the conviction of two defendants for conspiring to murder the U.S. Attorney for the District of Oregon.[129] Defendants there sought to depose an indicted co-conspirator living in Germany whom the government had tried to extradite.[130] The court allowed the deposition, but the defendants were unable to take it before the conclusion of trial. They argued on appeal that the court abused its discretion in denying their request for a continuance. The Ninth Circuit disagreed. It reasoned that "there was no indication" when the necessary approvals would be forthcoming from German authorities and cited the trial judge's statement that "[t]here was simply no end in sight" as a proper reason for denying the defendants' request.[131]

*Bastanipour* and *Croft* support the common sense conclusion that trial schedules need not be contingent on the outcome of foreign discovery proceedings. Counsel for al Fawwaz have cited an unpublished Fourth Circuit case, *United States v. Mason*,[132] as supporting al Fawwaz's arguments for delay.[133] But *Mason* involved highly unusual facts. The defendant there sought by

---

[128]    124 F.3d 1109 (9th Cir. 1997).

[129]    *Id.* at 1113.

[130]    *Id.* at 1116-18.

[131]    *Id.* at 1118.

[132]    919 F.2d 139 (4th Cir. 1990) (per curiam) (unpublished).

[133]    DI 1758 at 6-7.

letters rogatory the testimony of twenty-one witnesses located abroad. The trial judge held the requests under advisement for approximately eighteen months, then issued the letters rogatory sixty days prior to trial.[134] The Fourth Circuit ruled that this had been an abuse of discretion. The case involved an "indigent defendant" with no other way to procure foreign discovery,[135] and the court concluded that "[w]hile the issuance of letters rogatory is within the discretion of the trial judge, once the decision to issue them is made, the moving party must be given a reasonable amount of time in which to receive the responses."[136]

*Mason* ultimately stands for no more than the proposition, long ago enunciated by the Supreme Court, that a court may not subject a defendant to "an unreasoning and arbitrary insistence upon expeditiousness."[137] This Court, by contrast, did not authorize letters rogatory only to insist on the start of trial immediately thereafter. LR 3, the last of the three letters rogatory at issue, was issued in April 2014, more than nine months before the ultimate trial date, and LR 1 and LR 2 issued even earlier. Moreover, the Court postponed the trial several times already, most at the insistence of al Fawwaz.[138]

---

[134]

*Mason*, 919 F.2d 139, at *3.

[135]

*Id.*

[136]

*Id.*

[137]

*Morris*, 461 U.S. at 11-12 (internal quotation marks omitted).

[138]

*See, e.g.*, *United States v. Cicale*, 691 F.2d 95, 106-07 (2d Cir. 1982) (judge acted within his discretion by denying continuance when he already had "yielded twice on his preferred choice of trial date").

*III.* *Any Difficulties Accessing Files on Computer Discs Seized From Al Fawwaz's Apartment Did Not Warrant a Further Postponement*

Al Fawwaz's difficulties opening the .IMG files on PLW/35 did not warrant a further postponement for the principal reason that the issues were resolved prior to trial. Moreover, al Fawwaz offered no persuasive reason to believe that there was anything in any initially unreadable portions of these files that would be helpful to his defense or, for that matter, even relevant to the case.

The al Fawwaz team provided no indication that any of the thousands of accessible files on those discs seized from al Fawwaz's apartment was helpful to his defense in any way let alone any reasonable basis for supposing that the small percentage of (previously) inaccessible files contain such evidence. The Court commends counsel's thoroughness and desire to leave no stone unturned. But the situation was no different in principle than would be a case in which a defendant sought a further trial postponement on the ground that additional investigation might result in finding a helpful witness or a helpful document, but without offering any real basis for supposing that any such witness or document existed or could be found.[139] It must be noted, moreover, that al Fawwaz's counsel has been able to access these files for several weeks and has not suggested that those files in fact contain evidence helpful to the defense which necessitated further review.[140]

---

[139]

> *See O'Connor*, 650 F.3d at 854 (defendant provided "no inkling of what helpful information might have been found" during a continuance sought to investigate "surprise testimony"); *United States v. Cusack*, 229 F.3d 344, 349 (2d Cir. 2000) (the content of proposed handwriting expert's testimony "was not known"); *United States v. Frattini*, 501 F.2d 1234, 1237-38 (2d Cir. 1974) (counsel failed to articulate "the exact nature of the proffered evidence"); *Ellenbogen*, 365 F.2d at 987 ("In fact, when defense counsel was asked by the court what he actually expected to find from an examination of the [proposed evidence] he replied that he did not know.").

