**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
**--------------------------------------------------------x**

**UNITED STATES OF AMERICA**

        **-against-**                **S7 98 Cr. 1023 (LAK)**

**KHALID AL FAWWAZ,**

                **Defendant.**

**--------------------------------------------------------x**


**DEFENDANT'S SENTENCING MEMORANDUM**
**IN SUPPORT OF A SENTENCE LESS THAN LIFE**


**ATTORNEYS FOR KHALID AL FAWWAZ**

**Bobbi C. Sternheim, Esq.**       **David V. Kirby, Esq.**
**John Robinson, Esq.**          **Barbara E. O'Connor, Esq.**
**Law Office of Bobbi C. Sternheim**  **174 Battery Street, 3d Floor**
**33 West 19th Street – 4th Floor**   **Burlington, VT 05401**
**New York, NY 10010**          **802-863-0112**
**212-243-1100**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................... 1

FACTUAL BACKGROUND.......................................................................... 2

    A.    Personal Background ..................................................................... 2

    B.    Trial................................................................................................ 6

ARGUMENT................................................................................................ 10

    I.    A SIGNIFICANT BUT DEFINITE PRISON TERM IS SUFFICIENT TO
         COMPLY WITH THE PURPOSES OF SENTENCING. ...................... 11

        A. The Jury Convicted Khalid Al Fawwaz Of Crimes That Are Serious,
           But His Conduct Is Not As Blameworthy As The Charges Themselves
           Would Suggest. .................................................................... 11

        B. A Significant But Definite Sentence Of Imprisonment Would
           Adequately Deter Future Criminal Conduct. ........................................ 15

        C. Because Khalid Al Fawwaz Poses No Threat To Society, There Is No
           Need To Permanently Incapacitate Him. .............................................. 17

    II.    A SIGNIFICANT BUT DEFINITE PRISON TERM WOULD AVOID AN
         UNWARRANTED SENTENCING DISPARITY BETWEEN KHALID AL
         FAWWAZ AND THOSE WHO HAVE BEEN FOUND GUILTY OF
         SIMILAR CONDUCT................................................................................. 18

        A. Khalid Al Fawwaz Is Less Culpable Than His Co-Defendants............. 18

        B. Khalid Al Fawwaz Is Less Culpable Than Other Defendants Who Have
           Received Sentences Less Than Life. ..................................................... 21

    III.    KHALID AL FAWWAZ'S PERSONAL CIRCUMSTANCES WARRANT
         A SENTENCE LESS THAN LIFE .......................................................... 24

CONCLUSION.............................................................................................. 28

## PRELIMINARY STATEMENT

We submit this memorandum on behalf of Khalid Al Fawwaz to assist the Court in determining an appropriate sentence. The jury convicted Mr. Al Fawwaz of four conspiracy counts: (1) conspiring to kill United States nationals, (2) conspiring to murder, (3) conspiring to destroy buildings and property of the United States, and (4) conspiring to attack national defense utilities. All four convictions rest on the same factual premises: that Mr. Al Fawwaz provided support to those responsible for the actual crimes and that he knew or should have known that those individuals would engage in violence. These crimes are serious to be sure, but there are strong reasons why the extraordinary sentence of life imprisonment is inappropriate in this case, and why a significant but definite prison sentence would be sufficient but not greater than necessary to serve the ends of justice.

In particular, while the charges themselves are among the most serious in the criminal code, the conduct that the government proved Mr. Al Fawwaz engaged in was not as blameworthy as the charges themselves would suggest. As the government admitted at trial, Mr. Al Fawwaz did not help plan or carry out any terrorist plot, and there is no evidence that he had foreknowledge of the plot to bomb the embassies in Kenya and Tanzania, or any other violent conduct. Although the government presented evidence that Mr. Al Fawwaz helped facilitate communication between Usama bin Laden and the western media, we respectfully submit that this conduct is not of the heinous nature warranting a life sentence.

A sentence of life imprisonment for Mr. Al Fawwaz would also be unfair because it would result in an unwarranted sentencing disparity between Mr. Al Fawwaz and others who have been found guilty of similar conduct. Were the Court to sentence Mr. Al

Fawwaz to life in prison, the sentencing disparity between him and co-defendant Adel

Abdel Bary, who, unlike Mr. Al Fawwaz, is an individual originally charged with the

actual violent substantive offenses, would be especially stark.

Finally, Mr. Al Fawwaz's personal characteristics make him worthy of this Court's

consideration. While Mr. Al Fawwaz maintains his innocence, he has expressed deep

sorrow for the victims of the Embassy bombings and their families. Mr. Al Fawwaz

opposes violence and has demonstrated that he has opposed violence throughout his life.

And he has made the most of his difficult time in prison to improve himself and those

around him, and to assist the prison administration in maintaining decorum within the

correctional institutions where Mr. Al Fawwaz was housed, both here and in the United

Kingdom. Respectfully, he doesn't deserve to spend the rest of his life in a cell.

## FACTUAL BACKGROUND

### A. Personal Background

Khalid Al Fawwaz was born on August 25, 1962 to a family with long and deep roots

in Saudi Arabia. Though born in Kuwait, Mr. Al Fawwaz is a Saudi citizen, having

received the citizenship of his parents. He and his seven siblings grew up in a happy and

stable Muslim home. When Mr. Al Fawwaz was 18, his family returned to Saudi Arabia.

He graduated from high school in 1980 and attended one year of college before leaving

school to take a job at the Arabian Oil Company in Saudi Arabia, where he worked as an

operator of a water plant and earned $2,000 per month. He left school to take this job so

that he could assist his family financially.

In 1986, Mr. Al Fawwaz married his first wife. Shortly after the wedding, Mr. Al

Fawwaz's wife became ill, and so he devoted much of his time to her care. A few years

later, Mr. Al Fawwaz and his wife had their first child, a daughter named Asma. Asma is now 26 years old and works as a medical doctor in Saudi Arabia. Although Mr. Al Fawwaz and his first wife divorced in 1998, he continues to maintain contact with her as well as with his daughter, Asma.

