UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                      :

        - v. -                      :      (S7) 98 Cr. 1023 (LAK)

KHALID AL FAWWAZ,                             :
      a/k/a "Khaled Abdul Rahman Hamad
          al Fawwaz,"                       :
      a/k/a "Abu Omar,"
      a/k/a "Hamad,"                        :

             Defendant.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**GOVERNMENT'S SENTENCING MEMORANDUM**



PREET BHARARA
United States Attorney
Southern District of New York


Sean S. Buckley
Adam Fee
Nicholas J. Lewin
Stephen J. Ritchin
     Assistant United States Attorneys
     - Of Counsel -

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................................. 1

BACKGROUND .............................................................................................................................. 3

    I.    Facts Relevant to Sentencing ........................................................................................... 3

      A.   Al Qaeda ......................................................................................................................... 3

      B.   Al Qaeda's East Africa Cell ........................................................................................... 4

      C.   Al Qaeda's Public Declaration of War on the United States ......................................... 4

      D.   Fawwaz Was a Long-Standing and Dedicated Member of al Qaeda ............................ 6

    II.   Fawwaz Has Misrepresented Many of the Relevant Facts ................................................ 8

      A.   Fawwaz Misrepresents Himself as an Opponent of Violence ........................................ 9

      B.   Fawwaz Misrepresents His Understanding of Who Muhammad Atef Was ............................ 12

DISCUSSION ................................................................................................................................ 15

    I.    Fawwaz Concedes that the Sentencing Guidelines Call for a Life Sentence ................................. 15

    II.   The Statutory Sentencing Factors Call for a Life Sentence ........................................... 16

      A.   The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant ..................................................................................................... 17

      B.   A Life Sentence Serves the Goals of Deterrence, Just Punishment, and Respect for the Law ... 22

        1.   The Need for Just Punishment Requires the Imposition of a Life Sentence Here ................. 22

        2.   A Life Sentence Is Necessary for Both Specific and General Deterrence as Well as to Promote Respect for the Law ..................................................................... 27

        3.   A Life Sentence is Necessary to Protect the Public from Further Crimes of the Defendant .. 29

      C.   Fawwaz Should Receive the Same Sentence as His Similarly Situated Co-Defendants ........... 30

        1.   Fawwaz is Equally Culpable as Those Co-Conspirators Who Received Life Sentences in 2001 and 2010 ............................................................................... 31

        2.   Comparisons to the Sentences Imposed on Bary and al Nalfi Are Inapposite ..................... 33

        3.   Imposition of a Life Sentence Avoids Unwarranted Nationwide Disparities ..................... 38

CONCLUSION .............................................................................................................................. 42

# PRELIMINARY STATEMENT

For nearly a decade Khalid al Fawwaz was an important member of al Qaeda, serving that terrorist organization in several vital roles.  Fawwaz was the leader of a military training camp in Afghanistan where al Qaeda members learned to use weapons of war in service of the organization's goals.  He was a leader of al Qaeda in Nairobi, Kenya, while al Qaeda members used that city as a way station during their fight against American troops in neighboring Somalia, and while al Qaeda members began their surveillance of the American embassy in Nairobi that al Qaeda would ultimately bomb.  For four years he was al Qaeda's representative in London, where he served as Bin Laden's bridge to the West and a procurer of services and supplies that al Qaeda's leaders could not obtain in Afghanistan.

While in London, Fawwaz helped Bin Laden prepare and disseminate his sanguinary calls to Muslims to kill Americans, first soldiers and then all Americans, wherever in the world they could be found.  Fawwaz also advised al Qaeda about how best to broadcast its calls for death and terror, and interviewed journalists before they were permitted to interview Bin Laden. If al Qaeda's leaders in Afghanistan needed vehicles, or generators, or minutes for a satellite phone, Fawwaz helped find them and get them to Afghanistan.

In short, until he was arrested, Fawwaz devoted much of his adult life to helping al Qaeda succeed, and used his knowledge of English and the West, and his base in London, to help spread terror to America.  And when al Qaeda did succeed, when its calls to kill Americans that Fawwaz had helped prepare and disseminate yielded their bitter fruit of 224 dead and more than 4,000 injured in Nairobi and Dar es Salaam, Fawwaz kept talking to al Qaeda's leadership, kept on working with them to achieve their common goals.

For this conduct Fawwaz was convicted at trial of participating in four conspiracies headed by Bin Laden – to kill Americans, including members of the US military and those employed at the American embassies in Kenya and Tanzania, to murder, to destroy buildings and property of the United States and to attack national defense premises and utilities. Three of those conspiracies carry a maximum penalty of life. And that is the penalty he should receive. It is commensurate with his role as an important leader of al Qaeda and a full-fledged member of these conspiracies. It is commensurate with his full and unwavering support for Bin Laden's calls for violence, and all he did to ensure that those calls to violence were disseminated to those who might answer them. It is necessary to reflect the seriousness of the conspiracies in which he participated – which produced mass death and destruction in and near two United States embassies – and to justly punish him for his role in those conspiracies. It is necessary to deter others who might think to join conspiracies to kill Americans or attack American facilities; to make clear to them that those who participate in such conspiracies will be punished severely if they are caught. And it is necessary to protect the public from further crimes of this defendant, who even today, despite having heard the evidence against him and the jury's unanimous verdict of guilt on every count, remains unrepentant, convinced he has committed no crime.

For all of these reasons, and those set forth below, the Government respectfully requests that the Court, consistent with the Sentencing Guidelines and the recommendation of the Probation Office, sentence Khalid al Fawwaz to life in prison.

# BACKGROUND

## I. Facts Relevant to Sentencing

### A. Al Qaeda

Al Qaeda is an international terrorist group dedicated to opposing non-Islamic governments with force and violence; it was formed in the late 1980s. *See* PSR ¶ 24.[1] Throughout the relevant period, Al Qaeda functioned in part through a central command and control structure headed by its "emir," Usama Bin Laden. *See* PSR ¶¶ 24, 29; *see also* Tr. 320:16-23 (testimony of L'Houssaine Kherchtou). Al Qaeda trained its members to engage in acts of violence at training camps, the first of which were set up in Afghanistan. *See* Tr. 297:25-298:7, 298:19-299:9, 301:14-303:12, 314:19-21(testimony of L'Houssaine Kherchtou); 698:15-699:13, 709:24-710:18, 715:1-25 (testimony of Ihab Ali).

Almost from its inception, Al Qaeda opposed the United States. *See* PSR ¶ 25; Tr. 390:21-391:11 (testimony of L'Houssaine Kherchtou). American troops had arrived in Saudi Arabia, at the invitation of the Saudi Arabian government, beginning on August 7, 1990, and U.S. troops arrived in Somalia on a humanitarian mission beginning at the end of 1991. PSR at 8 n.1; Tr. 82:25-83:9, 93:20-24 (testimony of Daniel Coleman). One of Al Qaeda's principal goals was to drive the United States out of the Saudi Arabian peninsula and the Horn of Africa through violence. *See* Tr. 390:21-391:11 (testimony of L'Houssaine Kherchtou); GX 1600-T at 13.

---

[1] The Probation Office's Presentence Investigation Report, dated May 7, 2015, is referred to herein as "PSR" or "Presentence Investigation Report." The defendant's sentencing memorandum, dated May 1, 2015, is referred to herein as "Def. Mem." The defendant's letter, dated April 28, 2015, setting for the defendant's objections to the Presentence Investigation is referred to herein as "Def. PSR Objection Ltr." References to "GX" denote government exhibits introduced at trial. References to "Tr." denote specific pages from the 2015 trial transcript. And references to "Ex" denote exhibits to the instant memorandum.

**B. Al Qaeda's East Africa Cell**

During the early 1990s, Al Qaeda set up a base of operations in Nairobi, Kenya; the base was intended to, and was used to, facilitate the transport of Al Qaeda trainers and supplies to Somalia. *See* Tr. 731:2–732:9, 733:20-734:6, 741:2-6, 757:23-758:13, 811:12-20 (testimony of Ihab Ali); Tr. 403:4-406:25, 408:5-412:12 (testimony of L'Houssain Kherchtou); GX 310-74A-T; GX 300A-T; GX 647B-T. During this time period, Al Qaeda leaders took up residence in Nairobi, among them Khalid al Fawwaz. *See* Tr. 316:1-317:4, 395:10-396:18, 398:9-400:18 (testimony of L'Houssaine Kherchtou). The Nairobi cell was used not only as a base for sending al Qaeda operatives into Somalia. It was also used to plan an attack in Nairobi itself. Al Qaeda operatives, including Muhammad Atef, conducted surveillance of the United States Embassy in Nairobi in December 1993. *See* Tr. 410:16-416:3 (testimony of L'Houssaine Kherchtou).

**C. Al Qaeda's Public Declaration of War on the United States**

On August 23, 1996, Bin Laden issued a public declaration of holy war, or "jihad," against the United States. *See* PSR ¶ 33; GX 1600-T. Bin Laden called on Muslims to attack and kill American soldiers in his declaration. For example:

- "[T]he cause of the disease and the source of trouble remains the occupying American enemy. Therefore, all efforts must be directed to killing, fighting, destroying and ambushing it until it is defeated, God Almighty willing." GX 1600-T at 22.

- "Further, our terror against you, while you are carrying arms on our land, is a legal obligation, and reasonable reaction." GX 1600-T at 28.

- "It is an obligation upon every tribe in the Arabian Peninsula to engage in Jihad for God's sake and cleanse their land from the occupiers- Allah knows that their blood is lawful and taking their properties is lawful as well." GX 1600-T at 29.

- "Your brothers in the land of the Two Holy Sites and in Palestine are calling upon you for support, and they ask you to help them in their Jihad against your enemies and their enemies, the Israelis and the Americans. They have to be fought with every

possible means so they are forced out, defeated, and humiliated, from the Islamic holy places."  GX 1600-T at 30.