[140]

> Ltr. from B. Sternheim to Court (Jan. 13, 2015), at 2 ("After intensive effort this past week, and with assistance from the government, we have made significant progress in our ability

*IV.  Al Fawwaz's Other Assertions Were Unpersuasive*

    *A.  Client Review of Documents*

    Al Fawwaz claimed also that he needed additional time to review certain materials before trial – materials that he says were not made available to him until shortly before he made his motion.  As certain of the facts pertinent to that argument are classified, this aspect of his motion is disposed of in a supplemental memorandum of even date that will be filed with the Court Information Security Officer.  Nonetheless, without going into detail here, the Court notes the following, which bore on this aspect of al Fawwaz's motion:

    First, the Court postponed the trial for eight days in response to al Fawwaz's latest motion and on consent of the government.  Thus, defense counsel had more than two weeks from the date of their motion to the commencement of oral *voir dire*, and still more time until opening statements, within which to review the relevant materials with al Fawwaz.  That was entirely sufficient.

    Second, al Fawwaz contended that "[t]he Constitution requires that a defendant receive adequate notice of and an opportunity to review the information the government will use against him at trial."[141]  But the Constitution requires no such thing.  In fact, al Fawwaz had no right, constitutional or otherwise, to pretrial access to these materials.[142]  As the Supreme Court repeatedly

---

    to access the files that were identified in our motion. . . . We are also in the process of reviewing a subject of potentially relevant files, which we are not able to access, review, and forensically analyze.").

[141]

    DI 1824 at 3.

[142]

    Al Fawwaz was not entitled to a pretrial list of the witnesses the government plans to call. *See, e.g.*, *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Bejasa*, 904

has emphasized, "[t]here is no general constitutional right to discovery in a criminal case."[143] Indeed, the boundaries of the government's discovery obligations in criminal prosecutions are fixed by the Federal Rules of Criminal Procedure – chiefly or exclusively Rule 16 – and by the familiar *Brady-Giglio* doctrine, neither of which has expanded those obligations as far as al Fawwaz implies.[144]

Third, the government satisfied whatever discovery obligations it had under Rule 16 when it produced the materials at issue here to al Fawwaz's counsel;[145] al Fawwaz himself neither had then, nor has now, any additional right to this discovery. Moreover, even the limited rights created by Rule 16 are qualified: courts may "deny, restrict, or defer discovery" at any time for "good cause."[146]

---

F.2d 137, 139 (2d Cir. 1990). Nor was he entitled to a pretrial production of the documents the government intends to offer into evidence. *See, e.g.*, *Gray v. Netherland*, 518 U.S. 152, 167-68 (1996). He was, however, entitled to adequate notice of the charges against him – notice that he had for nearly fifteen years. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation . . . ."); *Cole v. Arkansas*, 333 U.S. 196, 201 (1948).

[143]

*Weatherford*, 429 U.S. at 559; *see also Kaley v. United States*, 134 S. Ct. 1090, 1101 (2014) (citing *Weatherford* and noting that neither the Federal Rules of Criminal Procedure nor due process require the government to disclose its witnesses or other evidence before trial); *United States v. Ruiz*, 536 U.S. 622, 629 (2002) ("[T]he Constitution does not require the prosecutor to share all useful information with the defendant."); *Netherland*, 518 U.S. at 168; *Pennsylvania v. Ritchie*, 480 U.S. 39, 59-60 (1987) ("Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.").

[144]

*See Weatherford*, 429 U.S. at 559 ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one.").

[145]

*See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 126 (2d Cir. 2008) ("[P]roduction of materials to a party's attorney alone falls within the common meaning of 'discovery.'"); *see also* FED. R. CRIM. P. 16.

[146]

FED. R. CRIM. P. 16(d)(1); *see also United States v. al Fawwaz*, No. S7 98-cr-1023 (LAK), 2014 WL 6997604, at *2 (S.D.N.Y. Dec. 8, 2014); *United States v. Urena*, 989 F. Supp. 2d

B.    *The Death of Al Liby*

Al Fawwaz's request for a postponement of the trial relied also on al Liby's death and the resulting publicity, some of which he said, "revisited the allegations made against him and Mr. Al Fawwaz in detail."[147]   He argued that time should be permitted to pass "to try to ensure that the jury pool is not impacted inappropriately by this event."[148]   That argument was addressed in detail in this Court's Memorandum and Order issued on January 14, 2015, and does not require any further discussion.[149]   Al Fawwaz contended also that additional time should have been granted because al Liby's lawyers had retained two experts who "were to testify on matters pertaining to Mr. Al Fawwaz's defense" and that al Liby's death left al Fawwaz's counsel responsible for the entire case without the aid of al Liby's counsel as to aspects common to both defendants.[150]   That matter warrants some further explanation.