The Soviet invasion of Afghanistan in the 1980s was a seminal event in Mr. Al Fawwaz's life. He was one of thousands of Arab Muslims who traveled to Afghanistan in the late 1980s to support the mujahideen in the fight to repel the invading Soviet Union from Afghanistan. He supported the cause as an aid and relief worker, assisting refugees who had left Afghanistan seeking refuge in Pakistan.

It was during this time that Mr. Al Fawwaz met Usama bin Laden. A fellow Saudi, Bin Laden shared an interest that Mr. Al Fawwaz long held in reforming Saudi Arabia. While living in Saudi Arabia, Mr. Al Fawwaz had grown distressed at the corruption of the Saudi royal family, and he and bin Laden dedicated themselves at that time to the peaceful reform of the Saudi government.

When Mr. Al Fawwaz returned to Saudi Arabia after the Soviet occupation ended in the early 1990s, he began pursuing a career in business, working first as a sales manager at a local company. Then, in 1993, he traveled to Kenya to pursue business opportunities there. Kenya was an attractive opportunity for Mr. Al Fawwaz because it was a former British colony, and he was fluent in English. While in Kenya, he started the company Asma, Inc., named after his daughter.

Around this same time, Mr. Al Fawwaz married his second wife, with whom he has three children. In 1994, he and his wife moved to London, where he helped open the London Office of the Advice and Reformation Committee ("ARC"), an organization

committed to the peaceful reform of the Saudi government. The ARC's constitution made clear that the group supported only peaceful reform and opposed violence of any sort. The organization issued numerous communiqués calling for reform, but none advocated violence.

While in London, Mr. Al Fawwaz also started a newsletter for Middle Eastern immigrants called *Addaleel*, meaning "The Guide." The newsletter focused on subjects relating to a Middle Eastern immigrant's daily life, including the process of Halal certification, children's education, and women's fashion. Mr. Al Fawwaz hoped that the newsletter would help him to earn an income in London, and he sold advertising space in the newsletter to local businesses.

Throughout his travels, Mr. Al Fawwaz never used any false names or passports. He always used and lived under his real name. And although Al Qaeda had a policy of requiring its members to shave their beards and wear Western dress when traveling abroad, Tr. 952, Mr. Al Fawwaz never disguised himself as a westerner. He lived exactly who he was—a conservative Muslim.

Mr. Al Fawwaz did not communicate with Usama bin Laden after bin Laden left the Sudan for Afghanistan. He did communicate with a man named Dr. Mohamed Atef, whom he understood to be a freelance journalist working out of Pakistan who had contact with Usama bin Laden. Through his connection with Atef, Mr. Al Fawwaz became a point person for people in the western media wishing to speak with bin Laden after his 1996 Declaration of Jihad. Mr. Al Fawwaz himself did not subscribe to the Declaration's violent message. Indeed, he was shocked and distressed by it, as he told several of his peers at the time.

As head of the London Office of the ARC, Mr. Al Fawwaz wanted to ensure that his actions were compliant with local law. From nearly the beginning of his tenure in London, he met with British intelligence agents, including an MI-5 agent who identified himself as Paul Banner. He told MI-5 that he represented a Saudi dissident group (the ARC) seeking peaceful reform in the Arabian Peninsula. He identified Usama bin Laden as one of the members of the Shura Council of the group, its leadership committee, and the man that signed the group's communiques. He told MI-5 that he wished to continue these activities, but wanted to make sure that he was complying with British law at all times. The British agents told him that he could continue his activities. Mr. Al Fawwaz continued these meetings with MI-5 right through his tenure in London.

After bin Laden issued his Declaration in 1996, MI-5 showed particular interest in meeting with Mr. Al Fawwaz, no doubt because he was a known associate of bin Laden's in connection with his work at the ARC. Mr. Al Fawwaz explained his opposition to the Declaration and his commitment to peaceful reform. Nonetheless, he wanted to continue to try to communicate with bin Laden if that was allowed under local law. The MI-5 agents told him that such communication was permissible depending on what he and bin Laden talked about.

On August 7, 1998, the United States Embassies in Kenya and Tanzania were bombed. On September 23, 1998, British authorities arrested Mr. Al Fawwaz and searched his home. The authorities held him for five days but then released him without charging him. He returned home and, within hours of his release, he was arrested again, this time at the behest of the United States pursuant to a request that he be extradited to face charges for the Embassy bombings. Mr. Al Fawwaz contested his extradition for 14 years, until he was

brought to stand trial in the United States in 2012. The indictment under which Mr. Al Fawwaz was extradited alleged that he was a member of conspiracies that had as their objectives: (1) to kill Americans anywhere in the world, (2) to bomb the United States embassies in Kenya and Tanzania, and (3) to kill American soldiers serving in Somalia and elsewhere on the Saudi Arabian peninsula.

**B.  Trial**

The government's theory at trial focused on proving that Mr. Al Fawwaz supported Al Qaeda generally. There was no proof introduced nor argument made that he knew of or participated in any particular terrorist plot. In its opening statement, the government stated:

> The defendant's job was a critical one, but it was *not* to plan terrorist attacks. The defendant did *not* plan the embassy bombings. And it was *not* to carry out terrorist attacks. The defendant obviously did *not* carry out the embassy bombings. The defendant's job for year after year was to lay the critical groundwork for Al Qaeda.

Tr. 30 (emphasis added).

The government opened its case with two journalists who described Mr. Al Fawwaz's function as an "expert on how to reach the western media," Tr. 1919, which the government described as "the most chilling function that [Mr. Al Fawwaz] may have played for Al Qaeda," *id.* Neither of these witnesses testified about Mr. Al Fawwaz's role in planning or carrying out any particular terrorist plot or his knowledge of any such plots.