Several months later, he reiterated his call for jihad against the United States in the Western media, in an interview with Peter Arnett of CNN.  *See* GX 80, 80-T (1997 interview with Usama Bin Laden).  These directives were received by Al Qaeda operatives residing in East Africa, who described themselves as the "implementers" of Al Qaeda's plans.  *See* GX 300A-T at 4 (translation of 1997 security report).

In February 1998, Bin Laden signed a "fatwa," or religious ruling, directing Muslims to kill American civilians, as well as American soldiers, wherever in the world they could be found.  *See* PSR ¶ 34.  Specifically, Bin Laden stated:

> [W]e issue the following fatwa to all Muslims:
>
> The ruling to kill the Americans and their allies – ***civilians and military*** – is an individual duty for every Muslim who can do it ***in any country in which it is possible to do it***.

GX 93-T (translation of 1998 fatwa) (emphasis added).  Then, in May 1998, Bin Laden broadcast this call to violence to the West, appearing on ABC to, *inter alia*, instruct his followers "not [to] differentiate between those dressed in military uniforms and civilians; they are all targets in this fatwa."  See GX 81D (portions of Bin Laden interview).

One of the ways al Qaeda sought to accomplish its goals was by conducting so-called "military operations."  One of the objectives of such "military operations" was "[b]lasting and destroying . . . embassies[.]"  GX 1677-T at 12 (training manual recovered from the United Kingdom residence of al Qaeda operative Anas al Liby)  To that end, al Qaeda members were trained to conduct surveillance of potential targets, including "embassies." Tr. 355:18-25, 356:1-24, 359:4-25, 361:24-367:24 (testimony of L'Houssaine Kherchtou), such as the surveillance

performed in Nairobi by the group of al Qaeda operatives that included Ali Mohamed, Anas al Liby, and other members of al Qaeda. *See* Tr. 410-15 (testimony of L'Houssaine Kherchtou).

### D.  Fawwaz Was a Long-Standing and Dedicated Member of al Qaeda

Fawwaz began his association with al Qaeda in its very early days, when he attended the Jawar al Qaeda military training camp. Tr. 641:9-643:23 (testimony of Ihab Ali); *see* PSR ¶ 53. By 1991 he was the emir, or leader, of al Qaeda's al Siddiq military training camp in Afghanistan. PSR ¶ 53; Tr. 313:15-315:9 (testimony of L'Houssaine Kherchtou).

In 1993, Fawwaz moved to Nairobi, Kenya, where he served as a leader of the al Qaeda members there. PSR ¶ 53; Tr. 316:1-318:4, 398:21-25, 399:16-25 (testimony of L'Houssaine Kherchtou). During Fawwaz's time as a leader of al Qaeda in Nairobi, al Qaeda's surveillance of the United States Embassy there began, Tr. 317:17-318:4, 410:16-416:3 (testimony of L'Houssaine Kherchtou), and al Qaeda sent trainers to Somalia through Kenya to support attacks against American forces in Somalia. Tr. 731:2-732:9, 733:20-734:6, 741:2-6, 757:23-758:13, 811:12-20 (testimony of Ihab Ali), 403:4-406:25, 408:5-412:12 (testimony of L'Houssaine Kherchtou); GX 310-74A-T, 300A-T, 647B-T. It was also during Fawwaz's time in Nairobi that he created Asma Ltd. along with Abu Ubaidah al Banshiri, who was then al Qaeda's second in command. PSR ¶ 53; GX 103, 605-B; Tr. 400:1-402:15 (testimony of L'Houssaine Kherchtou).

In 1994, following his arrest by Kenyan police, Fawwaz moved to London. PSR ¶ 53; Tr. 420:1-424:24 (testimony of L'Houssaine Kherchtou). Soon after Fawwaz arrived in London, Bin Laden named him director of the Advice and Reformation Committee's London office. PSR ¶ 53; GX 1606-T; 1607.

Two years later, in August 1996, when Bin Laden issued his declaration of jihad against the United States, Fawwaz assisted in the preparation and distribution of the declaration of jihad. For example, a file on Fawwaz's computer entitled "the Message," was created on July 30, 1996,

and contained subfolders that included electronic drafts of the August 1996 declaration. *See* GX 2500-I-T; GX 2501-T; GX 2502-T. In addition, a search of Fawwaz's residence revealed that Fawwaz had more than two dozen copies of the August 1996 declaration – in electronic and hard copy format – and those different versions varied in formatting, language, and style. Lastly, Fawwaz provided that Declaration to the editor of the *Al Quds* newspaper, which was the first newspaper to publish it. Tr. 1788:11-16 (testimony of Abdel Bary Atwan). Fawwaz also asked the editor of the *Al Quds* newspaper to interview Bin Laden, and helped to make arrangements for the interview. PSR ¶ 53. Tr. 1789:21-90:3.[2]

In March 1997, Fawwaz helped arrange the interview of Bin Laden by Peter Arnett of CNN, PSR ¶ 53; GX 80, 80-T, Tr. 135:5-140:2, during which Bin Laden broadcast to the world his view that it was a religious duty for Muslims to drive the Americans away from all Muslim countries. GX 80-T at 2. Fawwaz was responsible for vetting Arnett and his news team, and reporting back to al Qaeda leadership in Afghanistan. Later that year, in August 1997, Fawwaz received a fax from Harun Fazul requesting information about possible cooperation with a foreign government by a member of al Qaeda. *See* PSR ¶ 53; GX 246-T, 300 A-T.

In February 1998, a few days before the publication of the fatwa signed by Bin Laden calling for Muslims to kill Americans, civilian and military, in any country in which it is possible to do so, GX 14-TA, Atef notified Fawwaz that he might be sending the fatwa to him that evening, and asked Fawwaz to contact Abdel Bary Atwan about making plans to publish the fatwa. GX 2101-T. When Atef tried to fax the fatwa to Fawwaz, the fax failed, GX 2102-T, so

---

[2] In his objections to the PSR, Fawwaz "disputes the assertion that 'Al Fawwaz asked the Al-Quds newspaper editor to interview Bin Laden.'" Def. PSR Objection Ltr. at 2. However, Abdel Bary Atwan, the Al-Quds editor, when asked during his deposition "is it correct that at some point in 1996 prior to November Mr. al Fawwaz came to your office and asked if you would be interested in interviewing bin Laden?" responded "Yes, he did." Tr. 1789:25-90:3.

Fawwaz arranged for Atef to communicate directly with the Al-Quds newspaper in London, GX 95, and Atef dictated the fatwa to Al Quds for publication. GX 2104-T.

Fawwaz confirmed for Atef that the fatwa had been published, and sent it to CNN. PSR ¶ 53; GX 2105-T. Over the ensuing months, Fawwaz advised al Qaeda about how best to get out its murderous message, *see*, *e.g.*, PSR ¶ 53; GX 2113-T, and helped arrange for John Miller of ABC to interview Bin Laden, *see* PSR ¶ 53, Tr. 177:11-181:4, an interview during which Bin Laden predicted, *inter alia*, a "black day for America [which will] retreat and drag the corpses of their sons back to America, by the will of Allah." PSR ¶ 53, GX 81, 81-S, 81-T at 8.

On August 7, 1998, al Qaeda detonated truck bombs at the United States Embassies in Nairobi, Kenya and Dar es Salaam, Tanzania, see PSR ¶¶ 38-44, killing 224 people and injuring more than 4,000 others. GX S-114, S-117. Many of those injuries were extremely severe. *Id.* The bombings interrupted, but did not stop, the communication between Fawwaz and Atef. About two weeks after the bombings the two men spoke. Fawwaz noted that Atef had "disappeared for a while," which Atef explained by saying "You know we are a little busy." Fawwaz's immediate response was "May God help you . . . ." GX 2136-T at 1. Less than a month after the bombings Fawwaz and Atef were back to discussing matters such as the distribution of a video Atef had sent to Fawwaz and Fawwaz helping to arrange for the delivery of items to Afghanistan. GX 2137-T.

## II. Fawwaz Has Misrepresented Many of the Relevant Facts

In an effort to cast himself and his conduct in a more flattering light than they merit, Fawwaz has misrepresented and mischaracterized many of the relevant facts. Most importantly, he has grossly miscast himself as an opponent of violence, and as someone who did not understand the true identity of his principal al Qaeda contact, Muhammad Atef.

**A. Fawwaz Misrepresents Himself as an Opponent of Violence**

Despite having served as the emir of an al Qaeda military training camp – the sole purpose of which was to train others to commit violence – one of the principal claims Fawwaz makes in support of his request for a sentence of less than life is his claim that he is an opponent of violence. Indeed, he claims that he "abhors violence of any kind." Def. Mem. at 25. *See also* Def. Mem. at 2 (claiming that Fawwaz "opposes violence and has demonstrated that he has opposed violence throughout his life"). In his recorded calls with Muhammad Atef, Fawwaz claims, "not once does [he] advocate or condone the use of violence," Def. Mem. at 8, and he also claims that none of the evidence seized from his home showed that he "himself supported violence. The documents found in his home calling for bloodshed were the words of other men, not his." Def. Mem. at 9.

This characterization of Fawwaz as an opponent of violence is belied completely by evidence both within and without the trial record.[3] Bin Laden's Declaration of Jihad was plainly a call to violence of the most lethal kind. It threatened the American Secretary of Defense with youths who "only want one thing, to kill you so they go to Paradise," GX 1600-T at 26, and who "do not like to talk to you or complain to you. The tongue of each one of them says this to you:

---

[3] In determining the appropriate Sentencing Guideline offense level, the Court is permitted to consider "any appropriate evidence." *United States* v. *Prince*, 110 F.3d 921, 925 (2d Cir. 2002) (emphasis added); *see generally, e.g.*, 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). Indeed, the Supreme Court has emphasized the importance of the sentencing Court gathering, and relying upon, as much information as is possible. *See, e.g.*, *Williams* v. *New York*, 337 U.S. 241, 247 (1949) ("[h]ighly relevant – if not essential – to [a judge's] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics"); *see also United States* v. *Tucker*, 404 U.S. 443, 446 (1972). In light of these principles, the Court is not limited to considering the evidence that was presented to the jury. The Court may rely upon such information, *see United States* v. *Sisti*, 91 F.3d 305, 312 (2d Cir. 1996), but a "sentencing court remains entitled to rely on any type of information known to it."