Defense counsel in multi-defendant criminal cases inevitably face the possibility that one or more co-defendants will plead guilty, die, or otherwise become unavailable leaving counsel for the remaining defendant to face trial alone.   While there may be circumstances in which such an occurrence would warrant a postponement, the case for such relief was particularly weak in this case for two reasons.

---

253, 262 (S.D.N.Y. 2013).

[147]    DI 1824 at 4-5.

[148]    *Id*. at 5.

[149]    Mem. and Order [DI 1875].

[150]    DI 1824 at 4.

First, counsel long ago learned that al Liby was seriously ill and was aware at least as of June 18, 2014 that his condition probably was terminal.[151]  Al Fawwaz's counsel should have been, and almost certainly were, prepared to try the case without him.  Indeed, that is just what they sought to do.  As recently as December 30, 2014 – just three days before al Liby's death – the al Fawwaz team requested a separate trial from al Liby without any suggestion that a severance, if granted, would require postponement of the trial of al Fawwaz.[152]

Second, the argument that al Fawwaz required additional time to seek expert witnesses and reformulate witness presentations was entirely unpersuasive.  There was no evidence with respect to al Liby's experts' significance to al Fawwaz's defense, which could not be taken for granted given al Fawwaz's recent efforts to obtain a trial separate from al Liby.  Nor was there any evidence that al Liby's experts would be unwilling to testify on behalf of al Fawwaz.[153]  Moreover, the Court offered to appoint al Liby's counsel – assuming there were no conflicts of interest – for the purpose of examining whatever witnesses he had intended to examine prior to his client's death.[154]  Al Fawwaz's counsel never even responded to the Court's offer.  There was no basis to adjourn the trial any further on this ground.

---

[151]

Al Liby Mot. for Severance (June 18, 2014) (under seal) [DI 1637].

[152]

DI 1816 at 10.

[153]

Nor have al Fawwaz's counsel sought approval to retain either those experts, or any replacements for them, using Criminal Justice Act funds.

[154]

Jan. 6, 2015 Tr., 8:20-11:4.

C.      *The Surveillance Reports*

Al Fawwaz claimed also that he needed "a minimum of 30 days" to investigate "544 pages of surveillance reports" – originally prepared by a private company in the United Kingdom – that allegedly "detail the activities of Khalid Al Fawwaz, Dr. Muhammed Al Mass[a]ri, and Dr. Sa'ad Al Faqih during 1998."[155]  Al Fawwaz, who apparently believes he was "targeted" for this surveillance due to his "status as a peaceful Saudi dissident," says he received these reports from the government on December 31, 2014 – shortly after British authorities produced them – and that it is unclear when the British government learned of the surveillance or whether the U.S. government knew of it at all.[156]  Al Fawwaz claimed that the information contained in the reports "will likely require us to supplement and renew requests for letters rogatory and Rule 15 depositions of Drs. Al Massari and Al Faqih and to request letters rogatory and Rule 15 depositions of other individuals."[157]

As an initial matter, al Fawwaz ultimately had much – if not all – of the time he sought.  He received the material in question on December 31.  Given the brief postponement the Court granted him, oral *voir dire* did not begin until January 20.  The jury was not sworn and the government did not open until January 22 and the defense did not commence its case until February 17.  Thus, al Fawwaz had  three weeks before the start of the trial and more than six weeks before he presented any evidence to review these reports and conduct an investigation.  Yet no requests for additional Rule 15 depositions or letters rogatory were made.  Thus, with the benefit

---

[155]

DI 1824 at 3-4.

[156]

*Id.*; *see also* Ltr. from S. Buckley to Court (Jan. 10, 2015), at 5.

[157]

*Id.* at 4.

of hindsight, the possibilities to which al Fawwaz alluded in this aspect of his motion did not come to pass within the time he sought. Of course, the Court ruled on the request on January 14, 2015, so it did not have the benefit of everything it now knows. But it did then know that none of those possibilities had come to pass within two weeks of the December 31, 2014 production. And it knew more.

Al Fawwaz's theory as to why this surveillance was relevant seemed to be along these lines, although it was far from clear. Al Fawwaz concededly was running the London ARC office. He claims it was a legitimate operation of peaceful Saudi dissidents and not an al Qaeda front. If the surveillance was initiated on behalf of Saudi Arabia, that fact would have tended to corroborate his claim that he was targeted as a peaceful Saudi dissident, which he believed warranted an expanded deposition of Dr. al Massari and justified depositions of Dr. al Faqih and additional persons not identified. But none of that was persuasive.