The primary witnesses against Mr. Al Fawwaz were two long-term cooperating witnesses—L'Houssaine Kherchtou and Ihab Ali. These witnesses likewise offered no evidence linking Mr. Al Fawwaz to any particular terrorist plot. Instead, they testified about his presence in Afghanistan in the early 1990s and his presence in Kenya before he left in 1994. With respect to Afghanistan, Ali's entire testimony in this regard was that he had seen

6

Mr. Al Fawwaz "doing stretching exercises" at the Jawar training camp in 1990. Tr. 643. Kherchtou testified that Mr. Al Fawwaz was the "emir" or "individual in charge" at the Al Siddiq training camp in 1991, long before bin Laden's violent fatwahs, but he offered no basis for his opinion. Tr. 313-15. There is no evidence that Mr. Al Fawwaz engaged in any violence during his time in Afghanistan. And there is no evidence that he engaged in any anti-American activities during this time. Indeed, there was no evidence that he did anything illegal under United States law in Afghanistan.[1]

With respect to Kenya, Ali testified that Mr. Al Fawwaz assisted him in buying an airline ticket once in 1994 in Nairobi and that Mr. Al Fawwaz once remarked that there were "not too many Muslims in the world that were participating in jihad." Tr. 780. He said nothing about Mr. Al Fawwaz leading an Al Qaeda terror cell in Nairobi. Kherchtou testified that Mr. Al Fawwaz was "establishing a business" in Kenya and that when he needed money in Kenya, he would "first go to Abu Ubaidah al Banshiri," but if Abu Ubaidah al Banshiri wasn't there, he would "go to Khaled Al Fawwaz." Tr. 316. Again, Kherchtou offered no specifics about Mr. Al Fawwaz's activities in Kenya. There is no evidence that he engaged in any violence during his time in Kenya, that he engaged in any anti-American activities, or that he had anything whatsoever to do with planning the bombing of the American Embassy in Nairobi.

---

[1] In a previous trial under this indictment, the government stipulated that in response to the Soviet invasion of Afghanistan on December 27, 1979, a group of Muslims formed an armed force that became known as the Afghan Mujahideen, which fought the invading Soviet force and the Soviet-supported Afghan government. The government further stipulated that from shortly after the start of the Soviet invasion in Afghanistan in 1979, through September 1991, the United States, through one of its intelligence agencies, provided economic and military support to the Afghan mujahideen through a third country intermediary, including by providing stinger antiaircraft missiles. Tr. 539-40, *United States v. El Hage*, 98 Cr. 1023 (S.D.N.Y. Feb. 14, 2001).

According to the government, the "focus" of its case against Mr. Al Fawwaz was on "the preparation, the dissemination, and the publication of the August '96 declaration [and] of the February '98 fatwah . . . ." Tr. 1712. The only evidence that Mr. Al Fawwaz helped to prepare, disseminate, and publish the August 1996 Declaration was the fact that copies of the declaration were found in his home, and that he gave one copy of the declaration to Abdel Bari Atwan, the editor-in-chief of the newspaper Al Quds Al Arabi. And while the government presented evidence that Mr. Al Fawwaz was in contact with Al Quds shortly before the publication of the 1998 fatwa, there was no evidence that Mr. Al Fawwaz played any role in preparing the fatwa or otherwise distributing it. Indeed, the evidence of participation in preparation is completely to the contrary. The intercepted conversations between Mr. Al Fawwaz and Mohammed Atef around that time show that Mr. Al Fawwaz was not aware of the contents of the Fatwa until after Atef dictated it over the phone to Abdel Bari Atwan. *See* Gov. Exs. 2102(T)-04(T), Transcripts of Conversations on Feb. 21 and 22, 1998.

The government introduced a substantial number of these intercepted conversations at trial. The government argued that because Mr. Al Fawwaz "never expected that he would be able to intercept his telephone calls with Al Qaeda's leaders," the calls "give you an insight into his mind in 1998 . . . ." Tr. 2014. But in all the conversations the government introduced, not once does Mr. Al Fawwaz advocate or condone the use of violence. The government also noted that Mr. Al Fawwaz "never expected that . . . the British police would come and search his residence, that they would come and collect all of the evidence that you've heard . . . ." Tr. 2015. But none of that evidence showed that Mr. Al Fawwaz

himself supported violence. The documents found in his home calling for bloodshed were the words of other men, not his.

The government also made much of the alleged "Al Qaeda Member List" and the fact that Hamad Al Kuwaiti (which the government alleged was Khalid Al Fawwaz's kunya) appeared as number nine on that list. The Court is aware of the authenticity issues with the list:  we do not know who wrote it, when or for what purpose it was written, or whether it actually is an Al Qaeda list or a list of some other organization or group of individuals. All of the reasons why the law traditionally views hearsay as unreliable apply to the list. Clearly, whoever wrote the list did not do so under oath and was not subject to cross-examination. The fact that the Court found that the list satisfied the hearsay exclusion for coconspirator statements does not make it any more reliable, as it is well-recognized that the coconspirator statement exclusion exists out of "necessity." *See, e.g.*, *United States v. Gil*, 604 F.2d 546, 549 (7th Cir. 1979) (noting that the exclusion "is largely a result of necessity"). Moreover, an analysis of the list belies its accuracy as depicting the actual hierarchy of Al Qaeda. For example, Ihab Ali, who testified that he personally attended meetings with senior Al Qaeda members, was ranked only 66th on the list. Such inaccuracies further demonstrate that whoever authored the list did not have personal knowledge of Al Qaeda's membership or hierarchy, but more likely pieced the list together based on news reports and other second-hand accounts. This would explain Mr. Al Fawwaz's high ranking on the list, as his arrest and the charges against him were public knowledge after his arrest in 1998.