'There is nothing between us to discuss back and forth, except to smite necks and stab kidneys.'" GX 1600-T at 27. These youths, Bin Laden said, will enter "the heart of war smiling, and return[] with the spear covered in blood." GX 1600-T at 27. The Declaration exhorted Muslims to direct "all efforts" to "killing, fighting, destroying and ambushing [the occupying American enemy] until it is defeated . . . ." GX 1600-T at 22.

When this call to kill Americans was issued, the defendant promptly delivered it to the editor in chief of an Arabic-language newspaper, who promptly published it. Tr. 1787-89. Fawwaz also participated in preparing this call to violence and distributing it in other ways, as evidenced by the many different electronic versions of the same document, in both Arabic and English and in different formats and with different language highlighted or bolded, found on the electronic media in his home, *see*, *e.g.*, GX 2501, 2501-T, 2502, 2502-T, 2531, 2532, 2533, 2542, 2543, 2544, 2545, Tr. 1673-80 (testimony of Thomas McCarney), and the more than 18 bound hard copies also found in his home. GX 1628, 1628-T; Tr. 1309:7-1311:9 (testimony of Paul Webber).

Moreover, Fawwaz agreed with this call to violence. One of the videos seized by the British police in Fawwaz's home that was not introduced at trial contained a recording of an interview of Fawwaz. In the course of that interview, Fawwaz was asked: "Do you consider the call for jihad that [Bin Laden] has made is a just call?" Fawwaz responded: "Jihad against Americans, of course it is a just call. No one can find a reason to act against this call." Ex A at 19:12-19:28. Fawwaz also made it clear in that interview that the Advice and Reformation Committee's decision not to join the call for jihad was an issue of timing, not of disagreement with Bin Laden's call for violence against Americans. *See*, *e.g.*, Ex A at 19:29-19:40. Moreover, Fawwaz made it clear during the interview that he shared Bin Laden's worldview,

rejecting a description of Bin Laden as a terrorist and claiming instead that the Americans (and the Jews) were the "terrorists," Ex A at 14:36-16:17, and describing Bin Laden as "wise," "well-educated," and "a man who understands very precisely what is going on."  Ex A at 16:18-16:50.

Fawwaz was similarly supportive of Bin Laden's later call for even more widespread violence against Americans.  The fatwa published on February 23, 1998 claimed that it was "an individual duty for every Muslim," "in any country in which it is possible," to "kill the Americans and their allies – civilians and military" and called "on every Muslim who believes in God and wishes to be rewarded to comply with God's order to kill the Americans and plunder their money wherever and whenever they find it."  GX 14-TA at 2.  As he had with respect to the Declaration of Jihad 18 months earlier, Fawwaz did what he could to disseminate this call for violence.  Four days before the fatwa was published, Fawwaz agreed to Atef's request to contact Abdel Bari Atwan to help get the fatwa published.  *See* GX 2101-T at 1-2.  Fawwaz also helped arrange for Atef to dictate the fatwa to Al Quds so it would be published, GX 95, GX 2104-T, and in order to ensure that it reached the English-speaking world, two days later Fawwaz sent it to CNN.  GX 2105-T at 1.

Fawwaz's attitude toward the contents of the fatwa calling for the killing of Americans, whether civilian or military, became clear in a call ten days after its publication.  Fawwaz identified to Atef two problems that, in his view, might flow from the publication of the fatwa.  Neither of these problems was a concern that Muslims might respond to the fatwa's call for worldwide violence against Americans.  To the contrary, Fawwaz's first concern was that the response in the Muslim community might be very weak, but the reaction from the United States might be severe.  GX 2108-T at 2-3.  But the even greater problem, in Fawwaz's view, was if the fatwa's call to kill American civilians and soldiers evoked "no response at all … [m]eaning, the

people pay no attention to it whatsoever." GX 2108-T at 3. That, to Fawwaz, would have been a "disaster." *Id.*

Fawwaz's current claims that he "abhors" and opposes violence should be flatly rejected. The evidence shows that Fawwaz agreed with, disseminated and hoped for the success of each of Bin Laden's calls for violence against Americans. While the defense clings to the claim that the message of violence was not in Fawwaz's words, even if that is true, it is beyond dispute that Fawwaz was the faithful and effective messenger of Bin Laden's violent, hate-filled words.

## B. Fawwaz Misrepresents His Understanding of Who Muhammad Atef Was

According to Fawwaz's sentencing submission, he did not know who Muhammad Atef really was, but understood that he was "a freelance journalist working out of Pakistan who had contact with Usama bin Laden." Def. Mem. at 4. This claim, too, is belied by the evidence.

First, the sheer volume of the contact and communications between Fawwaz and Muhammad Atef make it extremely farfetched to believe that Fawwaz did not understand who Atef was. They had dinner together at least once in Nairobi in the early 1990s. Tr. 317:17-318:1 (testimony of L'Houssaine Kherchtou).[4] The available phone records show that they spoke with one another close to 200 times between August 1996 and September 1998, and those records cover neither all of that time period nor all of the phones that may have been used. *See* GX 99A, 99C, 2101-T, 2102-T, 2103-T, 2105-T, 2106-T, 2107-T, 2108-T, 2109-T, 2110-T, 2111-T, 2112-T, 2113-T, 2114-T, 2116-T, 2117-T, 2119-T, 2121-T, 2122-T, 2123-T, 2124-T, 2125-T, 2136-T, 2137-T.

Moreover, Muhammad Atef did not hide his affiliation with al Qaeda or Bin Laden from the public or from Fawwaz. He appeared at a press conference in Pakistan announcing the 1998

---

[4] In addition, Fawwaz was the emir of an al Qaeda military training camp in Afghanistan when Atef was a military leader of al Qaeda in Afghanistan. *See* PSR ¶ 53; Tr. 313:15-315:9 (testimony of L'Houssaine Kherchtou).

fatwa, seated at a table with only Bin Laden and Dr. Ayman al Zawahiri. *See* GX 105; Tr. at

210-11 (testimony of John Miller). He appeared, with his face uncovered, in video footage that

ABC News was permitted to take away from its interview with Bin Laden, *see* GX 81-S;Tr. 202,

as well as in the footage taken by an al Qaeda cameraman during the same interview, which was

found in Fawwaz's home. *See* GX 2001-A; Tr. 208-10.

In addition, Atef made clear the nature of his relationship with Bin Laden and the role he

played in al Qaeda in his communications with Fawwaz, both written and oral. For example, a

fax from Kandahr Communications found in Fawwaz's home announcing that the Taliban

government had said it would not negotiate the extradition of Bin Laden was signed by

Muhammad Atef on behalf of "The Information Office – Afghanistan." GX 2040-T. This

document alone makes it clear that Atef was not "a freelance journalist working out of Pakistan,"

but an al Qaeda leader preparing statements for its "Information Office," which was located in

Afghanistan.

In another fax from Atef at Kandahr Communications found in Fawwaz's home, Atef

told Fawwaz, *inter alia*, "[w]e want to get a channel on the Internet, we need advice about that,"

GX 2042-T, again making it clear that Atef was not a freelance journalist working out of

Pakistan, but in Afghanistan with al Qaeda, which was looking to Fawwaz for advice about

creating an Internet presence for itself. Similarly, Atef directed Fawwaz to send to the Arab

press the fatwa issued by the Afghani religious scholars, along with an introduction to, and

comments about, the fatwa written by Bin Laden, and asked Fawwaz to see if he could have the

fatwa and introduction published one day, and the comments published the following day. GX

1636-T. These are hardly the acts of a freelance journalist "who had contact with Bin Laden;"

these are the acts of an al Qaeda leader giving directions to another member of al Qaeda.

Atef's oral communications with Fawwaz were along the same lines. Atef sought, and Fawwaz provided, assessments of individuals who wanted to come to Afghanistan, *see* GX 2112-T at 1-2, including one whom Fawwaz described as "not a good fit . . . I believe that if he came to you guys, he would mess up all your work." GX 2113-T at 4-5. If Fawwaz thought Atef was a freelance journalist, who are the "you guys" whose work would be messed up to whom Fawwaz is referring? And Fawwaz advised Atef about which western media outlets to use, commenting, for example, that ABC was "neutral" in its coverage of events, GX 2113-T at 3-4, that Reader's Digest was "one of the very widely distributed magazines" in the United States, GX 2113-T at 7, about which television networks had a strong presence in the Arab world, GX 2113-T at 8-9, about which journalist would be helpful "if you want to send a direct message" and about which publication to use "if you want to send a clear message to the American people . . .," GX 2113-T at 12, all information useful to an al Qaeda leader deciding which media outlets should be permitted access to Bin Laden.

Another of the conversations between Atef and Fawwaz sheds particular light on the duration and nature of the relationship between them. In that conversation, Atef referred to Abdessalam, "our old friend . . . [t]he one who was with us. The one who hunted a gazelle. Do you remember him? . . . from a long time ago [U/I]." GX 2114-T at 3. In the ensuing discussion Fawwaz said that Abdessalam has been advised to go to the tribal areas, but insists on staying where he is, and thus "[w]e expect that he will be arrested anytime," followed by Atef saying "[w]e will try to send someone to him quickly." GX 2114-T at 4. Atef then discussed having Fawwaz "come to us and maybe Ezzedine can take your place." Even if Fawwaz cannot do that, Atef said, "it would be good if you could come to visit so that we could see you. I mean, there is a lot of work here." *Id.* This conversation makes it clear that Fawwaz does not think that

Atef is a "freelance journalist working out of Pakistan who had contact with Usama bin Laden," but instead is an old al Qaeda colleague, who has the power to send someone to try to save another al Qaeda member from arrest, and who is eager to have Fawwaz come to Afghanistan to help in al Qaeda's work.