The Court was given no reason to believe that additional review of the surveillance reports would have justified an expanded deposition of Dr. al Massari or depositions of Dr. al Faqih and other unspecified individuals. It certainly came as no surprise on December 31, 2014 that al Fawwaz had been under surveillance in London in 1998 by someone. His counsel told a British court in 1999 that al Fawwaz thought his telephone was being tapped and sought evidence with regard to possible surveillance through much of this case.[158] In any case, "'depositions [in criminal cases] are not intended as discovery devices.'"[159] They are available only when the are "material"

---

[158]

See supra Facts: The Alleged MI5 Material and Witnesses.

[159]

2 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CRIMINAL § 242 n.2 (4th ed. 2009) (quoting In re Application of Eisenberg, 654 F.2d 1107, 1113 n.9 (5th Cir. Unit B 1981)).

to the defense.[160]  And there was no showing in support of the motion for a postponement that there was any likelihood that further deposition testimony would have been material.  This was so particularly as to Drs. al Massari and al Faqih, as the Court already has ruled that depositions with respect to the their alleged fear of the Saudi Security Service would not have been material.[161]  The government contends, moreover, that these reports largely are irrelevant to the charged conspiracies, and, to whatever extent they are relevant, they are not helpful to the defense.[162]  For example, the reports state that al Fawwaz "claimed he was still close to Osama [b]in [L]aden" and "took credit for arranging the CNN interview with him."[163]  Accordingly, no basis existed to postpone the trial further with respect to these surveillance reports.

V.      *The Public Interest in Adhering to the Previously Adjourned Trial Date*

An additional factor merits particular attention in the context of this case's long history:  the public's interest in timely adjudication of the pending charges.

This request for a continuance was but the most recent in a series of requests to delay the trial.  It came more than two years after al Fawwaz's arraignment and more than sixteen years

---

[160]

*United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001).

[161]

*United States v. al Fawwaz*, 2014 WL 627083, at *5-6, *reconsideration denied*, Order (Apr. 16, 2014) [DI 1604].  The Court later authorized a deposition of al Massari on a different point.  DI 1706.

[162]

Ltr. from S. Buckley to Court (Jan. 10, 2015), at 5.

It must be noted that given the late disclosure the government agreed not to use any portions of these reports in its case-in-chief.

[163]

*Id.*

after the Embassy bombings.  The Court previously granted several requests to postpone these proceedings, yet al Fawwaz sought another delay in the *hope* that he *might* obtain some as-of-yet unspecified evidence that *could* prove helpful at trial.  In all the circumstances, the public's interest in moving forward outweighed that request.

In the first place, the logistical efforts involved in preparing for a trial of this magnitude, many of which are borne at public expense, are substantial.  The Supreme Court has recognized this basic reality, noting that the challenge of "assembling the witnesses, lawyers, and jurors at the same place at the same time . . . counsels against continuances except for compelling reasons."[164]  The Second Circuit has acknowledged that judges' aversion to the disruption engendered by eleventh-hour motions to delay is both understandable and entirely appropriate.[165]  In this very case, the Court dismissed an entire prospective jury panel in order to accommodate the defendant's request to push the trial into this new year.  The inconvenience and inefficiency of another delay weighed heavily against granting the pending motion.

The relevant considerations, however, transcended mere logistical difficulties.  The public has an interest in "the expeditious disposition of criminal prosecutions."[166]  More than sixteen years after the bombings of the embassies in Kenya and Tanzania, that interest looms large indeed.  The death of one of al Fawwaz's co-defendants while awaiting trial has served to place this interest

---

[164]

*Morris*, 461 U.S. at 11.

[165]

*See, e.g.*, *Beverly*, 5 F.3d at 641 (denial of continuance was proper when "based on [judge's] concern with the court's calendar [and] the effect of the delay on other litigants"); *Bein*, 728 F.2d at 114 ("[A] continuance . . . would have required rescheduling of the calendar for that day, thereby causing inconvenience to other litigants, a factor [the judge] was free to weigh in her consideration of the request for a stay.").

[166]

*United States v. Keilly*, 445 F.2d 1285, 1288 (2d Cir. 1971).

in even starker relief. Every day that passed threatened the trial, as memories fade and we face the inevitable likelihood that witnesses – many of whom are located across the globe – may die or disappear. The public's interest in bringing this matter to its conclusion was, and remains, utterly compelling.

*Conclusion*

For the foregoing reasons, al Fawwaz's motion was denied to the extent he sought a postponement of the trial beyond January 20, 2015.

SO ORDERED.

Dated:        February 19, 2015

Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)