Nonetheless, the jury determined that this evidence was sufficient to convict Mr. Al Fawwaz of the charged conspiracies. While we do not mean to take issue with the jury

verdict here for purposes of fashioning an appropriate sentence, it is worth noting how little one can infer about the jury's factual findings based on their verdict alone. There is no way to know, for example, whether the jury believed that Mr. Al Fawwaz was the "trusted lieutenant" of bin Laden that the government alleged. There is no way to know whether the jury believed that Mr. Al Fawwaz participated in Al Qaeda's conspiracies during his time in Afghanistan or Kenya.

Nor is there any way to know which of the conspiracies' multiple objectives the jury believed Mr. Al Fawwaz intended to further. Because the jury could have convicted Mr. Al Fawwaz even if it found that he disagreed with all but one of the charged conspiracies' multiple objectives, it is entirely possible that the jury rejected the government's charge that Mr. Al Fawwaz played any role in, for example, the bombing of the United States embassies, or the attacks on American soldiers in Somalia. Given the dearth of evidence establishing that Mr. Al Fawwaz knew of these objectives of the conspiracies, we respectfully submit that the jury in all likelihood did not conclude that Mr. Al Fawwaz participated in the conspiracies in this regard.

## ARGUMENT

As the Court is aware, Section 3553(a) requires the Court to impose a sentence that is sufficient, but not greater than necessary, to "comply with the purposes [of sentencing]." 18 U.S.C. § 3553(a). Those purposes, according to Section 3553(a), are (1) "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; (2) "to afford adequate deterrence of criminal conduct"; (3) "to protect the public from further crimes of the defendant"; and (4) "to provide the defendant with

needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." *Id.* § 3553(a)(2).

In addition, in fashioning an appropriate sentence, the Court must consider (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) "the need for the sentence imposed [to comply with the purposes of sentencing]"; (3) the kinds of sentences available; (4) "the kinds of sentence and the sentencing range established [by the Sentencing Guidelines]"; (5) "any pertinent policy statement [issued by the Sentencing Commission]"; (6) "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and (7) "the need to provide restitution to any victims of the offense."

Below, we address the three sentencing factors that we believe are most pertinent to this case—the need for the sentence imposed to comply with the purposes of sentencing, the need to avoid unwarranted sentence disparities, and the history and characteristics of the defendant.

## I. A SIGNIFICANT BUT DEFINITE PRISON TERM IS SUFFICIENT TO COMPLY WITH THE PURPOSES OF SENTENCING.

### A. The Jury Convicted Khalid Al Fawwaz Of Crimes That Are Serious, But His Conduct Is Not As Blameworthy As The Charges Themselves Would Suggest.

The first purpose of sentencing articulated in Section 3553(a)(2) is the need for the sentence imposed to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." Without a doubt, the offenses for which Mr. Al Fawwaz was convicted are serious, and a sentence commensurate with the nature of the offenses is appropriate to promote respect for the law and provide just punishment.

But there is no reason why the *only* sentence that can accomplish these worthy aims is a sentence of life imprisonment. A life sentence is a truly extraordinary and harsh sentence, one that the Supreme Court has recognized is different in kind from a sentence that leaves open the possibility of release. A sentence of life imprisonment "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence." *Graham v. Florida*, 560 U.S. 48, 69-70 (2010). It "means the denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison for the rest of his days." *Id.* at 70 (internal quotation marks omitted). For these reasons, a sentence of life imprisonment is reserved for only the most heinous of offenders.[2]

---

[2]  Indeed, several nations around the world have banned the punishment of life imprisonment, including Brazil, Mexico, Norway, Portugal, and Spain. The people of these nations presumably have determined that in their societies, even sentences less than life can reflect the seriousness of the most heinous offenses. In Norway, for example, Anders Behring Breivik, the mass murderer who killed 77 people in a bombing and shooting attack in July 2011, was sentenced to only 21 years in prison. Mark Lewis & Sarah Lyall, *Norway Mass Killer Gets the Maximum: 21 Years*, N.Y. TIMES, Aug. 24, 2012, *available at* http://www.nytimes.com/2012/08/25/world/europe/anders-behring-breivik-murder-trial.html?_r=0.

And in 2013, the European Court of Human Rights held that sentences of life imprisonment without any prospect of release amount to inhuman and degrading treatment of prisoners in violation of Article 3 of the European Convention on Human Rights. *Vinter v. United Kingdom*, 55 Eur. Ct. H.R. 34 (2013), *available at* http://hudoc.echr.coe.int/sites/fra/pages/search.aspx?i=001-122664#{"itemid":["001-122664"]}; *see also* Owen Boscott and Eric Allison, *Whole-life Jail Terms Without Review Breach Human Rights – European Court*, GUARDIAN, JULY 9, 2013, *available at http://www.theguardian.com/law/2013/jul/09/whole-life-jail-sentences-without-review-breach-human-rights*.

Khalid Al Fawwaz is not such an offender. The government will no doubt argue that Mr. Al Fawwaz's role was just as critical, and that he is just as culpable, as his co-defendants who drove the truck bombs into the United States embassies in Kenya and Tanzania. But is it really true that the dissemination of "murderous words" is *equally* as blameworthy as the murderous actions to which the government claims they lead?

There is no evidence that anyone died as a result of Khalid Al Fawwaz's actions. There is no evidence, for example, that the murderers in Kenya and Tanzania were inspired by, or even aware of, the 1996 declaration and/or the 1998 fatwa. And even if there were such evidence, the role that Mr. Al Fawwaz allegedly played in the dissemination of those messages was no greater than that played by the western journalists who the government called as witnesses in this case. Such journalists played an equally important role in propagating bin Laden's murderous words. Yet no one would argue that they should be punished for what they did.

And rightfully so. The Constitution prohibits the government from "proscrib[ing] advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless actions and is likely to incite or produce such action." *Virginia v. Black*, 538 U.S. 343, 359 (2003) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (*per curiam*)).