Finally, Fawwaz's communications with Atef are peppered with Atef's requests that Fawwaz obtain and send to him things that can be obtained in the West, but cannot be obtained easily in a country with a less developed economy, such as Afghanistan. Atef asked, for example, that Fawwaz send two generators and a car, and Fawwaz agreed to do so. *See* GX 2106-T at 2-3; *see also* GX 1632-T. Fawwaz also discussed his efforts to obtain for Atef a color copier, *see* GX 2115-T at 2-4, a satellite telephone battery and a device that would permit satellite access to the Internet. GX 2117-T, 2119-T at 6. These conversations, too, make it clear that Fawwaz is not dealing with "a freelance journalist working out of Pakistan," but a leader of an organization for which Fawwaz is also working.

In short, the claim that Fawwaz did not understand who Muhammad Atef was, in light of the number and nature of their communications, is completely incredible.

## DISCUSSION

### I. Fawwaz Concedes that the Sentencing Guidelines Call for a Life Sentence

The Embassy bombings were horrific acts of mass murder, and, as described above, the defendant played a central role in the al Qaeda conspiracies that culminated in the killings of August 7, 1998. Given the scale of the crimes, and the defendant's active participation in them, the Sentencing Guidelines call for a sentence of life imprisonment, and the defendant concedes

as much.  *See generally* Def. Mem. (no objection to the Probation Office's Guidelines

calculations); Def. PSR Objection Ltr. (no objection to the Guidelines calculations).[5]

In view of the foregoing, the Government respectfully requests that the Court adopt the

Guidelines calculations set forth in the Probation Office's Presentence Investigation Report.  *See*

*generally* PSR ¶¶ 71-89, 92.  Accordingly, the total offense level is 61, *see* PSR ¶ 89, and the

Criminal History Category is VI, *see* PSR ¶ 92.  *See also* PSR at 30 (sentencing

recommendation).

## II.  The Statutory Sentencing Factors Call for a Life Sentence

In *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005), the Court of Appeals held that,

after calculating the appropriate Sentencing Guidelines range, the sentencing court should

determine the appropriate sentence based on the Section 3553(a) factors.  As the Court is aware,

these factors are:

1.  the nature and circumstances of the offense and the history and characteristics of the defendant;
2.  the need for the sentence imposed

---

[5]  The Government respectfully requests that the Court correct two errors in the Presentence Investigation Report, which are immaterial to the Guidelines calculation but nevertheless relevant to the sentence to be imposed.  First, at paragraph 128, the Probation Office concludes that the sentencing exposure on Count 5 is "a minimum term of imprisonment [of] 5 years and the maximum term is 20 years."  18 U.S.C. § 844(n)."  PSR ¶ 128.  In fact, because the jury found that "the government proved in Count 5 that either the defendant or a co-conspirator directly or proximately caused the death of at least one person," *see* Verdict Form, the sentencing exposure that Fawwaz faces based on his conviction on Count 5 actually is a minimum term of imprisonment of 20 years and a maximum term of life.  *See* 18 U.S.C. 844(f)(3), (n).  Second, at paragraph 129, the Probation Office concludes that maximum term of imprisonment for Count 6 is life.  In 1998, however, 18 U.S.C. § 2155 carried a maximum penalty of 10 years' imprisonment under any circumstance.  It was not until the statute was amended in 2001 that the statutory maximum was increased to account for certain aggravating factors, including death resulting from the underlying crime.

Similarly, the Government respectfully requests that the "Statutory Provisions" section of the Presentence Investigation Report (at p. 30) be amended to reflect that the custody range for Count 5 is "20 years to life," and that the custody range for Count 6 is "up to 10 years' imprisonment."  *See* PSR at 30 (sentencing recommendation).

      a.   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

      b.   to afford adequate deterrence to criminal conduct;

      c.   to protect the public from further crimes of the defendant;

      d.   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

3.   the kinds of sentences available;

4.   the kinds of sentence and the sentencing range established [in the Sentencing Guidelines];

5.   any pertinent policy statement [issued by the Sentencing Commission];

6.   the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7.   the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Just as the Sentencing Guidelines call for a sentence of life, *see supra*, so too do the relevant Section 3553(a) factors. It is for this reason that the Probation Office has recommended a sentence of life here:

> The thoughtless and senseless actions of the defendant and his co-conspirators resulted in numerous family members losing loved-ones. Innocent individuals lost their lives, and various victims, to this date, continue to suffer emotionally, physically and financially. Al Fawwaz and his co-conspirators have given these innocent victims and their families a lifetime of pain and misery.
>
> We recommend a total sentence of life imprisonment. . . . This term of imprisonment will protect society as a whole since Al Fawwaz and his co-conspirators intended to kill human beings, and not giving a second thought as to the amount of innocent men, women and children they would harm.

*See* PSR at 30-31 (sentencing recommendation).

## A. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant

The nature of the defendant's offenses weighs heavily in favor of a life sentence, as do his history and characteristics. *See* 18 U.S.C. § 3553(a)(1). The August 7, 1998 attacks on the United States Embassies in Kenya and Tanzania were almost unimaginable in their brutality.

Two hundred and twenty-four people were murdered that day. *See* GX S-114 (stipulation re: 213 Kenyan victims); *see* GX S-117 (stipulation re: 11 Tanzanian victims).

With respect to the impact that the Embassy bombings had on the victims and their families, the Court knows firsthand the devastation that they caused. *See*, *e.g.*, Ex B (Relevant Portions of Government's Sentencing Submission from *United States* v. *Ghailani*). This Court has seen the videos of the aftermath, *see* GX 83A-R2 (video taken outside of the U.S. Embassy in Kenya in the immediate aftermath of the bombing); GX 84 (video taken outside of the U.S. Embassy in Tanzania in the immediate aftermath of the bombing), and has heard and seen the testimony and other evidence regarding the devastation and catastrophic loss of human life that followed in their wake. The Court has heard from many of the victims themselves, and read letters from dozens of other victims. *See*, *e.g.*, Ex C (2011 Ghailani Sentencing Transcript); *see also* Ex D (victim letters). Accordingly, the terrible suffering and cost in human life that were the result of these conspiracies need not be reprised here.

At the 2015 trial of this matter, the Court also heard testimony about the role that al Qaeda played in the October 1993 Battle of Mogadishu and the notorious "Blackhawk Down" incident. *See generally* Tr. 882-895 (testimony of James Yacone). Bin Laden himself, in a tape recovered from the defendant's residence, made clear not only that al Qaeda was responsible for those deaths, but that it relished them. *See*, *e.g.*, GX 2047-T at 11 (describing how al Qaeda remotely detonated explosives in Somalia to blow up "American tanks and the American armored vehicles," and how this was done by "our brethren who had done Jihad in Afghanistan and the Muslim Somalis who were doing Jihad against them"); Tr. 211 (testimony describing how, in 1998, al Qaeda members continued to brag about slitting the throats of American soldiers in Somalia); GX 300A-T (noting that the East Africa cell is "America's primary target . .

. since America knows well that the youth who work in Somalia and who are followers of the sheikh are the ones who have carried out operations to hit the Americans in Somalia. And that the main gateway for those people is Kenya."). And al Qaeda brazenly cited these deaths of U.S. soldiers in Somalia as part of its rallying cry for further attacks against the United States. *See*, *e.g.*, GX 1600-T at 25 ("[America] deployed tens of thousands of international forces, including twenty-eight thousands of your own, to Somalia. But after a few little confrontations when tens of your soldiers were killed, including the pilot who was dragged dead through the streets of Mogadishu, you left Somalia with humiliation and defeat."); GX-2047-T at 10 ("So after simple battles and a simple resistance in Somalia, which resulted in the killing of eighteen American soldiers and the American pilot was dragged in the streets of Mogadishu, as you know, the American military turned its rear end away, with nothing to show for.")

Against this backdrop, the defendant's participation in these conspiracies is all the more deplorable. And yet, Fawwaz contends at sentencing that "his conduct is not as blameworthy as the charges themselves would suggest." Def. Mem. at 11. To the contrary, his conduct constitutes the core of the illegal activity that the charges of which he stands convicted were designed to outlaw.

Fawwaz was with al Qaeda from the very beginning. He was in Afghanistan working with al Qaeda in the early 1990s. First as a trainee at an al Qaeda military training camp, and then, having proven himself to al Qaeda's leadership, as the Emir – the leader – of one of al Qaeda's military training camps – camps where new recruits were taught how to use guns and explosives, and how to blow up bridges and tanks.

Then Fawwaz was with al Qaeda in Kenya in 1993 and 1994. He was a leader of an al Qaeda terrorist cell in Nairobi, working with al Qaeda's senior leadership, including its then

second-in-command, Abu Ubaidah al Banshiri, to set up a base of operations in Kenya. And there is no serious dispute as to how al Qaeda used that Nairobi terrorist cell that the defendant helped run. Al Qaeda used it as a means to wage jihad in Somalia to fight against the United States; it was a stopover for the al Qaeda trainers who were traveling to and from Somalia.

And then Fawwaz traveled to London in 1994, where he continued to help al Qaeda to accomplish its murderous objectives. He assisted in the preparation and dissemination of al Qaeda's August 1996 declaration of jihad against the United States, *see* GX 1600-T, the August 1996 declaration that repeatedly and unambiguously made clear what al Qaeda's goals were. And then he worked hand-in-hand with Muhammad Atef, who was by then al Qaeda's second-in-command, to distribute the February 1998 fatwa that called on al Qaeda's followers to murder Americans – civilian and military alike – anywhere in the world. He and Atef worked assiduously to ensure that these calls to violence not only were published in Arabic-language newspapers, but that they were also disseminated to the Western media in written form and through interviews, so as to ensure that al Qaeda's murderous message reached the ears of the Americans in whom it was designed to incite terror. Faxes recovered from Fawwaz's residence and intercepted telephone calls showed that Fawwaz continued this work for al Qaeda during the run-up to the August 1998 bombings, and continued to do so after the bombings until his arrest in September 1998.