Thus, in *Brandenburg*, the Supreme Court reversed the conviction of a leader of the Ku Klux Klan, who gave a speech at a cross-burning rally in which he stated, among other things, that "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance taken . . . . I believe the nigger should be returned to Africa, the Jew returned to Israel." *Id*.

at 446-47. The Court emphasized the First Amendment principle that "'the mere abstract teaching of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.'" *Id*. at 448 (quoting *Noto v. United States*, 367 U.S. 290, 297-98 (1961)). Because the defendant engaged only in advocacy and not "incitement to imminent lawless action," his speech was protected by the First Amendment. *Id*. at 448-49.

We do not argue here that the First Amendment is a legal defense to the charges. But the fact that the law recognizes a moral difference between advocating violence and violence itself undermines the claim that Mr. Al Fawwaz's conduct is just as blameworthy as the murderers who committed the substantive crimes in the indictment. Those men deliberately drove bombs into buildings knowing that doing so would kill hundreds of innocent people. Their moral depravity is simply on a different scale than one who helps disseminate an idea, no matter how vile that idea may be. Al Qaeda wouldn't be able to spread terror throughout the world if its supporters were only willing to do what the government alleges Mr. Al Fawwaz did. Al Qaeda needs killers to spread its terror—people who are willing to die for the cause of jihad. Khalid Al Fawwaz was not one of them.

Indeed, when one sets aside the *label* of the charge "conspiring to kill Americans" and focuses on what the government alleges Mr. Al Fawwaz actually did, his conduct more closely resembles what today would be prosecuted under the material-support statute. *See* 18 U.S.C. 2339B (prohibiting "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so"). A conviction under that statute is far less likely to result in a life sentence. *See* Section II.B, *infra* (listing

similar cases involving material-support charges). As such cases demonstrate, a significant but definite prison sentence can accomplish the purposes of sentencing. For Mr. Al Fawwaz, a significant but definite sentence would in all likelihood consume the majority of the remainder of his natural life. He would lose any opportunity to build a career or be a presence in the life of his family. Such a severe deprivation of liberty readily reflects the seriousness of Mr. Al Fawwaz's conduct, promotes respect for the law, and provides just punishment.

### B. A Significant But Definite Sentence Of Imprisonment Would Adequately Deter Future Criminal Conduct.

The second purpose of sentencing articulated in Section 3553(a)(2) is the need for the sentence imposed to "afford adequate deterrence to criminal conduct." The notion that punishment deters would-be wrongdoers is an important principle on which our criminal justice system is based. But an equally important principle is that the punishment be sufficient, *but not greater than necessary*, to advance the purposes of sentencing.

There is no empirical support for the proposition that the threat of a life sentence is more likely to deter than a significant but definite sentence of imprisonment. To the contrary, "the bulk of research on the deterrent effects of harsher sentences fails to support" the assertion that "putting people in prison for years or even decades . . . deter[s] would-be-offenders from committing crimes." Valerie Wright, *Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment*, SENTENCING PROJECT (2010),

*available at* http://www.sentencingproject.org/doc/Deterrence%20Briefing%20.pdf.[3] This conclusion comports with the common-sense intuition that if a future criminal wouldn't be deterred by a significant prison sentence, he is similarly unlikely to be deterred by a sentence of life imprisonment.

But even if there were empirical support for the view that a sentence of life imprisonment can deter more effectively than a significant but definite sentence of imprisonment, it still would not follow that a sentence of life imprisonment would result in *optimum deterrence* in all cases. For a system of deterrence to work properly, it is important that only the most heinous offenders be punished most severely. Otherwise, there would be no incentive for a would-be criminal to constrain his conduct to causing less harm. Scholars have recognized the importance of this concept of "marginal deterrence" for hundreds of years. *See, e.g.*, JEREMY BENTHAM, AN INTRODUCTION TO THE PRINCIPLES OF LEGISLATION (1780), *in* COLLECTED WORKS OF JEREMY BENTHAM 1, 168 (J.H. Burns & H.L.A. Hart eds., 1970) (1789) ("[B]ut if a man must . . .commit an offense of some kind or other, the next object [of punishment] is to induce him to commit an

---

[3] Michael Tonry, a law professor at the University of Minnesota and one of the world's leading experts on crime and public policy, has noted that "[although] [n]o one doubts that society is safer having some criminal penalties rather than none at all, . . . [o]n the real-world question of whether increases in penalties significantly reduce the incidence of serious crimes, the consensus conclusion of governmental advisory bodies in many countries is possibly, a little, at most, but probably not."). Michael Tonry, *Mandatory Penalties*, *in* THE OXFORD HANDBOOK OF CRIME AND CRIMINAL JUSTICE 730, 745 (Michael Tonry, ed., 2011); *see also* Anthony N. Doob & Cheryl Marie Webster, *Sentence Severity and Crime: Accepting the Null Hypothesis*, *in* CRIME AND JUSTICE: A REVIEW OF RESEARCH 143,187 (Michael Tonry ed., 2003) (reviewing literature on general-deterrence research and concluding, "We could find no conclusive evidence that supports the hypothesis that harsher sentences reduce crime through the mechanism of general deterrence."), *available at* https://www.ncjrs.gov/pdffiles1/Digitization/202743-202750NCJRS.pdf.

offense less mischievous, rather than more mischievous; in other words, to choose always the least mischievous, of two offenses that will either of them suit his purpose.").

When defendants like Mr. Al Fawwaz are punished with the same severity as those who actually murder Americans, the entire purpose of general deterrence is undermined.

**C.  Because Khalid Al Fawwaz Poses No Threat To Society, There Is No Need To Permanently Incapacitate Him.**

Finally, Section 3553(a)(2) also states that the sentencing court should look to the need "to protect the public from further crimes of the defendant." As noted throughout this submission, Mr. Al Fawwaz never engaged in violence, and there is no need to protect the public from him. The people with whom he associated in the 1990s have nearly all been captured or killed. There is simply no credible risk that if he were released and returned to London, he would commit future crimes.