From London, Fawwaz also supplied al Qaeda's leadership with information and technology that was critical for al Qaeda's leadership to continue its violent jihad against United States civilians and military; information and technology that could only be obtained in the West, which was essential for Usama Bin Laden and al Qaeda's leadership to coordinate its worldwide network. For example, he assisted in providing them with a satellite phone. The same satellite

phone that al Qaeda's leadership in Afghanistan used to communicate with al Qaeda members throughout the world – including Fawwaz in London, and the terror cell in Kenya that was responsible for executing the August 1998 Embassy bombings. Fawwaz worked to ensure that the phone remained functional, making arrangements for batteries to be shipped to Atef and paying for pre-paid minutes to be added. But he also acquired for them information about accessing the Internet, vehicles, generators, printers, and other electronics.

Throughout his time in al Qaeda, Fawwaz was known to and in direct contact with the innermost circles of al Qaeda's leadership. For example, during his time in Kenya in 1993 and 1994, Fawwaz reported to Abu Ubaidah al Banshiri – then al Qaeda's second-in-command – and even started a business with Abu Ubaidah al Banshiri. Following the death of Abu Ubaidah al Banshiri in 1996, Fawwaz communicated directly with al Banshiri's replacement as Bin Laden's direct lieutenant, Muhammad Atef. And these were not sporadic or brief periods of communication. Throughout his time in London, Fawwaz was in contact with Atef on hundreds of separate occasions over a period of a few years. *See*, *e.g.*, GX 99A, 99B, 99C, 99D, 594C, 594D. And the transcripts of those conversations provided further evidence of the relationship and respect that Fawwaz enjoyed with al Qaeda's highest leaders – he was addressed with respect and as an equal.

The crimes of which Fawwaz has been convicted are horrible, and the roles that he played in those crimes, over the course of many years, were crucial to their success. The defendant's history and characteristics demonstrate that Fawwaz was willing to work to ensure that al Qaeda's murderous ventures succeeded. Accordingly, both the nature and circumstances of the offense and the history and characteristics of the defendant support the imposition of a life sentence here.

### B. A Life Sentence Serves the Goals of Deterrence, Just Punishment, and Respect for the Law

Section 3553(a)(2) directs the Court to consider "the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." The first three of these factors weigh heavily in favor of a life sentence.[6]

#### 1. The Need for Just Punishment Requires the Imposition of a Life Sentence Here

The instant offenses are justly punished only with a life sentence. Fawwaz was one of al Qaeda's senior members with direct access to Bin Laden, Abu Ubaidah al Banshiri, and Muhammad Atef – al Qaeda's three most senior leaders. Moreover, the evidence at trial made clear that Fawwaz helped to prepare and disseminate the August 1996 declaration and would have, but for a balky fax machine, seen a pre-publication version of the February 1998 fatwa. Moreover, after the issuance of each of these calls to violence against the United States, Fawwaz not only persisted in associating himself with al Qaeda, but took substantial steps to assist al Qaeda in spreading its messages of hate and murder and ensuring that al Qaeda's leadership had the supplies and communications equipment they needed. As a result, the evidence amply shows that Fawwaz aided al Qaeda and its operatives for years, with full knowledge of the organization's violent, anti-American goals, conduct whose seriousness warrants a life sentence.

Beyond this, however, the evidence plainly established that Fawwaz was a critical member of the conspiracy that resulted in the Embassy bombings, even if he was not the

---

[6] In light of the nature of the crimes here, and the sentence that should be imposed, educational and vocational training of the defendant do not pose a particular concern in this case, nor does the defendant require extraordinary medical care or other correctional treatment.

technician who built the lethal bombs.  Every terrorist organization, including al Qaeda, depends on people like Fawwaz to facilitate and coordinate the activities of the group, and to spread its message of terror and hate.  In this case, the evidence showed that Fawwaz provided critical services and goods such as: military training to al Qaeda members; critical communications facilities to al Qaeda leadership in Afghanistan, facilities that were unavailable in Afghanistan and that permitted the leadership to communicate with its followers throughout the world; other supplies, including generators and vehicles, and devices that allowed for access to the Internet; the distribution of key messages and policies from al Qaeda leaders, such as Bin Laden and Muhammad Atef; and the use of front organizations to conceal the terrorist activities of al Qaeda members such as the ARC and Asma Limited.  And he did all of these things *after* Bin Laden had publicly declared war on the United States in August 1996, and he continued to provide those services *after* the February 1998 fatwa called for the murder of American civilians wherever they could be found.  Thus, Fawwaz was an integral part of the conspiracies that resulted in hundreds of deaths and thousands of injuries.

Fawwaz nevertheless argues that "[b]ecause the defendant engaged only in advocacy and not 'incitement to imminent lawless action,' his speech was protected by the First Amendment," and that Fawwaz's conduct is not "as blameworthy as the murderers who committed the substantive crimes in the indictment" because the "moral depravity [of the substantive crimes] is simply on a different scale than one who helped disseminate an idea, no matter how vile that idea may be." Def. Mem. at 14.  In that vein, Fawwaz argues that:  "Al Qaeda wouldn't be able to spread terror throughout the world if its supporters were only willing to do what the government alleges Mr. Al Fawwaz did." *Id.*[7]

---

[7] Fawwaz wrongly asserts that "[t]here is no evidence . . . that the murders in Kenya and Tanzania were inspired by, or even aware of, the 1996 declaration and/or 1998 fatwa."  Def.

The Government respectfully submits that the Court should reject these arguments in imposing sentence. To adhere to this view would require the Court to consider Fawwaz's conduct in a vacuum; to look at Fawwaz's actions without regard to the impact they had upon, and the function they served for, the overall goals of al Qaeda's conspiracies. Fawwaz was not an isolated ideologue spouting ineffective (albeit vile) rhetoric, as the defense suggests. Fawwaz was a bridge, a conduit, for al Qaeda's leadership in Afghanistan to spread their message of terror to the world at large and the United States in particular. And it is clear that this role was viewed as critical to the conspiracy's success by al Qaeda itself. Fawwaz's tasks were so important, so critical to the success of the conspiracies that he worked with al Qaeda's most senior members to craft and hone al Qaeda's messages; he worked with al Qaeda's most senior leaders to disseminate the message of terror in the Arbic-speaking world, but more importantly (from his perspective) to the West, including the United States.

Fawwaz's role was critical to al Qaeda's conspiracies because without proper dissemination of al Qaeda's message – without Bin Laden's interviews being broadcast on major television networks like CNN, ABC, and others – al Qaeda could not create terror. Bin Laden, Atef, and the other members of al Qaeda would be nothing more than a largely unknown group of men in a far off land. That is why terrorist groups – like al Qaeda – need more than those who plot their murderous assaults, more than those who build the bomb, and more than those who

Mem. at 13. To the contrary, the evidence clearly established not only that the operators of the East Africa cell who executed the August 1998 bombings had received the message but that they were inspired by it and stood ready to implement its murderous decree. *See*, *e.g.*, GX 300A-T at 1 ("As we have heard, witnessed, and read, the "Hajj" [*i.e.*, Bin Laden] has declared war on America and that was confirmed when we heard the tape of the press interview . . . and the sheikh stated some points including – We declared war against America because it made itself police of the world . . . . And other points that we are pleased to hear, thanks be to god."); *id.* at 4 ("We, the east africa crew, do not want to know how work plans are operated, because we are not fit for plans. We are just implementers. We, thanks be to god, trust our command and appreciate their work . . . because this work we are doing 'the return of an Islamic state' is a team effort and not an individual one; we are all participating in it.").

detonate the bombs to execute their murderous designs. They also need people who make sure the world hears and understands their threats, people like Fawwaz. That is how terrorists amplify the effects of the death and destruction that they sow.

But that is not all Fawwaz did, and the defense's First Amendment argument fails for this reason as well. Fawwaz performed many other tasks for al Qaeda. Two examples suffice to illustrate how Fawwaz's efforts in furtherance of al Qaeda's goals went well beyond his role in disseminating al Qaeda's message.[8] First, following al Qaeda's move to Afghanistan, Fawwaz was instrumental in procuring and maintaining a satellite telephone that was used by al Qaeda and EIJ leadership alike. Once the satellite phone had been purchased and delivered to Afghanistan, Fawwaz was responsible for ensuring that it had the necessary power supply and that it was kept stocked with prepaid minutes. This function was critical to al Qaeda's operation. This was the same satellite telephone that Muhammad Atef used to transmit the February 1998 fatwa to Abdel Bary Atwan and *al Quds*. It is the same satellite telephone that was used by EIJ to convey the August 4, 1998 threat of retaliation against the United States to Ibrahim Eidarous, who then caused it to be published in newspapers. Moreover, this was al Qaeda's operational telephone, which al Qaeda's leadership used to communicate with the various cells throughout the world – including London, Kenya, Yemen, Sudan, and Azerbaijan – coordinating the activities of its operatives. It was the same satellite telephone that was used to call the cell in

---

[8] None of the defendant's hate-mongering speech was protected by the First Amendment. *See* Def. Mem. at 13-14. Moreover, the defendant was located outside of the United States throughout the entire period of the charged conspiracies and is not a United States national, and therefore has no rights under the First Amendment. *See United States* v. *Verdugo-Urquidez*, 494 U.S. 259, 265, 110 S. Ct. 1056 (1990) (observing that the First Amendment's reference to "the people" suggested that the rights belong "to a class of persons who are part of the national community or who have otherwise developed sufficient connection with this country to be considered part of that community," and suggesting that an "[e]xcludable alien is not entitled to First Amendment rights, because he does not become one of the people to whom these things are secured by our Constitution by an attempt to enter forbidden by law").

Azerbaijan – the cell responsible for transmitting the claims of responsibility for the bombings to London for further dissemination – before the bombings. The satellite telephone that repeatedly called the Azeri cell to update it on the timing of the bombings, and called Fawwaz in the early morning hours of August 7, 1998, mere hours before the bombs had been detonated.