Moreover, Mr. Al Fawwaz, now almost 53 years old, has been incarcerated since age 36. According to the United States Sentencing Commission, "[r]ecidivism rates decline relatively consistently as age increases." U.S. SENTENCING COMM'N, MEASURING RECIDIVISM: THE CRIMINAL HISTORY COMPUTATION OF THE FEDERAL SENTENCING GUIDELINES 12 (May 2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf. For example, "[a]mong all offenders under age 21, the recidivism rate is 35.5 percent, while offenders over age 50 have a recidivism rate of 9.5 percent." *Id.* Were the Court to sentence Mr. Al Fawwaz to, for example, 30 years in prison, he would not be eligible for release until close to age 70, even assuming that he were to get credit for the 16

years he has already served. He would thus be released at an age where he would be significantly less likely to pose a threat to society than someone released at a younger age.

## II.   A SIGNIFICANT BUT DEFINITE PRISON TERM WOULD AVOID AN UNWARRANTED SENTENCING DISPARITY BETWEEN KHALID AL FAWWAZ AND THOSE WHO HAVE BEEN FOUND GUILTY OF SIMILAR CONDUCT.

Section 3553(a)(6) requires the Court to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Here, a significant but definite prison term would avoid two kinds of sentencing disparities: a disparity between Mr. Al Fawwaz and his more culpable co-defendants, and a disparity between Mr. Al Fawwaz and other defendants who have received sentences of less than life for similar conduct.

### A.   Khalid Al Fawwaz Is Less Culpable Than His Co-Defendants.

Seven of Mr. Al Fawwaz's co-defendants have previously been sentenced. Sentencing Mr. Al Fawwaz to life imprisonment would create an unwarranted sentencing disparity between him and these co-defendants, all of whom are more culpable than Mr. Al Fawwaz, and two of whom received sentences substantially less than life.

Adel Abdel Bary was charged with 279 substantive counts, including 224 counts of murder. He was charged with these counts because the claims of responsibility were recovered from Bary's London office with his fingerprints on them. He admitted to transmitting the claims of responsibility via international fax to the press. By contrast, there was no evidence that Mr. Al Fawwaz had anything whatsoever to do with the

Embassy bombings. Bary, however, was sentenced to only 25 years' imprisonment pursuant to a plea agreement.[4]

Mohamed Suleiman Al Nalfi pleaded guilty to violating 18 U.S.C. § 2155(b), conspiracy to destroy national defense materials, premises, or utilities. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 137 (2d Cir. 2008). He admitted to creating a jihad group in Sudan in 1989 and traveling with others from Sudan to Egypt to establish a route to be used by Al Qaeda to move weapons without detection. Benjamin Weiser, *Qaeda Member Pleads Guilty to 1990's Conspiracy Charge*, N.Y. TIMES, Feb. 1, 2003, available at http://www.nytimes.com/2003/02/01/us/threats-responses-courts-qaeda-member-pleads-guilty-1990-s-conspiracy-charge.html. In 1992, he met with Al Qaeda officials to discuss how they might forcibly remove American and United Nations forces from Somalia and Saudi Arabia. *Id.* He also helped create businesses in Sudan as a cover for the procurement of explosives, chemicals, and weapons. *Id.* He was sentenced to just over 10 years in prison.

Mr. Al Fawwaz's remaining co-defendants all received sentences of life imprisonment. But these other co-defendants were all significantly more culpable than Mr. Al Fawwaz. To punish Mr. Al Fawwaz as severely as these co-defendants would thus defeat the purposes of *marginal* deterrence, *see* Section I.B., *supra*, as well as create unwarranted *uniformity*, which is just as offensive to the principle of proportionality as unwarranted disparity. *See Gall v. United States*, 552 U.S. 38, 55 (2007) (praising district court for considering not only "the need to avoid unwarranted disparities" but also "the need to

---

[4]   The fact that Bary pleaded guilty is irrelevant to the disparity analysis. There is no moral justification for punishing Mr. Al Fawwaz more harshly for exercising his right to a trial by jury.

19

avoid unwarranted *similarities* among other co-conspirators who were not similarly situated").

Mohamed Sadeek Odeh admitted that he was a member of Al Qaeda and that he was trained in the use of explosives. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d at 104. He fled Nairobi the day before the embassy bombings and was arrested in Pakistan the next day, where forensic analysis revealed explosives residue on his clothing and other items contained in his luggage. *Id.* The government alleged that he was the technical adviser for the embassy bombings, who instructed the Nairobi cell about how best to build and place the bomb so as to cause maximum fatalities. *Id.* at 105.

Mohamed Rashed Daoud Al-'Owhali helped place the bomb that exploded outside the American embassy in Nairobi, left the truck shortly before the bomb detonated and was seen fleeing the scene by an eyewitness. *Id.*

And Khalfan Khamis Mohamed was alleged to have assembled the bomb used in the bombing of the American embassy in Dar es Salaam and to have helped orchestrate the bombing. S(7) Indictment ¶¶ 12 aaaaaa, bbbbbb.

All three men—Odeh, Al-'Owhali, and Mohamed—were convicted of substantive counts of murder, and the United States sought the death penalty for each of them.

Similarly, Ahmed Khalfan Ghailani was alleged to have played a direct role in the logistical preparations for the Dar es Salaam bombing. *United States v. Ghailani*, 733 F.3d 29, 38 (2d Cir. 2013). He procured a number of items necessary for building an explosive device on the back of a truck, including 7 large metal tanks filled with flammable gas and a refrigeration truck. *Id*. He hid blasting caps in a locked armoire in his home. *Id*. He fled

Dar Es Salaam just a few days before the bombings and remained an active and engaged member of Al Qaeda until he was arrested in 2004. *Id.*

The last of Mr. Al Fawwaz's co-defendants to be sentenced—Wadih El Hage—was alleged to have served as the head of Al Qaeda's terrorist cell in Nairobi during the period post-dating bin Laden's 1996 Declaration of jihad through the time of the embassy bombings. *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d at 104. The government alleged that in February 1997, he conveyed a message from bin Laden directing the Nairobi cell to prepare for military activity. *Id.* After flying to the United States in September 1997, El Hage lied to a grand jury about the last time he had seen bin Laden, the nature of his contacts with various bin Laden associates, and his awareness of bin Laden's plans to target American interests. *Id.*

In contrast to these defendants, Mr. Al Fawwaz left Kenya 4 years before the bombings, and there was no evidence that he played any role in them. And he never lied or obstructed efforts to find bin Laden, indeed, quite the contrary. He met often in London with MI-5 and was forthcoming about his activities in trying to keep contact with bin Laden.