Second, Fawwaz's role in Nairobi was not that of a peaceful businessman. He was one of the leaders of al Qaeda's terror cell there. It was during his time in Nairobi that he created a front company with two other al Qaeda members, one of whom was the then second-in-command of al Qaeda, Abu Ubaidah al Banshiri. During his time in Nairobi, Fawwaz interacted directly with al Qaeda's senior leadership, including Banshiri and Muhammad Atef. Indeed, Fawwaz was so important to al Qaeda's operations that, following his arrest in Nairobi in 1994, Abu Ubaidah al Banshiri instructed another al Qaeda member to do whatever it takes to get Fawwaz out of jail. *See* Tr. 421 (testimony of L'Houssaine Kherchtou). It was during Fawwaz's tenure as one of the leaders of the al Qaeda cell in Nairobi that al Qaeda trainers traveling to Somalia to wage jihad against the United States forces in Somalia used Nairobi as a way station; it was during his tenure there that 18 U.S. soldiers were killed in Somalia during the "Blackhawk Down" incident, *see* Tr. 894:24-895:5 (testimony of James Yacone); and it was during his tenure there that al Qaeda sent a surveillance team and other senior leaders to Nairobi to conduct surveillance of the U.S. Embassy and other potential targets for a terrorist attack, *see* Tr. 410-15 (testimony of L'Houssaine Kherchtou describing surveillance team in Nairobi and encounter with Anas al Liby on Moi Avenue).

In short, while the defense is right that al Qaeda "needs killers to spread its terror – people who are willing to die for the cause of jihad," Def. Mem. at 14, to succeed in waging its "global jihad" against the United States, it also needs trainers to train those killers, leaders to

oversee those killers, propagandists to publicize and glorify the acts of those killers, trusted advisors to vet reporters and media, and people who can supply al Qaeda with the technology, information, and equipment it needs to coordinate its activities. And during his nearly decade-long role in al Qaeda, Fawwaz fulfilled each and every one of those roles for al Qaeda. A life sentence would justly punish him for the roles he played.

### 2. A Life Sentence Is Necessary for Both Specific and General Deterrence as Well as to Promote Respect for the Law

Even now, after having heard the evidence against him and the jury's verdict, Fawwaz "maintains his innocence." Def. Mem. at 27. Despite having worked for years in furtherance of al Qaeda's goals, despite having worked to prepare and helped to disseminate the August 1996 declaration and the February 1998 fatwa – both of which unambiguously called on Muslims to murder Americans – he contends that "[t]here is no evidence that anyone died as a result of [his] actions." Def. Mem. at 13. Similarly, Fawwaz continues to minimize his role in Afghanistan, claiming that it was limited to that of "an aid and relief worker, assisting refugees who had left Afghanistan seeking refuge in Pakistan." Def. Mem. at 3; *see* PSR ¶ 121 ("The defendant reported that from 1989 through 1992, while in Pakistan, he 'assisted refugees.'"). And despite having been found guilty by a jury of four violent conspiracies – including one that included a specific finding that the conspiracy proximately caused the death of at least one other person – Fawwaz contends that "it is worth noting how little one can infer about the jury's factual findings based on their verdict alone." Def. Mem. at 10; *see also* PSR ¶ 70 ("Mr. Al Fawwaz does not dispute that he assisted in providing materials to certain individuals; however, he does dispute the charges and will appeal his conviction. That being said . . . he had nothing to do with it [*i.e.*, the Embassy bombings]"). This defiant and unrepentant stance strongly suggests that the Court can have no confidence that, if released, Fawwaz would not engage in similar behavior again.

Fawwaz's claim that he does not present a danger of recidivism because he will "be released at an age where he would be significantly less likely to pose a threat to society than someone released at a younger age," Def. Mem. at 17-18,[9] is unpersuasive in light of the facts of this case. Fawwaz's participation in criminal conspiracies was not an instance of youthful caprice. By his own admission, prior to joining al Qaeda, Fawwaz was an educated, entrepreneurial adult. Def. Mem. at 2. After he joined al Qaeda, he did not regret his decision; to the contrary, he continued to work for the organization for several years, and likely still would be working for the organization if not for his arrest in September 1998. Moreover, the role that Fawwaz fulfilled in al Qaeda was not one that required youthful energy or physical strength, but rather intellect, business sense, and leadership ability. These characteristics are unlikely to decline significantly over time. Further, the fact that Fawwaz had a family – including his father, mother, five brothers, two sisters, two wives, and several children, Def. Mem. at 3 – did not deter him from joining and remaining with a terrorist organization, even though he was putting them at risk by continuing to work for that terrorist organization. There is nothing that suggests that his family would deter him from engaging in similar crimes in the future.

A life sentence is also necessary to deter others who would commit similar crimes. As Judge Walker has put it: "[i]n no area can the need for adequate deterrence be greater than in terrorism cases, with their potential for devastating loss of innocent life." *United States* v. *Stewart*, 590 F.3d 93, 181 (2d Cir. 2009) (Walker, J., concurring in part and dissenting in part). That terrible potential was realized here. Imposing a life sentence will make it less likely that it will be realized again. It is important that those who are tempted to make similar choices to

---

[9] While Atef and Bin Laden have been killed, there is no evidence to support Fawwaz's broad claim that "[t]he people with whom he associated in the 1990s have nearly all been captured or killed." Def. Mem. at 17. Indeed, several of the co-conspirators named in his indictment remain wanted fugitives, including but not limited to Ayman al Zawahiri, the current leader of al Qaeda.

Fawwaz – to work closely with a terrorist group's senior-most leaders to further its violent agenda – understand that they will be imprisoned for life.

### 3. A Life Sentence is Necessary to Protect the Public from Further Crimes of the Defendant

Moreover, the need for permanent and lifelong incapacitation to protect the public from future crimes of the defendant is particularly acute here for many of the same reasons noted above. Fawwaz's claim that because he never personally engaged in violence, "there is no need to protect the public from him," Def. Mem. at 17, reflects a complete misunderstanding and denial of the egregious nature of his crimes and the critical role that he played in the conspiracies. Fawwaz is an individual who continues to believe that he has done nothing wrong. And that is exactly the type of individual who needs to be incapacitated permanently so that he cannot engage in similar conduct – conduct that he maintains to this day is innocent – against the United States in the future.

With that mindset, this Court should have no expectation, no assurance, that Fawwaz will not attempt to engage in similar conduct if he is released. Fawwaz's complete unwillingness to acknowledge what he has done or accept responsibility for it makes it clear that a sentence of life is necessary to prevent him from engaging in similar conduct again. If seeing the evidence and hearing the jury's verdict have not led Fawwaz to accept responsibility for what he has done, there is little reason to think that even decades in prison would do so. Indeed, if his views have not changed after nearly 17 years of incarceration, it is clear that no limited term of imprisonment can protect the public from Fawwaz committing future crimes of a similar nature if he is released. Accordingly, a sentence of life imprisonment is appropriate for this reason as well. *See*, *e.g.*, *United States* v. *Meskini*, 319 F.3d 88, 91-92 (2d Cir. 2003) (noting the link

between "the difficulty of deterring and rehabilitating" terrorists and the conclusion that "terrorists and their supporters should be incapacitated for a longer period of time").

### C. Fawwaz Should Receive the Same Sentence as His Similarly Situated Co-Defendants

Another Section 3553(a) factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In order to avoid such disparities, the defendant should receive the same sentence as the four co-conspirators who were convicted at trial in 2001, which is the same sentence imposed by this Court on a fifth co-conspirator, Ahmed Khalfan Ghailani, who was convicted at trial in 2010. Each of these defendants – including Fawwaz – was an important member of the al Qaeda conspiracies that culminated in the Embassy bombings. Treating like cases alike means ensuring that the Fawwaz receives the same sentence as his co-conspirators: life in prison.

As an initial matter, the uncontested Guidelines sentencing range here is life. As the Court of Appeals has explained, "the guidelines cannot be called just another factor in the statutory list, 18 U.S.C. § 3553(a), because they are the only integration of the multiple factors." *United States* v. *Rattoballi*, 452 F.3d 127, 131 (2d Cir. 2006) (citations and internal quotation marks omitted); *cf. United States* v. *Fernandez*, 443 F.3d 19, 28 (2d Cir. 2006) (stating that "the Guidelines range should serve as 'a benchmark or a point of reference or departure' for the review of sentences" (quoting *United States* v. *Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005))). "[T]o secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 50. Indeed, it is precisely because the Guidelines function as a national "benchmark" that a Guidelines sentence here will advance another § 3553(a) goal: "the need to avoid unwarranted sentence disparities." 18 U.S.C. § 3553(a)(6).

### 1. Fawwaz is Equally Culpable as Those Co-Conspirators Who Received Life Sentences in 2001 and 2010

Against this conclusion, Fawwaz contends that he is "less culpable than his co-defendants," and therefore should receive a non-Guidelines sentence that is "substantially less than life." Def. Mem. at 18. But this argument relies on a misunderstanding and misstatement of the evidence.

### a. Fawwaz Deserves the Same Sentence as Al-'Owhali, Odeh, K. Mohamed, and Ghailani

Fawwaz erroneously claims that his co-conspirators Mohamed Rashed Daoud al-'Owhali, Mohamed Sadeek Odeh, and Khalfan Khamis Mohamed "were all significantly more culpable than Mr. Fawwaz." Def. Mem. at 19. As noted *supra*, while the Government does not contend, and never has contended, that Fawwaz built or detonated the bombs on August 7, 1998, he nevertheless played a crucial role in al Qaeda and his conduct – whether in Afghanistan, Kenya, or London – was a critical component of the overarching conspiracies that resulted in the Embassy bombings. Indeed, Fawwaz was closer to those at the very top of these conspiracies than any of this group of defendants.