### B.  Khalid Al Fawwaz Is Less Culpable Than Other Defendants Who Have Received Sentences Less Than Life.

Sentencing Mr. Al Fawwaz to life imprisonment would also create an unwarranted sentencing disparity between him and other defendants who have received sentences of less than life for similar conduct. According to the Center on Law and Security at New York University School of Law, from September 11, 2001, to September 11, 2008, the average sentence for a violation of 18 U.S.C. § 2332, the statute that Mr. Al Fawwaz was

convicted of violating in Count I, was 26 years. *Terrorist Trial Report Card: September 11, 2008*, NEW YORK UNIVERSITY SCHOOL OF LAW CENTER ON LAW AND SECURITY, at 1, *available at* http://www.lawandsecurity.org/Portals/0/documents/ 03_Sept08TTRCFinal1.pdf. A review similar cases shows that a sentence of life imprisonment is the exception, not the rule.[5]

For example, Tarek Mehanna flew to Yemen in 2004 in search of a terrorist training camp, but returned home after he was unable to locate a camp. *U.S. v. Mehanna*, 735 F.3d 32, 41 (1st Cir. 2013). The record at trial was "shot through with evidence of the defendant's rabid support for al-Qa'ida, his 'love' for Osama bin Laden, his admiration of the September 11 hijackers, and his conviction that the September 11 attacks were justified and a 'happy' occasion." *Id.* at 46. In 2005, he began to translate Arab-language materials into English and post his translations on a website that "comprised an online community for those sympathetic to al-Qa'ida and Salafi-Jihadi perspectives." *Id.* at 41. "At least some offerings that the defendant translated constituted al-Qa'ida generated media and materials supportive of al-Qa'ida and/or jihad." *Id.* at 41 (footnotes omitted). He was convicted of material support and sentenced to **17 ½ years** in prison. *Id.* at 40.

---

[5]  Although the Guidelines range in this case is life imprisonment, in practice, judges in the Second Circuit more often sentence a defendant below the Guidelines range than within it. According to the most recent statistics, only 27.9% of defendants in the Second Circuit received sentences within the Guidelines range. By contrast, 71.7% of defendants received below-Guidelines sentences, and 37.9% received below-Guidelines sentences based on §3553(a) factors alone (as opposed to a below-Guidelines sentences based on a downward departure). In the Southern District of New York, 74.9% of defendants receive below-Guidelines sentences, and 50.9% of defendants receive below-Guidelines sentences based on §3553(a) factors alone. U.S. SENTENCING COMM'N, PRELIMINARY QUARTERLY DATA REPORT, 1ST QUARTER RELEASE, PRELIMINARY FISCAL YEAR 2015 at 2-3, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2015_1st_Quarterly_Report.pdf.

John Walker Lindh joined a mujahideen training camp seeking "to fight with the Taliban on the front line of Afghanistan," and he "voluntarily swore allegiance to Jihad." *United States v. Lindh*, 227 F. Supp. 2d 565, 567-68 (E.D. Va. 2002). While at the camp, Lindh participated in a "program focused primarily on the goals of Jihad," and for twenty days received weapons instruction that included firing numerous rounds on various types of weapons; he then participated in training activities at an Al Qaeda-funded training camp, attended lectures by Osama bin Laden, and gained "additional, more extensive military training" in "weapons and explosives," as well as "orienteering, navigation, and battlefield combat." *Id.* After obtaining his extensive battlefield training, he traveled with other Al Qaeda supporters where he fought on the front line against the Northern Alliance from September through November 2001. *Id.* at 568. He pleaded guilty to supplying services to the Taliban and carrying an explosive during the commission of a felony. He was sentenced to **20 years** in prison. *Id.* at 572.

Iyman Faris traveled to an Al Qaeda training camp in late 2000, where he met Usama bin Laden. *See United States v. Faris*, 107 Fed. Appx. 308, 311 (4th Cir. 2004). While at the training camp, Faris researched ultralight airplanes, ordered sleeping bags for use by Al Qaeda, helped obtain extensions on airline tickets for members of Al Qaeda, and discussed the possibility of destroying the Brooklyn Bridge. *Id.* at 311-12. When Faris returned to the United States, he traveled to New York City, inspected the Brooklyn Bridge, and relayed

his assessment of the feasibility of destroying the bridge to members of Al Qaeda. *Id.* He

was convicted of material support and sentenced to **20 years** in prison. *Id.* at 311.[6]

As these cases demonstrate, a significant but definite prison term can reflect the

seriousness of the offenses in this case, promote respect for the law, and provide just

punishment.