Further, the jury implicitly rejected Fawwaz's argument that he was somehow less culpable than his co-conspirators for the deaths that resulted from the Embassy bombings when it convicted him of participating in the conspiracies to murder United States nationals, to murder officers or employees of the United States, to destroy United States property by means of explosives, and to attack national defense premises and utilities. The jury's verdict means that Fawwaz is properly held responsible for all the consequences of these conspiracies. Judge Sand's statements with respect to co-conspirator Wadih el Hage's efforts to distance himself from the 224 deaths that were a direct and proximate result of the conspiracies for which he was convicted are equally applicable to Fawwaz:

> Mr. El Hage may have convinced himself, he is capable of mind games, Mr. El Hage may have convinced himself that he is not responsible for the 2[2]4 deaths because, unlike some of the other defendants, he was not an actual deliverer of the bombs, and it may be difficult for him to understand that once one is a member of a conspiracy, one is responsible for the reasonably foreseeable acts taken by the co-conspirators in furtherance of that conspiracy, but the law is clear that that responsibility exists. The Court finds that the evidence, beyond a reasonable doubt, shows that Mr. El Hage's membership in the conspiracy continued through all of the events which are recited in the indictment.

Ex E (10/17/2001 Sentencing Tr.) at 37.

Moreover, the description of Fawwaz's role in the conspiracies as "a facilitator" does not alter this calculus. As Judge Sand concluded at the 2001 sentencing when he rejected this same argument when it was proffered by el Hage:

> Do you want me to find that El Hage is the least culpable of the four defendants? I would not make such a finding. Do not press me as to whether I think he is the most culpable of the four. . . . [T]he notion that the facilitator, to use a term which I believe was first used in the government's summation and has been repeated in the papers, to suggest that the facilitator is less culpable than the low-level individual who ground up the explosive powder is not a set of values that I would subscribe to. Facilitator of what? Facilitator of the conspiracy to kill Americans.

Ex F(10/18/01 Sentencing Tr.) at 127-129. See also *United States* v. *Kassir*, S2 04 Cr. 356 (JFK) (sentencing the defendant to multiple terms of life in prison for attempting to establish a jihad training camp and for distributing bomb-making manuals).

### b. Fawwaz Deserves the Same Sentence as Wadih el Hage

Equally unavailing is Fawwaz's attempt to portray himself as less culpable than – or his conduct as less reprehensible than that of – Wadih el Hage. *See* Def. Mem. at 21. The opposite is true. The similarities between the roles the two men performed in furtherance of al Qaeda's goals underscores the propriety of a life sentence here.

Like Fawwaz, el Hage was one of the earliest members of al Qaeda and remained dedicated to al Qaeda's cause until his arrest in September 1998. Moreover, el Hage and Fawwaz both had direct and extensive communications with al Qaeda's most senior leadership, including Bin Laden, Abu Ubaidah al Banshiri, and Muhammad Atef. During his time in Sudan and Kenya, el Hage also was responsible for procuring materials for al Qaeda's leadership and facilitating communications between and among al Qaeda's leadership in Afghanistan, and al Qaeda members located in other parts of the world. Moreover, both men performed nearly identical functions as leaders of al Qaeda's Nairobi-based terror cell: they both handled the cell's finances, established front companies, and communicated with al Qaeda leadership. Indeed, following Fawwaz's arrest in Nairobi and his decision to leave Nairobi, el Hage was the one who traveled to Kenya to fill the void created by Fawwaz's departure.[10]

There, however, the similarities end. There is no evidence to suggest that el Hage continued to communicate with al Qaeda leadership following his return to the United States in 1997. In contrast, Fawwaz continued to communicate with al Qaeda members throughout the world, including al Qaeda's senior-most leaders, Usama Bin Laden and Muhammad Atef, communication that Fawwaz continued throughout 1997 and 1998, even after the Embassy bombings, until he was arrested.

### 2. Comparisons to the Sentences Imposed on Bary and al Nalfi Are Inapposite

Fawwaz also contends that the imposition of less-than-life sentences on co-defendants Adel Abdel Bary and Suleiman al Nalfi supports his claim that his conduct warrants a sentence of less than life. *See* Def. Mem. at 18-19. The record is clear, however, that the crimes of which

---

[10] Fawwaz erroneously contends that el Hage "served as the head of Al Qaeda's terrorist cell in Nairobi . . . through the time of the embassy bombings." Def. Mem. at 21. In fact, el Hage returned to the United States in September 1997 and never again traveled outside of the United States.

those defendants were convicted are as distinct from those of which Fawwaz stands convicted as was the scope and nature of the conduct that led to their convictions. Accordingly, the Court should not consider these individuals as "similarly situated defendants," and should sentence Fawwaz well beyond the sentences that these two men received.

### a. Adel Abdel Bary

Fawwaz first cites the example of Adel Abdel Bary. In support of his argument, Fawwaz notes that Bary was "charged with 279 substantive counts, including 224 counts of murder," and was sentenced to only 25 years' imprisonment pursuant to a plea agreement." Def. Mem. at 18-19. Fawwaz's attempt to cast Bary as "a defendant[] with [a] similar record[] who ha[s] been found guilty of similar conduct," *see* 18 U.S.C. § 3553(a)(6), falls flat and should be rejected by this Court.

As an initial matter, Bary was not convicted of the 279 substantive counts or any of the 224 individual counts of murder with which he had been charged. To the contrary, Bary pleaded guilty to three terrorism-related counts related to his dissemination of the claims of responsibility for the bombings and his conspiracy with Eidarous and Zawahiri to kill Americans. While these are serious offenses, they carry a combined total offense level of 25 years. *See* S15 98 Cr. 1023 (LAK) Docket Entry No. 1719 (Bary Information). By contrast, Fawwaz stands before this Court convicted after trial of four conspiracy counts, three of which carry maximum sentences of life imprisonment, and one of which carries a mandatory minimum sentence of 20 years' imprisonment. The potential sentencing disparities between their crimes of conviction are therefore very substantial.

And this is for good reason: the difference in the conduct that resulted in each defendant's convictions mirrors the difference in their sentencing exposures. For example, there was no evidence that Bary participated in any military training, let alone led an al Qaeda (or EIJ)

military training camp. While each of the cooperating witnesses identified Fawwaz and was able to describe the roles he played in the charged conspiracies, none of the cooperating witnesses was able to identify Bary. Moreover, the al Qaeda membership list contained no reference to Bary, and Bary's voice was not captured on any of the intercepted telephone calls between the London cell and al Qaeda's and EIJ's leadership in Afghanistan. Indeed, whereas Fawwaz had direct and frequent contact with al Qaeda's highest-ranking leadership in Afghanistan, the evidence showed that Bary communicated with EIJ leadership rarely, and then generally through his direct supervisor in London, Ibrahim Eidarous.

Lastly, and in direct contrast to Fawwaz, there was evidence that showed that Bary's commitment to EIJ and its goals – particularly insofar as its alliance with Usama Bin Laden was concerned – vacillated over time. As the Court is aware, in the run-up to the August 1998 bombings, Bary authored a letter in which he announced his intention to renounce EIJ and its goals. *See* Ex G ("Sharia never told us to kill a human being just because of nationality, American, French, or others"); *id.* ("If I find out that any action was done in association with the contractor [Bin Laden], I will never deal with the company [EIJ] or with the Dr. [Zawahiri] again. Honestly saying; our project is with the regime in Egypt. Our project has nothing to do with the ideas of the contractor, and everybody agrees to that."). In a similar vein, other documents showed that Bary had fallen out of the good graces of EIJ leadership, was not viewed favorably by other EIJ members located outside of London, and was not considered to be a trusted member of EIJ.

There is no such evidence with regard to Fawwaz. Quite the opposite. The intercepts show that throughout his time in London, Fawwaz remained a trusted and senior member of al Qaeda. In late 1997, when the Nairobi cell was concerned for its security, Fawwaz was the first

person they reached out to. *See* GX 300A-T; GX 246-T (August 2, 1997 fax from Harun Fazul to Fawwaz). Toll records show that Fawwaz was in close, near constant communication with Atef. Indeed, the transcripts of the intercepted communications show that not only was Fawwaz in direct communication with al Qaeda's senior-most leaders, but even after the February 1998 fatwa had issued, he remained joined in common cause with them, and worked in furtherance of that cause: the murder of Americans, civilian and military alike.

Lastly, Bary – unlike Fawwaz – took responsibility for his actions and the murderous consequences of those actions. Fawwaz attempts to minimize this significant difference, arguing that the "fact that Bary pleaded guilty is irrelevant to the disparity analysis," because there "is no moral justification for punishing Mr. Al Fawwaz more harshly for exercising his right to a trial by jury." Def. Mem. at 19. If that were true, then there would be no moral justification for a significant, and frequently used, provision of the Sentencing Guidelines that provides for just such a discrepancy in recommended sentences. *See* U.S.S.G. § 3E1.1(a) (two-level reduction for acceptance of responsibility); § 3E1.1(b) (providing for a further one-level reduction if the defendant "by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently"). *See also United States* v. *Araujo*, 539 F.2d 287, 292 (2d Cir. 1976) ("A show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial." (internal quotation marks omitted)) (quoting *United States v. Thompson*, 476 F.2d 1196, 1201 (7th Cir.), *cert. denied*, 414 U.S. 918, 38 L. Ed. 2d 154, 94 S. Ct. 214 (1973)). Moreover, it is not the fact of a plea versus the conviction after trial alone that makes them different. Bary provided a thorough plea allocution, and reaffirmed that plea allocution at his sentencing

hearing. In that allocution, he took full responsibility for his actions, admitted to what he had done, and admitted that he was part of a conspiracy that resulted in the deaths of 224 innocent people.

How does that compare to what Fawwaz has done here? It is precisely the opposite. The difference between Bary's acceptance of responsibility for his crimes and Fawwaz's continued claims of innocence is a factor that this Court can and should consider. As noted above, unlike Bary, Fawwaz has shown no remorse for his crimes and continues to deny that his actions in any way were wrong.

### b. Suleiman al Nalfi

Similarly inapposite is Fawwaz's comparison to Suleiman al Nalfi. Like Bary, the crime of which al Nalfi was convicted pales in comparison to the crimes with which Fawwaz stands convicted. And like Bary, al Nalfi pleaded guilty.