### III.  KHALID AL FAWWAZ'S PERSONAL CIRCUMSTANCES WARRANT A SENTENCE LESS THAN LIFE

Mr. Al Fawwaz is an intelligent, caring father of four who wishes for nothing more

than to one day have the opportunity to see his children and grandchildren. He remains in

close touch with his family—his siblings, children and his elderly mother. His father

---

[6] *See also Hamdan v. United States,* 696 F.3d 1238, 1240 (D.C. Cir. 2012) (Usama bin Laden's driver in Afghanistan convicted of providing material support to Al Qaeda—sentenced to **5 ½ years** in prison); *United States v. Al Kassar,* 660 F.3d 108 (2d Cir. 2011) (defendants found guilty after trial of, among other things, conspiracy to murder Americans and provide material support to designated foreign terrorist organization—sentences ranged from **25 to 30 years** in prison); *United States v. Jayyousi,* 657 F.3d 1085 (11th Cir. 2011) (Defendant, Jose Padilla, convicted of material support involving training in Al Qaeda facilities in Afghanistan and volunteering for violent activity overseas—originally sentenced to just over 17 years in prison, subsequently resentenced to **21 years** in prison); *United States v. Paracha*, 313 F. App'x 347, 348 (2d Cir. 2008) (Defendant convicted of "conspiracy and substantive counts of providing material support and resources to al Qaeda, making or receiving a contribution of funds, goods or services on behalf of Al Qaeda, and committing identification document fraud to facilitate an act of international terrorism"—sentenced to **30 years** in prison); *Hicks v. United States*, No. CMCR 13-004, 2015 WL 1402663, at *2 (USCMCR Feb. 18, 2015) (Defendant pleaded guilty to material support to Al Qaeda in Afghanistan following the September 11, 2001, attacks—sentenced to **7 years** in prison); *United States v. Warsame*, 651 F. Supp. 2d 978, 981 (D. Minn. 2009) (Defendant trained at two terrorist training camps, had access to Al Qaeda leadership, and maintained contact with training camp colleagues after his return to Canada and the United States—sentenced to less than **8 years** in prison); *United States v. Goba*, 240 F. Supp. 2d 242, 243 (W.D.N.Y. 2003) (Defendants traveled to Afghanistan and trained in war tactics, explosives, and weapons—sentences ranged from **7 to 10 years** in prison).

passed away while he was incarcerated in the UK, a tragedy he regrets to this day, and it is unlikely he will see his mother—to whom he is devoted—again. He is a devout Muslim who believes that Islam is a religion of peace. He abhors violence of any kind. During his 16 years of incarceration, he has exhibited excellent behavior, having not been cited for a single disciplinary infraction. He has not once in his life—whether in prison or in the outside world—resorted to violence.

Mr. Al Fawwaz was a model prisoner during his incarceration in the United Kingdom.[7] While at Belmarsh Prison, Mr. Al Fawwaz performed interpretation services for inmates and prison officers. For example, most of the individuals arrested during Operation Challenge spoke only Arabic. Mr. Al Fawwaz explained to these inmates what was going on and helped prison officers communicate with them. On one occasion, Ibrahim Eidarous tried to commit suicide. The prison officers brought Mr. Al Fawwaz in to help them speak to Eidarous and understand what was going on. On another occasion, Eidarous made a complaint about his treatment by a prison officer. Mr. Al Fawwaz interpreted between Eidarous and other officers during the investigation.

In Brixton prison, Mr. Al Fawwaz was trained as and worked as a "listener." "Listeners" were trained to understand, be aware of, and prevent suicide. They were available 24/7 to listen to and counsel any inmate that was depressed and considering suicide. As a part of this responsibility, Mr. Al Fawwaz attended monthly meetings of Listeners to discuss the climate of each unit and anything prison authorities could do to lessen the tension on the units and improve the mental health of inmates.

---

[7] We requested Mr. Al Fawwaz's prison records from the United Kingdom in the hope that we would be able to submit them to the Court for consideration. Unfortunately, we have not yet received the records.

Mr. Al Fawwaz was elected by the unit population in Brixton to represent the unit on a number of prison committees. As the "Food/Canteen Representative," Mr. Al Fawwaz attended monthly meetings to discuss with other representatives and prison authorities issues relating to the prison menu and canteen (the British equivalent of the commissary). Mr. Al Fawwaz also served as the Race Relations Representative. In this role, he attended monthly meetings with the prison administration to discuss issues of race relations.

In Brixton, Mr. Al Fawwaz also acted as the official interpreter during disciplinary adjudications, explaining the charges to Arabic-speaking inmates and interpreting during the hearings. He acted as the substitute imam and led Jumu'ah services when the imam was absent. He also worked as an orderly, cleaning the prison landings, floors, and the unit; in the kitchen serving food; in the laundry department, doing laundry for his unit, changing bedding, and providing clothes to new inmates. He pursued his education, taking computer classes, IT classes, art classes, and textile classes.

In Woodhill prison, Mr. Al Fawwaz served as the head imam for six months after the prison's imam left. When the prison hired a permanent imam, Mr. Al Fawwaz continued to provide religious services and counseling. Mr. Al Fawwaz was elected "Unit Representative" and helped organize local and holiday activities on the unit. He also represented his unit at meetings having to do with food/canteen issues. He continued to pursue his education, taking courses in art, parenting, anger management, and information technology.

In Long Lartin prison, Mr. Al Fawwaz continued to provide counseling to his fellow inmates. He took courses in informational technology and woodworking, where he learned to make handmade furniture.

26

During his comparatively brief time at the Metropolitan Correctional Center in New York, Mr. Al Fawwaz has continued to be a model prisoner. As he was in the United Kingdom, Mr. Al Fawwaz is a respected figure in his community, leading the Friday Jumu'ah prayer for the jail's Muslim inmates and continuing be there for his fellow inmates when they need someone to listen.

Finally, Mr. Al Fawwaz is unique among many of his co-defendants in that he is repentant. Although he maintains his innocence, he feels deep sorrow for the victims of the bombings and sees the bombings as utter tragedies. He regrets his actions and realizes the extremely poor judgment he exercised earlier in his life. He accepts that the Court must sentence him in accordance with the jury's verdict. But he humbly requests that the Court acknowledge his distinction from the violent characters who have come before the Court and not deny him the hope that one day he may be able to experience freedom again.

**CONCLUSION**

For the foregoing reasons, we respectfully request that the Court sentence Khalid Al

Fawwaz to less than life imprisonment.


Dated: New York, NY
      May 1, 2015

                          Respectfully submitted,
                          Attorneys for Khalid Al Fawwaz

                          *Bobbi C. Sternheim*

                          Bobbi C. Sternheim
                          David V. Kirby
                          Barbara E. O'Connor
                          John Robinson