But the disparities between his case and that of Fawwaz do not end there. Al Nalfi was convicted of a single count of a conspiracy to injure, interfere with and obstruct the national defense utilities of the United States by injuring and destroying national defense utilities and premises, in violation of Title 18, United States Code, Section 2155. *See* S11 98 Cr. 1023 (KTD). At the time of al Nalfi's guilty plea, that statute carried a statutory maximum sentence of ten years' imprisonment, which was the sentence that al Nalfi ultimately received.

Most tellingly, however, nothing about the crime of which al Nalfi was convicted had causing death, or intending to cause death, as an element. As a consequence, there simply is no comparison between the crime of which al Nalfi was convicted and those of which Fawwaz now stands convicted. As such, al Nalfi's sentence is not properly considered in evaluating sentences imposed upon similarly situated defendants.

### 3. Imposition of a Life Sentence Avoids Unwarranted Nationwide Disparities

Finally, as to nationwide disparities, a life sentence is never routine, but life sentences are regularly imposed in federal courts in cases like this one. Courts have often imposed such sentences on defendants convicted of participating in consummated terror plots as well as those that come close to completion. *See*, *e.g.*, *United States* v. *Mustafa Kamel Mustafa*, 04 Cr. 356 (KBF) (S.D.N.Y. 2015); *United States* v. *Faisal Shahzad*, 10 Cr. 541 (MGC) (S.D.N.Y. 2010) (life imprisonment for attempted bombing in Times Square, New York); *United States* v. *Mohammed Mansour Jabarah*, 02 Cr. 1560 (BSJ) (S.D.N.Y. 2008) (life imprisonment upon a guilty plea to conspiring to bomb U.S. Embassies in Singapore and the Philippines); *United States* v. *Zacarias Moussaoui*, 01 Cr. 455 (LMB) (E.D. Va. 2006) (life sentence for conspiring with respect to the attacks of September 11, 2001); *United States* v. *Richard Reid*, 02-10013-WGY (D. Mass. 2003) (three life sentences upon a guilty plea to attempting to destroy with explosives an in-flight commercial aircraft); *United States* v. *Mohammed Salameh, et al.*, 93 Cr. 180 (KTD) (S.D.N.Y. 1999) (effectively imposing life sentences for 1993 bombing of the World Trade Center, which resulted in six deaths); *United States* v. *Terry Nichols*, 96 Cr. 68-m (D. Colo. 1998) (life imprisonment for conspiracy to bomb the Oklahoma City federal building; defendant acquitted of murder but convicted of manslaughter); *United States* v. *Abdul Hakim Murad, et al.*, 93 Cr. 180 (KTD) (S.D.N.Y. 1998) (life imprisonment plus 60 years imposed on each of two defendants for a conspiracy to bomb United States airliners in Southeast Asia); *United States* v. *Omar Abdel-Rahman*, 93 Cr. 181 (MBM) (S.D.N.Y. 1996) (life sentence for seditious conspiracy); *see also United States* v. *Timothy McVeigh*, 96 Cr. 68-m (D. Colo. 1997) (death sentence for the bombing of the Oklahoma City federal building, resulting in 168 deaths).

A recent example in this District, which was omitted from the defendant's catalogue of recent terrorism cases, serves to illustrate this point further. This Court imposed a life sentence

on Suleiman Abu Ghayth. *See United States* v. *Suleiman Abu Ghayth*, 98 Cr. 1023 (LAK). As the Court is aware, Abu Ghayth was convicted principally for serving as a spokesperson for al Qaeda in the wake of the attacks of September 11, 2001, conduct similar to a subset of Fawwaz's. In addition, Abu Ghayth – like al Fawwaz – appeared before this Court unrepentant for his crimes and defiant in the face of his conviction. And, as with Fawwaz, there was no claim that Abu Ghayth himself was a killer or a bomber, but rather that he performed other critical functions that furthered al Qaeda's success. Moreover, while Ghayth's conduct – which spanned from approximately July 2001 until in or about 2003 – was rooted in his efforts to spread al Qaeda's message by his own words, Fawwaz did much more. As described above, over the course of nearly a decade, Fawwaz performed many different functions for al Qaeda.

In the face of these precedents, the defendant argues that he is "less culpable than other defendants who have received sentences less than life." Def. Mem. at 21. On that ground, Fawwaz argues that sentencing him "to life imprisonment would also create an unwarranted disparity between him and other defendants who have received sentences of less than life for similar conduct." *Id.* Although the defendant cites an extensive list of sentences that are less than life imprisonment, which were imposed on defendants across the United States, *see* Def. Mem. 22-24, he fails to demonstrate any parity between the conduct at issue in those cases and his own. Indeed, even a cursory review of the sentences cited by Fawwaz demonstrates that the defendant's reliance on those sentences is misplaced, and the propriety of a life sentence in this case.

As an initial matter, many of the cases on which Fawwaz relies pertain to defendants who were convicted of providing material support and resources to foreign terrorists and/or foreign terrorist organizations in violation of Title 18, United States Code, Section 2339A and/or 2339B

(collectively referred to below as "material support"). As the Court is aware, the material support statutes carry a maximum penalty of 15 years' imprisonment. *See* 18 U.S.C. 2339A(a)(1) & 2339B(a)(1). Those cases, therefore, are inapposite; a sentence of life imprisonment was simply unavailable. Here, in contrast, the defendant was convicted of four conspiracies to commit terrorist acts, three of which carry maximum sentences of life.

Indeed, the defendant himself acknowledges that the material support cases to which he cites are inapposite insofar as they are based on charges different from those of which Fawwaz was convicted. *See* Def. Mem. at 14 ("A conviction under [18 U.S.C. 2339B] is far less likely to result in a life sentence.").[11] Nevertheless Fawwaz argues that "his conduct more closely resembles what today would be prosecuted under the material-support statute." Def. Mem. at 14 (citing 18 U.S.C. § 2339B).

The Court should reject this argument. Fawwaz was a member of al Qaeda for nearly a decade, not merely someone providing support to the organization. Indeed, he was a high-ranking member of al Qaeda, in regular contact with its leaders, an important source of advice on al Qaeda's media strategy, a member trusted to vet the journalists allowed to interview Bin Laden himself and number nine on a list of al Qaeda members found by the U.S. military in Afghanistan. *See* 2201A-T. As such, Fawwaz was a full-fledged member of the conspiracies he was convicted of participating in. The claim that he is appropriately viewed as one who provided material support to al Qaeda is simply wrong. Moreover, Congress has made plain its view that participating in the conspiracies Fawwaz participated in is far more serious than material support, as demonstrated by, *inter alia*, the gulf between the maximum penalties that

---

[11] This proposition is both unsurprising and unpersuasive in this context – a conviction for material support, which has a statutory maximum of 15 years' imprisonment, *see* 18 U.S.C. § 2339B – cannot, standing alone, "result in a life sentence."

can be imposed (*i.e.*, 15 years' imprisonment as opposed to life imprisonment) as well as the fact that at least one of the counts of conviction, by statute, required "written certification of the Attorney General or the highest ranking subordinate of the Attorney General with responsibility for criminal prosecutions that, in the judgment of the certifying official, such offense was intended to coerce, intimidate, or retaliate against a government or a civilian population." *See* 18 U.S.C. 2332(d) (limitation on prosecution).[12]

Accordingly, in order to avoid unwarranted sentencing disparities and to ensure that similarly situated defendants receive similar sentences, the Government respectfully submits that the Court should impose a sentence of life imprisonment here.

---

[12] Fawwaz's claim that for the period "from September 11, 2001, to September 11, 2008, the average sentence for a violation of 18 U.S.C. § 2332, the statute that Mr. Al Fawwaz was convicted of violating in Count I [*sic*], was 26 years," is misleading at best. *See* Def. Mem. at 22-23 (citing *Terrorist Trial Report Card: September 11, 2008*, NEW YORK UNIVERSITY SCHOOL OF LAW CENTER ON LAW AND SECURITY, at 1). The Court should disregard this statistic because the article cited by the defense provides no explanation as to how it calculated this "average sentence." Indeed, it is impossible to quantify in years the length of incarceration for those individuals currently under life sentences who are still alive, and therefore this statistic is meaningless. Moreover, this statistic very likely cuts against the defendant's argument. This is so because, in the past, as well as more recently, the publisher of this annual report typically has quantified each life sentence as if it were a sentence of 30 years. *See*, *e.g.*, *Terrorist Trial Report Card: September 11, 2001-September 11, 2011*, NEW YORK UNIVERSITY SCHOOL OF LAW CENTER ON LAW AND SECURITY, at 9, n.5; *Terrorist Trial Report Card: September 11, 2001-September 11, 2009*, NEW YORK UNIVERSITY SCHOOL OF LAW CENTER ON LAW AND SECURITY, at 13 (chart entitled "Average Sentences"). If that is the figure that was used to calculate the mean sentence for convictions for violations of 18 U.S.C. § 2332 in the report cited by Fawwaz, an average sentence of 26 years suggests that the vast majority of sentences imposed for such violations were life. In any event, because the report provides no insight on how that number was calculated, and does not indicate the number of life sentences actually imposed anywhere in the report itself, it is of little relevance to the issue before this Court.

**CONCLUSION**

Accordingly, for the foregoing reasons and for those set forth in the Probation Office's Presentence Investigation Report, the Government respectfully submits that a Guidelines sentence of life imprisonment is sufficient but not greater than necessary to achieve the goals set forth in Section 3553(a). Specifically, such a sentence is appropriate in view of the gravity of the offenses, promotes respect for the law, and provides just punishment for these serious offenses. In addition, such a sentence will deter others who may be similarly situated from engaging in similar criminal conduct, and protect the public from a defendant who has been convicted after trial of, among other things, conspiring to kill Americans and conspiring to destroy federal buildings and property by means of explosives.

Dated: New York, New York
      May 8, 2015

                                        Respectfully submitted,
                                        PREET BHARARA
                                        United States Attorney

By:  _/s/ Sean S. Buckley_____
            Sean S. Buckley
            Adam Fee
            Nicholas Lewin
            Stephen J. Ritchin
            Assistant United States Attorneys
            (212) 637-2261 / 1589 / 2337 / 2503